Flemming Zulack Williamson Zauderer LLP
One Liberty Plaza
New York, New York 10006
(212) 412-9500
Dean R. Nicyper, Esq. (DRN-7757)

Attorneys for Plaintiff Earl Davis

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ X
EARL DAVIS,                                                        :
                                                                  :    Index No. 07 Civ. 4165 (SHS) (DF)
                              Plaintiff,                           :
                                                                  :
           -against-                                              :
                                                                  :
                                                                  :
SALANDER O'REILLY GALLERIES LLC                                   :
f/k/a SALANDER O'REILLY GALLERIES INC.,                           :
and LAWRENCE B. SALANDER                                          :
                                                                  :
                              Defendants.                          :
------------------------------------------------------------------ X


# MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR
# A PRELIMINARY INJUNCTION AND EXPEDITED DISCOVERY



FLEMMING ZULACK WILLIAMSON ZAUDERER LLP
One Liberty Plaza, 35th Floor
New York, New York 10006
(212) 412-9500

Dean R. Nicyper, Esq.

Attorneys for Plaintiff Earl Davis


294391

## TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES ........................................................................... iii

PRELIMINARY STATEMENT ....................................................................... 1

FACTS ....................................................................................................... 3

   A.   The Parties' Twenty-Year Trust Relationship ........................................ 3

   B.   Signs Of Trouble At The Gallery, And Plaintiff's
       Requests That Sales Cease And All Works Be Returned ....................... 5

   C.   Further False Reassurances ................................................................. 7

   D.   Unreported Sales Revealed By Outside Sources .................................... 8

   E.   116 Works Either Are Unaccounted For Or Were Sold
       Without Payment To Plaintiff .............................................................. 9

   F.   Final Failed Efforts To Obtain The Works And Sales Proceeds .............. 10

   G.   Defendants Admit They Owe Plaintiff The
       Sales Proceeds At Issue ...................................................................... 11

   H.   While Owing Plaintiff Millions Of Dollars Of Trust
       Funds, Defendants Paid Millions Of Dollars To Others ......................... 12

ARGUMENT .............................................................................................. 12

   I.   BY STATUTE, PLAINTIFF ALONE IS ENTITLED
      TO HIS WORKS AND THE PROCEEDS FROM
      SALES OF HIS WORKS ..................................................................... 12

   II.   AN INJUNCTION IS NEEDED HERE TO PREVENT
      FURTHER IRREPARABLE HARM TO PLAINTIFF ............................... 14

      A.   Likelihood Of Success On The Merits ............................................ 16

      B.   Plaintiff Would Suffer Irreparable Harm And
          Extreme Damage If The Injunction Is Not Issued .......................... 18

# TABLE OF CONTENTS (cont'd)

                                                                                    PAGE

      C.    The Balance Of The Hardships Decidedly Tips
            In Favor Of Plaintiff ............................................................................... 20

   III.  PLAINTIFF IS ENTITLED TO EXPEDITED DISCOVERY ............................... 21

CONCLUSION ............................................................................................................... 25

## TABLE OF AUTHORITIES

PAGE

Cases

Ayyash v. Bank al-Madina,
   233 F.R.D. 325 (S.D.N.Y. 2005) ................................................................. 21, 22, 23

B.U.S.A. Corp. v. Ecoglaves, Inc.,
   No. 05 Civ. 9988 (SCR), 2006 WL 3302841 (S.D.N.Y. Jan. 31, 2006) ....................... 20-21, 23

Bronx Household of Faith v. Bd. of Educ. of New York,
   226 F.Supp.2d 401 (S.D.N.Y. 2002), aff'd, 331 F.3d 342 (2d Cir. 2003) ........................ 14, 15

Castle Creek Tech. Partners v. Cellpoint Inc.,
   No. 02 Civ. 6662 (GEL), 2002 WL 31958696 (S.D.N.Y. Dec. 9, 2002) ................................. 20

Columbia Broad. Sys., Inc. v. Am. Soc'y Of Composers, Authors And Publishers,
   320 F. Supp. 389 (S.D.N.Y. 1970) ...................................................................... 15-16

Delphine Software Int'l v. Elec. Arts, Inc.,
   No. 99 Civ. 4454 AGAS, 1999 WL 627413 (S.D.N.Y. Aug. 18, 1999) .................................. 22

Demolition Workers Union v. Mackroyce Contracting Corp.,
   No. 97 Civ. 4094 (LMM), 2000 WL 297244 (S.D.N.Y. Mar. 22, 2000) ........................... 14, 20

Green Party v. New York State Bd. of Elections,
   389 F.3d 411 (2d Cir. 2004) ...................................................................................... 14

Horizon Mktg. v. Kingdom Int'l Ltd.,
   244 F. Supp. 2d 131 (E.D.N.Y. 2003) .................................................................. 14, 15, 17, 20

Keybank Nat'l Ass'n v. Quality Payroll Sys., Inc.,
   No. CV 06-3013 (JS) (AKT), 2006 WL 1720461 (E.D.N.Y. 2006) ........................................ 24

Koeniges v. Woodward
   183 Misc.2d 347, 702 N.Y.S.2d 781 (Civ. Ct. N.Y. Co. 2000) ............................................. 13

Notaro v. Koch,
   95 F.R.D 403 (S.D.N.Y. 1982) ........................................................................... 22, 24

O'Keefe v. Bry,
   456 F. Supp. 822 (S.D.N.Y. 1978) ........................................................................... 15

OMG Fid., Inc. v. Sirius Techs.,
   239 F.R.D. 300 (N.D.N.Y. 2006) ............................................................................. 22

**<u>TABLE OF AUTHORITIES</u> (cont'd)**

<u>PAGE</u>

Pagliai v. Del Re,
No. 99 Civ. 9030 (DLC), 2000 WL 122142 (S.D.N.Y. Jan. 21, 2000)......................................18

Renaud v. Gillick,
No. C 06-1304 RSL, 2007 WL 98465 (W.D. Wash. Jan. 8, 2007)............................................23

Semitool, Inc. v. Tokyo Election Am., Inc.,
208 F.R.D. 273 (N.D.Cal. 2002) ...........................................................................................23

Standard Invest. Chartered, Inc. v. NASD, Inc.,
No. 07 Civ. 22014 (SWK), 2007 WL 1121734 (S.D.N.Y. Apr. 11, 2007)..............................22

Twentieth Century Fox Film Corp. v. Mow Trading Corp.,
749 F. Supp. 473 (S.D.N.Y. 1990) .........................................................................................24

Wesselmann v. Int'l Images, Inc.,
169 Misc.2d 476, 645 N.Y.S.2d 263 (Sup. Ct. N.Y. Co. 1996) ..................................16, 19, 20

Wesselmann v. Int'l Images, Inc.,
172 Misc. 2d 247, 657 N.Y.S.2d 284 (Sup. Ct. N.Y. Co. 1996) ..............................................13

Zucker v. Hirschl & Adler Galleries, Inc.,
170 Misc.2d 426, 648 N.Y.S.2d 521 (Sup. Ct. N.Y. Co. 1996) ................................................13

<u>Statutes</u>

CPLR 6301.................................................................................................................................16

N. Y. Arts and Cultural Affairs Law, § 11.01.3 (McKinney 1984)............................................13

N. Y. Arts and Cultural Affairs Law, § 12.01.1(a) (McKinney 1984 Supp. 2007)...............passim

Plaintiff Earl Davis ("Davis" or "Plaintiff") respectfully submits this memorandum of law in support of his motion for a preliminary injunction and expedited discovery against defendants Salander O'Reilly Galleries, LLC (f/k/a Salander O'Reilly Galleries, Inc.) ("SOR" or the "Gallery") and Lawrence B. Salander ("Salander") (SOR and Salander are referred to herein collectively as "Defendants").

## PRELIMINARY STATEMENT

Plaintiff is the son and heir of the well-known American artist Stuart Davis and owns hundreds of works of art created by his father. Plaintiff consigned hundreds of Stuart Davis works of art (the "Works") to Defendants' art gallery. Under Article 12 of New York's Art and Cultural Affairs law ("NYACA"), Defendants, as art merchants, are statutorily deemed to hold all of the Works they received from Plaintiff as "trust property ... for the benefit of [Plaintiff]" and hold all proceeds from sales of those works of art as "trust funds ... for the benefit of [Plaintiff]."

In addition to their significant monetary value, these important works of art created by Plaintiff's father have enormous non-monetary value to Plaintiff. In December 2005 and early 2006, Plaintiff repeatedly instructed Defendants to cease all sales of his Works and demanded that Defendants return to Plaintiff all unsold Stuart Davis works of art and deliver to Plaintiff all proceeds from sales of his Works. Defendants said they would do so, but Plaintiff recently learned that Defendants instead pledged at least fourteen of Plaintiff's Works as collateral to cover Defendants' own debts and sold other works outright without notifying Plaintiff or forwarding the sales proceeds to Plaintiff. Plaintiff also learned that Defendants have sold dozens of Plaintiff's Works over the past several years and never disclosed those sales or forwarded the sales proceeds to Plaintiff.

Under NYACA, Plaintiff alone is entitled to the Works he delivered to Defendants and Plaintiff alone is entitled to all proceeds from the sales of any of the Works. Defendants have no right, title or interest in those Works or sales proceeds from them. Defendants' only right is a contractual right for Plaintiff to pay Defendants an agreed-upon amount as a commission.[1]

One apparent reason Defendants have not returned Plaintiff's Works or paid him the statutory trust funds to which he is entitled is that, as Defendants recently asserted in court in another action, Defendants have "a liquidity crisis" and are concerned that their "house of cards will collapse." To avoid the collapse of their house of cards, Defendants have been using the cash they receive to pay other creditors. Because Defendants have failed to return Plaintiff's Works and pay him the proceeds from sales of those works, a court order is needed to prevent Defendants from further dissipating Plaintiff's unique Works of art and using his trust funds for Defendants' "liquidity problems."

In addition, Plaintiff has asked Defendants to provide account records and documents to determine what Works have been sold, the sale prices of sold Works, what Works are out on consignment and where, and what installment payments are still due. Defendants have failed and refused to provide such documents, other than a handful of invoices pertaining to only one-third of the Works. Discovery is therefore needed to obtain this crucial information.

For these reasons, Plaintiff respectfully requests that this Court issue a preliminary injunction: (1) enjoining Defendants from (a) selling or otherwise disposing of or encumbering any of the Works still in Defendants' possession or under their control; or (b) using any proceeds from sales of those Works for Defendants' own purposes; and (2) mandating that Defendants (a) retrieve and deliver to Plaintiff all unsold Works; (b) segregate in a separate bank account and

---

[1]    The commission rates agreed to by Plaintiff and Defendants were: For each painting, 20% of up to $1 million and 10% for proceeds in excess of $1 million; for each work on paper, 30% of up to $20,000 and 20% of amounts in excess of $20,000.

deliver to Plaintiff all proceeds that Defendants already have received from sales of Plaintiff's Works; and (c) segregate in a separate bank account and deliver to Plaintiff immediately upon receipt all incoming installment payments that constitute proceeds from prior sales of Plaintiff's Works. In addition, Plaintiff respectfully requests that this Court authorize expedited discovery to: (i) locate all of the Works and proceeds from sales of any Works; (ii) determine which of the Works have been sold and for what amount; (iii) identify all persons and entities that owe installment payments on any previously sold Works; and (iv) locate any of the Works that were improperly pledged as collateral by Defendants.

## FACTS

### A.    The Parties' Twenty-Year Trust Relationship

Plaintiff is the son of the well-known American artist Stuart Davis. (See Declaration of Earl Davis in Support of Motion for Preliminary Injunction and Expedited Discovery ("Davis Dec.") ¶ 1.) Plaintiff's father died in 1964. (Davis Dec. ¶ 4.) For decades, Plaintiff, as an heir of his father's estate, has actively managed the large collection of works of art that remained in the family after his father's death. (Davis Dec. ¶ 5.) These works of art have incalculable personal and emotional significance to Plaintiff. (Davis Dec. ¶ 3.)

Defendant Salander-O'Reilly Galleries, LLC (f/k/a/ Salander-O'Reilly Galleries, Inc.) ("SOR" or the "Gallery") is a well-known art gallery located just off Fifth Avenue in Manhattan. Individual Defendant Lawrence Salander ("Salander") is the Managing Director of SOR, and he directs and oversees the Gallery's operations directly and through others. See Complaint, a copy of which is attached as Ex. 1 to the Declaration of Dean R. Nicyper in Support of Motion for Preliminary Injunction and Expedited Discovery ("Nicyper Dec.").

Plaintiff and Defendants have had a business and trust relationship for more than twenty years. During that relationship, Plaintiff delivered hundreds of works of art created by his father (the "Works") to the Gallery for exhibition and possible sale. (Davis Dec. ¶ 6.)

The works of well-known artist Stuart Davis have significant value. But, because of the non-monetary significance of the Works to Plaintiff, Plaintiff made clear to Defendants that, although he delivered the Works to SOR for exhibition and possible sale, he did not want all of the Works to be sold. To the contrary, Plaintiff expressly informed SOR that, depending upon which of the Works might first become in demand, Plaintiff would want to keep at least some of the other remaining Works in his own collection. Plaintiff and Defendants had a long-standing practice of regularly reassessing the asking prices for these Works. In recent years, Plaintiff informed Defendants that he was to be notified prior to any of the Works being offered for sale to discuss whether to offer the individual work and, if so, the price at which it would be offered. (Davis Dec. ¶ ¶ 7, 8.)

Plaintiff and Defendants accordingly agreed that Defendants would offer a work for sale only after consultation with Plaintiff and only at prices expressly authorized by Plaintiff, and that, for such sales, SOR would be entitled to commissions as follows:

For each painting:

- 20% of sales proceeds up to $1 million.
- 10% of sales proceeds in excess of $1 million.

For each work of art on paper:

- 30% of sales proceeds up to $20,000.
- 20% of sales proceeds in excess of $20,000.

(See letter agreement between Salander-O'Reilly Galleries and Earl Davis, attached to Davis Dec. as Ex. 1.)

**B.    Signs Of Trouble At The Gallery, And Plaintiff's
        Requests That Sales Cease And All Works Be Returned**

In early 2005 -- more than twenty years into their business relationship -- Plaintiff began to see signs that the Gallery was having what appeared to be bookkeeping problems. He therefore asked the Gallery to print an inventory of the Works, listing the current prices for each Work. (Davis Dec. ¶ 10.) Plaintiff also requested that Defendants verify the location of each of the Works. (Davis Dec. ¶ 11.) Weeks later, in response, Defendants' Registrar told Plaintiff that he personally had confirmed the location all of the Works in the Gallery's storage facilities and assured Plaintiff that "everything was in order." (Davis Dec. ¶ 12.) Defendants' assurances later proved to be false.

On November 30, 2005, Defendants sold four of the most significant works remaining in Plaintiff's collection (the "4-Paintings Sale") without informing Plaintiff of the sale and without confirming the sale prices. When Defendant Salander finally notified Plaintiff after the sale, Plaintiff demanded that the sale be rescinded. Salander told him it could not be. Salander initially said that the sale price of $2,700,000 was to be paid in installments over three years (Davis Dec. ¶ 14), but later represented that the installment payments were to be made over four years in 48 monthly payments. (Id.) If Salander's latter statement is true, more than two years of such installment payments for the 4-Paintings Sale are yet to be paid.[2]

After learning that he had not been consulted about a major sale, Plaintiff told the Gallery in the first week of December 2005 to cease selling his Works. (Davis Dec. ¶ 16.) In January 2006, Plaintiff repeated this instruction, specifying that the Gallery must "clearly freeze any further offerings of sales," and he demanded "the immediate return of all [Plaintiff's] inventory"

---

[2]    From time to time Defendants sold other Works on a similar installment payment basis. Plaintiff does not have information identifying which of Plaintiffs' Works were recently sold on an installment basis or what installment payments are still outstanding. (Davis Dec. ¶ 15.) Discovery is necessary to determine this information.

of Works. (Davis Dec. ¶ 17 and Ex. 2.) Salander assured Plaintiff in person that sales would cease and the Works would be returned. (Davis Dec. ¶ 18.)

To further reassure Plaintiff, Salander represented (falsely) in an e-mail that: "I will pay you in full whatever it is you think I owe you…. I am prepared to live without my commission deducted or even more (within reason). I will pay in full on or before December 31, 2006." (Davis Dec. ¶ 19 and Ex. 2.) Contrary to Salander's promise, Plaintiff received no proceeds from the 4-Paintings Sale.

In May 2006, Salander told Plaintiff that many of the Works were out of the Gallery at framers, restorers, on consignment, or "on approval" with potential buyers. Until then, Plaintiff had not been aware that so many of the Works would be out of the Gallery. (Davis Dec. ¶ 21.) Plaintiff therefore asked the Gallery for a full inventory identifying the location of each of the Works, and instructed Defendants to arrange for all to be returned. (Davis Dec. ¶ 22.)

Rather than focus on preparing an inventory and returning the Works, Defendants arranged the sale of another Stuart Davis painting, titled *Punchcard Flutter,* for $2,250,000 and the sale of 12 other Stuart Davis works of art for $650,000 (the "Two Sale Agreements"). (Davis Dec. ¶ 23.) Defendants induced Plaintiff to accept the Two Sale Agreements by Salander's falsely representing the sale price and promising immediate payment. (Davis Dec. ¶ 24.) After concluding the sales, Salander claimed that the buyers had not paid, but he nonetheless released the works to the buyers. (Davis Dec. ¶ 25.) For months, Defendants repeatedly promised to pay Plaintiff, but never did. (Davis Dec. ¶ 26.)

On May 31, 2006, Plaintiff repeated his instruction to the Gallery to cease all sales: "I want Everyone involved in sales of my father's work at the gallery to be clearly and unambiguously notified that I wish to Completely Suspend any and all offerings of such works

for sale until after such time that they have each been physically returned to my possession and a more reliable system of accounting and record keeping has been established at the gallery." (Davis Dec. ¶ 27 and Ex. 3 (emphasis in original).  See also Davis Dec. ¶ 28 and Ex. 4.)

## C.    Further False Reassurances

By mid-June, Plaintiff still had not been paid any proceeds from the 4-Paintings Sale or the Two Sale Agreements.  To temporarily mollify the growing concerns Plaintiff increasingly was expressing, Salander, without any prior discussion with Plaintiff, handed Plaintiff a stack 24 post-dated checks (each in the amount of $222,083) on June 21, 2006.  The checks were to pay over a 24-month period the debt that Defendants had disclosed to Plaintiff as of that date, namely the proceeds from: the 4-Paintings Sale; the Two Sale Agreements; and two partnership transactions Plaintiff and Defendants had entered into.[3]  (Davis Dec. ¶ 29.)  Surprised to be handed the checks without his agreeing to them, Plaintiff told Salander he did not want a 24-month payout.  In response, Salander said the checks were merely to serve as back-up security for Plaintiff and reassurance that Defendants planned to pay.  (Davis Dec. ¶ 31.)  Only three of the checks eventually cleared.

In June 2006, Defendants finally began to return some of Plaintiff's Works.  In nine separate deliveries to Plaintiff between June 1, 2006 and January 11, 2007, Defendants returned 102 of 218 outstanding Works.  (Davis Dec. ¶ 32.)  Although beginning to receive some of the Works was somewhat comforting to Plaintiff, he later learned when the returns ended in January 2007 that the returns included very few paintings and for the most part were the least significant and least valuable Works.  (Id.)

---

[3]    The two partnership deals were entered into in 2003.  Pursuant to those deals, Plaintiff and Defendants jointly purchased a Courbet painting and a pair of bronze sculptures.  (Davis Dec. ¶ 30, and Ex. 5.)  In accordance with their agreement, Defendants were to have paid Plaintiff $400,000 in June 2004 and pay $560,000 in August 2004. Id.

After months of Plaintiff's repeated requests, Defendants finally produced an inventory listing all of Plaintiff's Works in late July 2006. (Davis Dec. ¶ 33.)  (See list provided by SOR to Plaintiff in late July 2006 (the "2006 List"), attached as Ex. 6 to the Davis Dec.)  The 2006 List identified 124 Works which, at that time, had not been returned to Plaintiff.  In the 2006 List, Defendants represented to Plaintiff that 103 of the 124 Works listed were out on consignment with other galleries or dealers, eight others were either on consignment or on approval with various private collectors or museums, nine purportedly were in SOR's possession, and four were missing.  The 2006 List did not disclose that any of the 124 listed Works had been sold.  To the contrary, Gallery officer Andrew Kelly handwrote on the 2006 List the last agreed-upon prices at which the Gallery would offer each of the listed Works and the years in which those prices had been agreed to.  (Davis Dec. ¶ 34.)

**D.    Unreported Sales Revealed By Outside Sources**

In mid-September through October 2006, however, Plaintiff discovered from people not associated with Defendants that several of the Works designated in the 2006 List as out on consignment in fact had been sold without any of the proceeds being forwarded to Plaintiff. Specifically, a Gallery client, Joseph Carroll, told Plaintiff that he owned 10 of the Works. (Davis Dec. ¶¶ 36, 37.)  In addition, a show at the Whitney Museum included two of the Works listing their owners as someone other than Plaintiff.  (Davis Dec. ¶ 37.)  Finally, another art gallery was selling five of the Works.  (Id.)  Plaintiff also learned from a lawyer who represented the person who bought *Punchcard Flutter* that the buyer had paid an intermediary dealer in full for the painting on June 1, 2006 and that the dealer had paid the Gallery in full on June 2, 2006 (contrary to Salander's claim that the Gallery was not paid for *Punchcard Flutter*).  When

Plaintiff confronted Salander with these previously undisclosed, apparent sales, Salander feigned surprise and stated that he would look into it. (Davis Dec. ¶¶ 38, 39.)

In November 2006, after the checks Salander handed to Plaintiff in June cleared for the first three months, the Gallery's accountant told Plaintiff not to deposit any more checks because they were unlikely to clear. (Davis Dec. ¶ 41.)[4] In addition, in mid-December 2006, a high-level Gallery employee informed Plaintiff that the Gallery had sent letters for return of Plaintiff's Works to only four of the numerous people and entities that the 2006 List described as consignees of the Works. When Plaintiff reiterated to Salander that the letters must be sent, Salander threatened to go on the attack against Plaintiff if he made any statements to anyone that Salander might consider to be damaging to his reputation. (Davis Dec. ¶ 42.)

**E.    116 Works Either Are Unaccounted For
Or Were Sold Without Payment To Plaintiff**

The Gallery continued to return Works until January 11, 2007. When the returns ceased, 99 Works were not accounted for. (Davis Dec. ¶ 43.) An updated inventory list Defendants delivered to Plaintiff, dated January 4, 2007 (the "January 4, 2007 List") provided a horrifying explanation. In stark contrast to the 2006 List, which had identified 124 of the Works and their locations, the January 4, 2007 List identified only 73 of the Works and now reported that *all 73 had been sold*. (Davis Dec. ¶ 43 and Ex. 8.) For those 73 Works, the January 4, 2007 List provided dollar amounts that purportedly represented the prices for which the 73 Works were sold. If accurate, the January 4, 2007 List indicates that Defendants received a total of $9,378,875.00 in sales proceeds for those 73 Works (some portion may be owed in installment payments).

---

[4]    The checks that did clear were only sufficient to cover the Defendants' debt for the two partnership deals they had entered into in 2003. The cleared checks did not compensate Plaintiff for any of the Works at issue in this action.

When Plaintiff asked about the location of his other Works, Defendants provided several revised lists, culminating in a revised list dated February 2, 2007 (the "February 2, 2007 List"). (Davis Dec. ¶ 44 and Ex. 9.) The February 2, 2007 List identified 116 works, comprised of the 99 Works that were not returned, plus the Works in the 4-Paintings Sale and the 12 Works Sale, plus *Punchcard Flutter*. The list included sales information for the same 73 Works listed as sold in the January 4, 2007 List, but not for the other 43 Works. It is unclear whether those 43 Works have been sold, are at the Gallery or are elsewhere. If accurate, the lists suggest that many of the 43 Works may be at locations other than Defendants' premises.

The lists reveal that many of the previously undisclosed sales took place *several years ago*. (Davis Dec. ¶ 44.) For years, therefore, Defendants withheld Plaintiff's trust fund sales proceeds. Defendants have never paid any of the $9,378,875.00 in sales proceeds to Plaintiff. (Davis Dec. ¶ 45.)

Not only did Defendants sell Plaintiff's Works without consulting him and without paying him, but Defendants also used Plaintiff's Works as collateral for Defendants' own debts. A recent search of Uniform Commercial Code ("UCC") financing statements revealed that in 2006 Defendants pledged at least fourteen of Plaintiff's Works as collateral to secure Defendants' own debt obligations. (See Ex. 9 to the Nicyper Dec.)

## F.    Final Failed Efforts To Obtain The Works And Sales Proceeds

When Defendants ceased returning Works in mid-January and produced lists in January and February identifying 116 Works -- 73 of which were sold without notice or payment and 43 of which are still unaccounted for -- Plaintiff lost faith in the trust he had relied on in his more than 20-year relationship with Defendants. He retained counsel and his counsel met with Salander over several weeks in March and April 2007 to negotiate alternative methods for

Defendants to make payments of at least some of the amounts Defendants owe to Plaintiff. (Nicyper Dec. ¶ 7.)

At one meeting, Defendants provided sales invoices, but for only 42 of the 73 sold Works, and a modified version of the February 2, 2007 List containing handwritten notes identifying those Works for which Defendants were producing invoices (the "Annotated List"). (See Nicyper Dec. ¶ 2, and Ex. 2 thereto.) Defendants said they were unable to locate invoices any other Works, even though the lists Defendants provided included sale prices for 31 other Works. (Nicyper Dec. ¶ 3.) Moreover, none of the invoices Defendants produced pertained to sales to Joseph Carroll (the Gallery client who told Plaintiff last fall that he had purchased 10 of Plaintiff's Works), even though Mr. Carroll recently contacted Plaintiff again this year and said that the Gallery did generate and provide invoices to him for those sales. (Davis Dec. ¶ 51.)

After the meetings between Plaintiff's counsel and Defendants failed to result in signed agreements (Nicyper Dec. ¶ 8), Plaintiff initiated this action.

**G.      Defendants Admit They Owe Plaintiff The Sales Proceeds At Issue**

Defendants have repeatedly acknowledged to Plaintiff that Defendants owe him all sales proceeds for all Works sold. For example, in a December 13, 2006, e-mail to Plaintiff, Salander stated: "The only thing that could stand in the way of paying you would be my death…. The fact is your trust was, is and will be well placed with me. You will get paid every cent you are owed." (Davis Dec. ¶ 48, and Ex. 10 thereto.)

In a March 12, 2007 e-mail to Plaintiff, Salander further stated: "So it comes down to money, and a lot of it. I have already promised you I will pay you every cent I owe you and as quickly as I possibly can…. You have the right to say, 'Yeah, but it's my money' – and that it is." (Davis Dec. ¶ 49, and Ex. 11 thereto.)

**H.    While Owing Plaintiff Millions Of Dollars Of Trust
Funds, Defendants Paid Millions Of Dollars To Others**

The Defendants' inventory lists show that Defendants sold many of the Works years ago

for millions of dollars in the aggregate, but none of those sales proceeds/statutory trust funds

were paid to Plaintiff. During that same time, Defendants went on a buying spree, acquiring art

with a price tag of more than $11 million. Court filings in cases brought by sellers against the

Gallery for its failure to pay in full for that artwork show that Defendants paid between

$4,436,443.10 and $6,138,550.60, or more, to others over the last couple of years, while

Defendants withheld from Plaintiff at least $9,378,875 of Plaintiff's trust funds. Their buying

spree ultimately led Defendants to declare in one of the cases that they had a "liquidity crisis"

and were concerned that their "house of cards will collapse." (Nicyper Dec. ¶ 5 and Ex. 8.)

## ARGUMENT

**I.    BY STATUTE, PLAINTIFF ALONE IS ENTITLED TO HIS
WORKS AND THE PROCEEDS FROM SALES OF HIS WORKS**

Article 12 of the New York Arts and Cultural Affairs Law provides in pertinent part:

(a) Whenever an artist or craftsperson, his heirs or personal representatives,
delivers or causes to be delivered a work of fine art, craft or print of his own
creation to an art merchant for the purpose of exhibition and/or sale on a
commission, fee or other basis of compensation, the delivery to and
acceptance thereof by the art merchant establishes a consignor/consignee
relationship as between such artist or craftsperson and such art merchant with
respect to the said work, and:

    (i)    such consignee shall thereafter be deemed to be the agent of such
consignor with respect to the said work;

    (ii)   such work is trust property in the hands of the consignee for the
benefit of the consignor;

    (iii)  any proceeds from the sale of such work are trust funds in the
hands of the consignee for the benefit of the consignor;

    (iv)  such work shall remain trust property notwithstanding its purchase
by the consignee for his own account until the price is paid in full
to the consignor; . . . and

(v)    no such trust property or trust funds shall be subject or subordinate to any claims, liens or security interest of any kind or nature whatsoever.

N. Y. Arts and Cultural Affairs Law ("NYACA"), § 12.01.1(a) (McKinney 1984 Supp. 2007).

The scope and strength of NYACA's trust fund provisions protecting artists and their heirs cannot be overstated. For example, in Zucker v. Hirschl & Adler Galleries, Inc., 170 Misc.2d 426, 648 N.Y.S.2d 521 (Sup. Ct. N.Y. Co. 1996), a gallery sought to hold a number of an artist's original works of art as collateral for loans made by the gallery to the artist. The artist did not dispute that he had received monetary advances from the gallery or that he owed money to the gallery. The court nevertheless denied the gallery's petition to hold the artist's works because "the statute expressly precludes any such security interest." Id. at 433, 526. The court instead ruled that "the Gallery shall return to plaintiff all such artwork in its custody, control or possession." Id. at 435, 527. See also Koeniges v. Woodward, 183 Misc.2d 347, 349, 702 N.Y.S.2d 781, 783 (Civ. Ct. N.Y. Co. 2000) (referring to prior summary judgment in the case ordering art gallery to return photographs to photographer under NYACA); Wesselmann v. Int'l Images, Inc., 172 Misc. 2d 247, 253, 657 N.Y.S.2d 284, 288 (Sup. Ct. N.Y. Co. 1996) ("Wesselmann I") (artist "Tom Wesselmann is entitled to the return from defendants of all art works created by him that are in defendants' possession, custody or control.... Such art works and the proceeds from sales of such art works are trust funds in the hands of defendants for the benefit of Tom Wesselmann.").

Here, Plaintiff is the heir of the well-known artist, Stuart Davis. (Davis Dec. ¶ 1.) As such, he owns hundreds of his fathers works of art and consigned hundreds of Works to Defendants. (Davis Dec. ¶ ¶ 5, 6.) Defendants are art merchants, as that term is defined in NYACA. See NYACA, § 11.01.3. As such, Defendants are required to hold all of the Works

they received from Plaintiff as "trust property . . . for the benefit of [Plaintiff]" and all of the

proceeds from sales of the Works as "trust funds . . . for the benefit of [Plaintiff]." Id. at §

12.01.1(a).

Under NYACA, therefore, Plaintiff alone has title in and all rights to the Works as well

as to all proceeds from sales of those Works. Only Plaintiff is entitled to possession of those

Works and the sales proceeds. Defendants have no rights in the Works themselves and no right

to the proceeds from sales of the Works. Defendants only have a contractual right for Plaintiff to

pay to the Gallery an agreed-upon commission. Defendants have absolutely no right to use the

sales proceeds for their own operations or working capital.

## II.    AN INJUNCTION IS NEEDED HERE TO PREVENT FURTHER IRREPARABLE HARM TO PLAINTIFF

A preliminary injunction should be issued under Rule 65 of the Federal Rules of Civil

Procedure where the moving party demonstrates: (1) irreparable injury if the injunction is not

issued; and (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious

questions going to the merits and a balance of hardships decidedly tipped in the movant's favor.

Green Party v. New York State Bd. of Elections, 389 F.3d 411, 418 (2d Cir. 2004); Bronx

Household of Faith v. Bd. of Educ. of New York, 226 F.Supp.2d 401, 411 (S.D.N.Y. 2002),

aff'd, 331 F.3d 342 (2d Cir. 2003); Demolition Workers Union v. Mackroyce Contracting Corp.,

No. 97 Civ. 4094 (LMM), 2000 WL 297244 (S.D.N.Y. Mar. 22, 2000) (granting injunction

requiring payment of funds).

Preliminary injunctive relief is particularly appropriate to enforce the rights of a

beneficiary of a statutory trust. See, e.g., Horizon Mktg. v. Kingdom Int'l Ltd., 244 F. Supp. 2d

131 (E.D.N.Y. 2003) (granting preliminary injunction restraining produce buyers from

dissipating assets that were part of statutory trust established for the benefit of produce sellers

under the Perishable Agricultural Commodities Act ("PACA"), finding that the statutory trust was "meant to ensure that sellers are paid in full from the proceeds derived from the re-sale of produce."). In <u>Horizon</u> -- a case involving a statutory trust under a statute parallel to the NYACA statute at issue here -- the court held that irreparable harm was "the risk that a produce buyer will have dissipated the PACA trust without paying the produce seller, thus leaving the produce seller out of luck and out of money." 244 F. Supp. 2d at 140. Likewise, irreparable harm under NYACA "is the risk that [an art merchant] will have dissipated the [NYACA] trust without paying the [artist or his heir], thus leaving the [artist or his heir] out of luck and out of money." The court in <u>Horizon</u> additionally found that the likelihood of success on the merits prong likewise is addressed easily in such statutory trust contexts where a plaintiff delivers goods to defendants but is not paid for those goods. <u>Id.</u> ("that plaintiffs are entitled to payment is not in dispute.").

Under a standard that differs somewhat from the standard for a restrictive injunction, a mandatory injunction is properly ordered where the moving party demonstrates "a clear or substantial likelihood of success on the merits, or that it will suffer extreme or very serious damage if denied preliminary relief." <u>Bronx Household</u>, 226 F. Supp. 2d at 411 (citations omitted). Preliminary mandatory injunctions for transfer of works of art are appropriate where the moving party has the sole ownership rights in the works of art. <u>See</u>, <u>e.g.</u>, <u>O'Keefe v. Bry</u>, 456 F. Supp. 822, 824 (S.D.N.Y. 1978) (referring to court's earlier granting of preliminary injunction motion requiring "all the relevant artworks [owned by artist Georgia O'Keefe] ... in [art agent's] custody be transferred to a safe place"). Courts also may grant mandatory preliminary injunctions to require the payment of money pending trial where warranted by "the circumstances and equities of the case." <u>See</u>, <u>e.g.</u>, <u>Columbia Broad. Sys., Inc. v. Am. Soc'y Of</u>

Composers, Authors And Publishers, 320 F. Supp. 389, 392 (S.D.N.Y. 1970) ("the

circumstances and equities of the case do render appropriate the granting of an injunction

ordering monetary payments pendente lite").

Applying the preliminary injunction standard in New York, which is substantially the

same as the standard applicable in this Court, the court in Wesselmann v. Int'l Images, Inc., 169

Misc.2d 476, 645 N.Y.S.2d 263 (Sup. Ct. N.Y. Co. 1996) ("Wesselmann II"), issued a

preliminary injunction in circumstances parallel to those here, applying NYACA:

> Plaintiffs have established their right to a preliminary
> injunction pursuant to CPLR 6301. They have shown a likelihood
> of success on the merits of the claim pursuant to the Arts and
> Cultural Affairs Law. Plaintiffs have demonstrated that it is likely
> that they will succeed in proving their claim that the Art is trust
> property in defendants' hands held for the benefit of plaintiffs.
> Plaintiffs' allegations that Karla has taken the Art that is the
> subject of this action out of the State of New York, that she is
> selling it, and that plaintiffs are owed money for past sales are
> uncontradicted. If Karla continues doing this it would render
> ineffectual the judgment compelling the return of the Art. It also
> appears that the MacKays may be unable to pay a judgment in
> plaintiffs' favor. A preliminary injunction compelling the
> placement of the Art in the hands of an independent third party
> while this action is pending will maintain the status quo and will
> not prejudice either party.

Id. at 482-83, 267.

As demonstrated below, this District's preliminary injunction standards are met in this

case, and we respectfully submit that this Court should issue the injunction Plaintiff seeks.

### A.    Likelihood Of Success On The Merits

As heir to the estate of well-known artist Stuart Davis, Plaintiff delivered the Works at

issue to the Gallery. Under NYACA, the Defendants hold those Works as "trust property … for

the benefit of [Plaintiff]" and hold "any proceeds from the sale of such [W]ork[s] [as] trust funds

… for the benefit of [Plaintiff]." NYACA, § 12.01.1(a). Since December 2005, Plaintiff

294391                                16

repeatedly demanded that Defendants cease offering any Works for sale, return all Works, and

deliver all sales proceeds to Plaintiff. (Davis Dec. ¶¶ 16, 17, 27, 28, 35, 40, 43.) Plaintiff alone

has all rights to possession of and title to such Works and the sales proceeds therefrom.

The inventory lists prepared by Defendants themselves demonstrate that 116 Works

delivered by Plaintiff to Defendants have not been returned to Plaintiff. (Davis Dec. ¶ 44 and

Ex. 9 thereto.) In those lists, Defendants claim to have sold 73 of those Works for a total of

$9,378,875. (Davis Dec. ¶ 46 and Ex. 9 thereto.) None of those sales proceeds have been

delivered to Plaintiff despite his numerous demands. (Davis Dec. ¶ 46.) The Gallery's

Managing Director, Defendant Salander, admits that Defendants owe the sales proceeds to

Plaintiff: "So it comes down to money, and a lot of it. I have already promised you I will pay

you every cent I owe you and as quickly as I possibly can…. You have the right to say, 'Yeah,

but it's my money' – and that it is." (Davis Dec. ¶ 49, and Ex. 11 thereto.)

The 43 other Works (*i.e.*, the 116 total missing Works minus the 73 Works Defendants

claim to have sold leaves 43 Works unaccounted for) have not been returned to Plaintiff despite

his numerous demands. Because Plaintiff alone is entitled to those 43 Works and the other 73

Works, and the $9,378,875.00 in proceeds from sales of those Works, and because Defendants

have failed deliver to Plaintiff the 43 Works and the other 73 Works or the $9,378,875 in sales

proceeds, there is a substantial likelihood that Plaintiff will succeed on his NYACA and replevin

claims (the only claims at issue in this motion). See, e.g., Horizon Mktg. v. Kingdom Int'l Ltd.,

244 F. Supp. 2d 131 (E.D.N.Y. 2003) (finding likelihood of success on the merits prong satisfied

where plaintiff delivered goods to defendant but was not paid, in violation of defendants'

statutory trust obligations).

**B.    Plaintiff Would Suffer Irreparable Harm And
Extreme Damage If The Injunction Is Not Issued**

The Works at issue in this case are unique, irreplaceable, important works of art created

by the Plaintiff's father, renowned artist Stuart Davis. Cf. Pagliai v. Del Re, No. 99 Civ. 9030

(DLC), 2000 WL 122142, at *1 (S.D.N.Y. Jan. 21, 2000) (finding that paintings are works of art

that are "unique and irreplaceable") (citations omitted). In addition to their significant value to

the art world in general, the Works have incalculable personal and emotional significance to

Plaintiff. (Davis Dec. ¶ 3 .)

Plaintiff already has been irreparably harmed by Defendants' dissipation of his Works.

Sources other than Defendants revealed to Plaintiff that Defendants sold several Works after

Plaintiff expressly instructed Defendants not to sell any more of the Works. The lists that

Defendants themselves prepared reveal that Defendants sold at least four Works after Plaintiff

instructed Defendants not to do so. (E.g., Annotated List (Nicyper Dec. Ex. 2), items Y-93, Y-

84A, O. 13, and O. 48.) Gallery client Joseph Carroll informed Plaintiff that he bought several

additional Works of Plaintiff's from the Gallery in 2006. (Davis Dec. ¶ 37.) As Defendants

have not provided invoices or sale dates for 77 of the Works, it is unclear how many other Works

were sold after Plaintiff instructed Defendants to sell no more of his Works.

Without the intervention of this Court, Plaintiff irreparably will lose more of his unique

Works of art. Defendants have neither returned nor accounted for at least 43 Works. (Davis

Dec. ¶¶ 45, 46, 50.) Nor have Defendants provided any sales records to support their claimed

sales of 31 of the 73 purportedly sold Works. If those 31 Works in fact were not sold, they must

be returned to Plaintiff. The recent search of UCC financing statements, revealing that

Defendants pledged at least fourteen of the Works as collateral for Defendants' own debts,

demonstrates Defendants' practice of using Plaintiff's Works for Defendants' own benefit

causing irreparable harm to Plaintiff. (Nicyper Dec. ¶ 6 at Ex. 9.) Defendnats' sale of 73 Works without paying Plaintiff demonstrates the same.

Given Defendants' repeated actions in disregard of NYACA and Plaintiff's rights to his Works, there is every reason to believe Defendants will continue to dissipate Plaintiff's Works absent an injunction from this Court. See Wesselmann II, 169 Misc.2d at 482, 645 N.Y.S.2d at 267 (mandatory injunction granted under similar New York standard where plaintiff artist demonstrated it was likely that art works in question were plaintiff's trust property under NYACA, and defendant was selling those art works and keeping proceeds).

Plaintiff will be further irreparably harmed by Defendants' dissipation of his sales proceeds. Despite Defendants' statutory obligation to hold the proceeds from sales of the Works in trust for the Plaintiff, and despite Defendants' admissions that they owe Plaintiff "money and a lot of it," Defendants have not paid any of the $9,378,875.00 in sales proceeds to Plaintiff. Yet, while their obligation to pay those sales proceeds has been outstanding, Defendants have used millions of dollars to acquire other works of art and relieve Defendants of their debts to others (see, supra, pp. 10, 18). In light of Defendants' admission that they have "a liquidity crisis" and are concerned that their "house of cards will collapse" (Nicyper Dec. ¶ 5 at Ex. 8), there is an enormous risk that, absent an injunction, the sales proceeds will be dissipated.

In addition, Defendants permitted certain purchasers to make installment payments for certain of the Works, including four of the most significant works in Plaintiff's collection (the "4-Paintings"). (Davis Dec. ¶¶ 14, 15.) Defendants have not paid to Plaintiff *any* of the installment sales proceeds, all of which constitute trust funds. (Davis Dec. ¶ 26.) Given Defendants practice of not delivering those installment proceeds to Plaintiff and given Defendants' "liquidity crises," Plaintiff may never recover his proceeds from past sales or the

294391

19

ongoing installment payments. See Horizon, 244 F. Supp. 2d at 140 (irreparable harm existed
where there was risk that trustee would continue to dissipate trust funds without paying entity for
which funds were held in trust, potentially "leaving the [trust beneficiary] out of luck and out of
money."); Castle Creek Tech. Partners v. Cellpoint Inc., No. 02 Civ. 6662 (GEL), 2002 WL
31958696, at *4 (S.D.N.Y. Dec. 9, 2002) (ordering delivery of stock shares because defendant
was "at the brink of insolvency" and there was an "actual and imminent threat" that defendant
would be unable to turn over the shares or otherwise satisfy the judgment); Demolition Workers
Union v. Mackroyce Contracting Corp., 2000 WL 297244, at *9 (S.D.N.Y. March 22, 2000)
(defendant's "apparently precarious financial condition" and substantial danger that disputed
funds may not be collectable, *inter alia*, were grounds for finding irreparable harm and issuing
preliminary injunction requiring amount in dispute to be paid to court registry). See also
Wesselmann II, 169 Misc.2d at 482, 645 N.Y.S.2d at 267 (granting a preliminary injunction
because "[i]f [defendant] continues [selling the art] it would render ineffectual the judgment
compelling the return of the [a]rt. It also appears that [defendants] may be unable to pay a
judgment in plaintiffs' favor.")

### C.    The Balance Of The Hardships Decidedly Tips In Favor Of Plaintiff

Even if Plaintiff could not demonstrate a likelihood of success on the merits -- which he
has -- an injunction nonetheless should issue because, at the very least, sufficiently serious
questions exist and the balance of hardships decidedly tips in favor of Plaintiff. As demonstrated
above, Defendants have no legitimate right, title or interest in the Works or their sales proceeds.
Defendants therefore will not suffer any hardship should they be prevented from continuing to
sell the Works, from using the sales proceeds for their own purposes, or from continuing to use
the Works as collateral for their own debts. See B.U.S.A. Corp. v. Ecogloves, Inc., No. 05 Civ.

9988 (SCR), 2006 WL 3302841, at *7 (S.D.N.Y. Jan. 31, 2006) (finding that balance of hardships favored plaintiff since injunction would prevent defendants from engaging in conduct "which they cannot do regardless of the injunction"). In contrast, if the preliminary injunction is not issued, Plaintiff will continue to lose his unique, irreplaceable works of art and the possibility of compensation for his losses. The hardships at issue here therefore are entirely one-sided favoring a preliminary injunction.

*     *     *

Accordingly, Plaintiff respectfully submits that this Court should issue a preliminary injunction: (1) enjoining Defendants from (a) selling or otherwise disposing of or encumbering any of Plaintiff's Works, and (b) using any proceeds from sales of those Works for Defendants' own purposes; and (2) mandating that Defendants (a) retrieve and deliver to Plaintiff all unsold Works, (b) segregate in a separate bank account and deliver to Plaintiff all proceeds that Defendants already have received from sales of Plaintiff's Works; and (c) segregate in a separate bank account and deliver to Plaintiff immediately upon receipt all incoming installment payments that constitute proceeds from prior sales of Plaintiff's Works.

## III.    PLAINTIFF IS ENTITLED TO EXPEDITED DISCOVERY

In circumstances such as those here, courts "assess [an expedited discovery] application under the flexible standard of reasonableness and good cause." Ayyash v. Bank al-Madina, 233 F.R.D. 325, 326-27 (S.D.N.Y. 2005) (noting that "it seems that the intention of the rule-maker was to confide the matter [of expedited discovery] to the Court's discretion" and that "it makes sense to examine the discovery request . . . on the entirety of the record to date and the *reasonableness* of the request in light of all the surrounding circumstances.") (internal quotation

marks and citations omitted) (emphasis in original).[5]  Specifically, to "obtain[] leave to engage in expedited discovery a party seeking discovery must establish to the court's satisfaction that the requests are reasonable under the circumstances." OMG Fid., Inc. v. Sirius Techs., 239 F.R.D. 300, 303 (N.D.N.Y. 2006) (internal quotation marks and citations omitted).

Expedited discovery is appropriate in many circumstances, including where the discovery is sought in aid of a preliminary injunction. See, e.g., Standard Invest. Chartered, Inc. v. NASD, Inc., No. 07 Civ. 22014 (SWK), 2007 WL 1121734 *2, 5-6 (S.D.N.Y. Apr. 11, 2007) (affirming Magistrate Judge Debra Freeman's partial grant of expedited discovery where plaintiff sought expedited discovery to "bolster its anticipated motion for a preliminary injunction"); OMG, 239 F.R.D. at 305 (granting expedited discovery, where it "is clear that plaintiff will potentially be unfairly prejudiced should [the court] not permit discovery to go forward since it will not have an early opportunity to develop evidence in support of such a motion [for a preliminary injunction]."); Delphine Software Int'l v. Elec. Arts, Inc., No. 99 Civ. 4454 AGAS, 1999 WL 627413, at *3 (S.D.N.Y. Aug. 18, 1999) ("Plaintiff's application for expedited discovery is granted.  Delphine is entitled to substantial discovery to enable it to proceed with a preliminary injunction hearing . . . .").

Here, expedited discovery is necessary to prevent the further transfer and loss of artwork and sales proceeds to which Plaintiff alone is entitled under NYACA.  Plaintiff's proposed discovery requests are narrowly tailored to address this immediate need in presenting his case

---

[5]    Courts at times have applied a different test for evaluating a request for expedited discovery, which was set forth in Notaro v. Koch, 95 F.R.D 403, 405 (S.D.N.Y. 1982).  That test, which was rejected in Ayyash, tracks the requirements for obtaining a preliminary injunction: "(1) irreparable injury; (2) some probability of success on the merits; (3) some connection between the expedited discovery and the avoidance of the irreparable injury; and (4) some evidence that the injury that will result without expedited discovery looms greater than the injury that the defendant will suffer if the expedited relief is granted." Id. (footnote omitted).  The court in Ayyash, however, found that "employing a preliminary-injunction type analysis to determine entitlement to expedited discovery makes little sense, especially when applied to a request to expedite discovery in order to prepare for a preliminary injunction hearing." Ayyash, 233 F.R.D. at 326-27 (citation omitted); Standard Invest., 2007 WL 1121734, at *5, n.4 (same).

for, and ensuring compliance with, a preliminary injunction -- namely, to (i) locate all of the Works; (ii) locate the proceeds from sales of any works; (iii) determine which of the Works have been sold and for what amount; (iv) identify all persons and entities that owe installment payments on any previously sold Works; and (v) locate any of the Works that were improperly pledged as collateral by Defendants -- before such Works and proceeds are forever out of reach.

This information will support and effectuate adherence to the requested preliminary injunction order. Indeed, without information identifying the status and location of the Works and arrangements for buyers' payment for the Works, Plaintiff cannot adequately determine to which Works and sales which portions of the preliminary injunction may apply. See, e.g., Renaud v. Gillick, No. C 06-1304 RSL, 2007 WL 98465, at *1-3 (W.D. Wash. Jan. 8, 2007) (finding good cause for expedited discovery by plaintiffs in suit to reclaim from defendant proceeds of sale of shares, where plaintiffs sought information from several third-party financial institutions as to money held in defendant's name, in aid of a temporary restraining order to prevent further disbursement). See also B.U.S.A. Corp., 2006 WL 3302841, at *8 (expedited discovery obtained at time preliminary injunction granted); Ayyash, 235 F.R.D. at 327 (granting expedited third-party discovery, in part because "there is considerable urgency to plaintiff's need to seek information about the location of defendants' possible assets within the United States").

Moreover, Plaintiff, on his own, has repeatedly and diligently sought information from the Defendants concerning the location, sales and status of the Works -- but to no avail. See Renaud, 2007 WL 98465, at *3 (finding request for expedited discovery appropriate because, in part, "[d]efendant has had notice of this inquiry but has failed to respond with the requested information."); Semitool, Inc. v. Tokyo Election Am., Inc., 208 F.R.D. 273 (N.D.Cal. 2002) (granting motion for expedited discovery which sought documents that Plaintiff repeatedly had

requested from defendant). Defendants responded to Plaintiff's requests for documents and information with false assurances and fictitious accounts, leaving Plaintiff to learn from others that Defendants sold Works after he instructed them to cease sales, that rather than paying Plaintiff his sales proceeds (trust funds) Defendants have been paying off the growing line of creditors at their door, and that Defendants even have pledged at least fourteen of the Works as collateral to secure their own debts. Given Defendants' admission in open court to a "liquidity crisis", see Nicyper Dec. ¶ 5 at Ex. 8, as well as their indisputable track record of improper use and transfer of Plaintiff's property, the "good cause" and reasonableness standard for expedited discovery is met here.[6]

Plaintiff respectfully requests that this Court authorize (1) immediate service of Plaintiff's Document Requests to Defendant SOR and Plaintiff's subpoenas to galleries and dealers to which Defendants sent Plaintiff's Works (see Nicyper Dec. ¶ 13 and Ex. 10); and (2) expedited discovery upon the issuance of the preliminary injunction to further: locate Works and proceeds from sales of any Works; determine which of the Works have been sold and for what amount; identify entities that owe installment payments on any previously sold Works; and locate Works that Defendants improperly pledged as collateral.

---

[6]    Expedited discovery is warranted here under the Notaro test as well. See Keybank Nat'l Ass'n v. Quality Payroll Sys., Inc., No. CV 06-3013 (JS) (AKT), 2006 WL 1720461, at *4-5 (E.D.N.Y. June 22, 2006) (finding that plaintiff had satisfied the standard for obtaining expedited discovery under either test); see also Twentieth Century Fox Film Corp. v. Mow Trading Corp., 749 F. Supp. 473, 475 (S.D.N.Y. 1990) (granting expedited discovery under the Notaro test). Plaintiff here already has shown, see supra Section II, irreparable injury and a likelihood of success on the merits. As for the third prong of the Notaro test, the expedited discovery sought is inextricably linked to the avoidance of irreparable harm, in that Defendants' continued unauthorized sales of Plaintiff's property and use of Plaintiff's property as collateral for their own debts has created a very real, palpable risk that Plaintiff's property, which has incalculable emotional significance as well as monetary value to Plaintiff, will soon be beyond his -- and this Court's -- reach. Accordingly, Plaintiff needs to know where the Works and sales proceeds are in order to forestall further dissipation of his property. Finally, with respect to Notaro's fourth prong, the potential irreparable injury looms far greater for Plaintiff than for Defendants if this discovery is permitted. Defendants have no right, claim or title to the Works, and cannot possibly suffer harm in being enjoined from doing that which they legally have no right to do -- injunction or no injunction.

## CONCLUSION

For all of the forgoing reasons, Plaintiff respectfully submits that this Court should (A) issue a preliminary injunction: (1) enjoining Defendants from selling or otherwise disposing of or encumbering any of Plaintiff's Works and from using any proceeds from sales of those Works for Defendants' own purposes; (2) mandating that Defendants retrieve and deliver to Plaintiff all unsold Works, and segregate in a separate bank account and deliver to Plaintiff all proceeds that Defendants already have received from sales of Plaintiff's Works; and (3) segregate in a separate bank account and deliver to Plaintiff immediately upon receipt all incoming installment payments that constitute proceeds from prior sales of Plaintiff's Works; and (B) authorize expedited discovery to: (i) locate all of the Works and proceeds from sales of any Works; (ii) determine which of the Works have been sold and for what amount; (iii) identify all persons and entities that owe installment payments on any previously sold Works; and (iv) locate any of the Works that Defendants improperly pledged as collateral.

Dated: New York, New York
        June 27, 2007

Flemming Zulack Williamson Zauderer LLP

By: _____
    Dean R. Nicyper (DN-7757)
    One Liberty Plaza
    New York, New York  10006
    (212) 412-9500
    Attorneys for Plaintiff Earl Davis