Exhibit 8

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


Saundra B. Lane,                )
            Plaintiff,          )
                                )
                                )
vs.                             )        CA No. 06-40178-FDS
                                )
                                )
Lawrence Salander and           )
Salander-O'Reilly Galleries,    )
LLC,                            )
            Defendants.          )


BEFORE:  The Honorable F. Dennis Saylor, IV


                    Motion hearing


                        United States District Court
                        Courtroom No. 2
                        595 Main Street
                        Worcester, Massachusetts
                        April 13, 2007


                Marianne Kusa-Ryll, RMR, CRR
                   Official Court Reporter
                United States District Court
                595 Main Street, Room 514A
                  Worcester, MA 01608-2093
                       508-929-3399
         Mechanical Steno - Transcript by Computer

```
 1    APPEARANCES:

 2    Nutter, McClennen & Fish, LLP
      World Trade Center West
 3    by Joseph F. Shea, Esquire
      155 Seaport Boulevard
 4    Boston, Massachusetts 02210-2699
      for the Plaintiff
 5
      Sugarman, Rogers, Barshak & Cohen
 6    By Anthony M. Doniger, Esquire
      101 Merrimac Street
 7    Boston, Massachusetts 02114
      for the Defendants
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    P R O C E E D I N G S

2

3           THE CLERK:  All rise.  Court is now open.  You may be

4     seated.

5           Case No. 06-40178, Lane versus Salander.

6           Counsel, please note your appearance for the record.

7           MR. SHEA:  Joseph Shea, representing the plaintiff,

8     Saundra Lane.

9           THE COURT:  Good morning.

10          MR. SHEA:  Good morning, your Honor.

11          MR. DONIGER:  Anthony Doniger, representing the

12    defendants, your Honor.

13          THE COURT:  All right.  Good morning.

14          All right.  This is a hearing on plaintiff's motion

15    for a temporary restraining order and renewed motion for

16    preliminary injunction.

17          I've reviewed the papers; and as far as I know, Mr.

18    Doniger, there's no opposition on file at this stage?

19          MR. DONIGER:  That's correct, your Honor.

20          THE COURT:  All right.  How do the parties wish to

21    proceed?  Should we -- I don't see anyone.  I don't expect

22    you're going to put on live testimony; is that right, Mr. Shea?

23          MR. SHEA:  I didn't anticipate it, your Honor, no.

24          THE COURT:  All right.  Mr. Doniger, do you expect any

25    live testimony?

1          MR. DONIGER:  No live testimony, your Honor.  I mean

2    there is -- there is really no dispute as to the facts.  I

3    think the issue that we are grappling with is how to fashion

4    appropriate relief that protects his client without throwing

5    this business into total disarray, and we can explain or at

6    least I can explain the situation, as I understand it.

7          THE COURT:  All right.  Why don't I let you lead off

8    then, and I'll let Mr. Shea respond.

9          MR. DONIGER:  As your Honor knows, this -- this matter

10   involves the sale of a painting by Mrs. Lane to Mr. Salander

11   and his gallery.  The payment schedule was -- was pretty pricey

12   installment payments, but this is a high-level gallery and a

13   high-level aspect of the art world.

14         Mr. Salander made payments, some late.  A -- a -- the

15   original note was renegotiated, and an amendment and allonge,

16   which is before you, which is an exhibit to Mrs. Lane's

17   affidavit.

18         THE COURT:  I'll confess I looked that up.  That was a

19   new word.

20         MR. DONIGER:  It's a new word to me.  Mr. Shea's law

21   firm travels in that world with great facility.

22         In any event, in February -- the February payment, a

23   check was sent.  There was some disarray in the gallery; the

24   CFO went out, and that -- that payment -- there were

25   insufficient funds, let's put it that way, backing that

1   payment.

2           Since then, two more payments were due, that is, a

3   March payment and an April payment, and they have not been

4   made; though, two days ago, Mr. Salander Federal Expressed to

5   Mrs. Lane a $500,000 check.  It was delivered yesterday to

6   her -- to her residence.  She's out of town.  I have with

7   me -- it was Federal Expressed to me this morning -- a

8   replacement check.  So that a $500,000 payment is there.  I

9   also have two postdated checks for a May and June payment; and

10  I offer them, and I talked to my -- my brother about them,

11  really as a show of good faith.

12          There is no question that under the terms of the

13  amendment and allonge, there has been an event of default.

14          The issue that we're all grappling with is to ensure

15  that Mrs. Lane gets paid.  Mr. Salander fully intends to and

16  will make payment.  He is -- he has a liquidity crisis, there's

17  no question about it.  There is a large banking facility, and

18  actually Mr. Shea informed me this morning, and he believes

19  there are three banking facilities sitting on the situation in

20  New York and watching things very carefully.

21          My greatest concern is that an order would issue from

22  this court that in some way, if it enjoined the ability of this

23  business to function, that is, to continue to buy and sell art,

24  because that is the only way he can get the revenue in to pay

25  Mrs. Lane, that the banking facilities will call things in and

1  shut it down, or that he simply won't be able to operate.

2        THE COURT:  Well, my understanding was that the

3  requested relief was for the return, or delivery, rather, of

4  certain paintings in which there was an express security

5  interest --

6        MR. DONIGER:  That's correct.

7        THE COURT:  -- isn't that right?

8        MR. DONIGER:  The so-called collateral; and frankly,

9  your Honor, I think that's where the focus should be, because

10  I -- I think the appropriate thing to have happen here is for

11  Mr. Salander to be ordered to turn over the collateral.

12        Now, there have been some issues with the collateral,

13  as you will see from the papers.  There were -- there was a

14  substitute collateral at one point for some of the original

15  collateral paintings, because Mr. Salander sold them.  There

16  was, as an item of collateral, the painting itself, the Sheeler

17  painting.  That has been sold, and is not available; and so

18  what Mr. Salander has done is offered to provide substitute

19  collateral to the satisfaction of Mrs. Lane and her appraisers

20  to ensure that security.  The appraisers --

21        THE COURT:  Was there an -- I'm sorry.  Was there an

22  Article 9 filing on the paining?

23        MR. SHEA:  This was, your Honor, on the painting and

24  any other collateral as well.

25        THE COURT:  All right.

aaf5ae08-dd0f-480e-95f8-f5ca55d8deba

1       MR. DONIGER:  That is -- that -- that may be an issue

2   for Mr. Salander and the purchasers down the road, and I

3   certainly don't speak to that, or make any representations

4   about that.  I simply want to point out to the court that that

5   painting is not available.

6       He has been fully prepared to make available

7   substitute collateral.  The appraisers went down there.  There

8   were some issues of what was there and what was not there; but

9   frankly, I think the appropriate thing is to order him to

10  produce the available -- the available collateral and

11  substitute collateral for any of the collateral that is not

12  available to the satisfaction of Mrs. Lane and Mrs. Lane's

13  appraisers.  That way, at least the security, the contemplated

14  security for the -- for the payment of this note will -- will

15  be there.

16      The thing that I'm terribly afraid of is if any

17  additional injunctive relief were issued by way of either

18  freezing bank accounts, or restricting the use of the gallery's

19  bank accounts to payment of salaries, utilities, things like

20  that, as opposed to the buying and selling of art, the very

21  business that the gallery is in, then the -- the house of cards

22  will collapse, because that's the only way that he can go

23  forward and get this -- get this debt paid, which he honors,

24  and which he fully intends to pay.

25      So I -- my focus and my -- my plea to you is that we

aaf5ae08-dd0f-480e-95f8-f5ca55d8deba

1    focus on the collateral and get him to produce the collateral.

2    He'll send it to -- to Nutter; and, you know, Mr. Shea can hold

3    onto it.  That's not -- that's not the issue.

4         THE COURT:  But the only identified collateral, that

5    is, the six or so works of art, the only collateral presently

6    in the -- in the possession of Mr. Salander, or the gallery,

7    are these two Albert Pinkham Ryder paintings; is that right?

8         MR. DONIGER:  I think that's right.  I think there may

9    be -- I think there were -- a couple of the other items are

10   there, but they were not available at the time the appraiser

11   went to inspect them, and I -- I don't know the exact details.

12   There is an e-mail from Mr. Salander that I forwarded on to Mr.

13   Shea that explains that.  It, again, is in one of the exhibits

14   to Mrs. Lane's affidavit.

15        THE COURT:  All right.  Mr. Shea.

16        MR. SHEA:  Your Honor, if I can first turn to the

17   collateral, since that seems to be the focus, and also the --

18        THE COURT:  Well, it's part of the focus.  I mean it's

19   the easiest piece of it, let's put it that way.

20        MR. SHEA:  The relief we prayed for actually had three

21   parts.  One was to limit payments out of this bank account to

22   trade debt, salaries, utilities, that kind of thing, to make

23   sure there's enough money there.

24        The second piece was not to dissipate any of the

25   assets of this gallery, which I presume are paintings and objet

aaf5ae08-dd0f-480e-95f8-f5ca55d8deba

1    d'art.

2         And third, we want the delivery of the collateral.

3    Now, Mr. Doniger has proposed that, in effect, substitute

4    collateral be provided.  In principal, of course, we have no

5    problem with that.  We don't want to be oversecured.  We don't

6    want to cause any harm unnecessarily, but I do want to -- if I

7    may, just touch briefly on the history of the collateral here,

8    and why I'm a little skeptical, frankly, about the proffer of

9    the collateral.

10        First, the greatest piece of collateral, the most

11   valuable piece of collateral was the painting that we

12   sold -- my client sold to the gallery.  We had a security

13   interest, and we recorded it, and that painting is gone.  We

14   don't know how much money was paid to the gallery for it, but

15   we didn't get it, so our main piece of security is gone.  As to

16   the remaining --

17        THE COURT:  And, presumably -- I'm just sort of

18   thinking ahead here.  If it came to that, obviously, you could

19   require Mr. Salander to indicate what happened to the painting;

20   and if those -- if whoever bought it took it in light of the

21   Article 9 filing, at least you would have rights against that

22   person, right, I mean assuming it's --

23        MR. SHEA:  This is -- this a little bit outside of my

24   bailiwick, but I am informed, your Honor, that there is an

25   exception in the UCC for dealers, and that certainly without

1    making any kind of traditional admission, it might be a tougher

2    road to hoe than it otherwise would be --

3         THE COURT:  All right.

4         MR. SHEA:  -- because of the fact that Mr. Salander is

5    a dealer, but, yes, that's something we are very, very

6    interested in.

7         THE COURT:  And, of course, if it's in arid shape, or

8    something, you may have another set of problems, but --

9         MR. SHEA:  Right.  Then as to the remaining

10   collateral, we first got a representation from Mr. Salander,

11   his gallery, as to the value of the additional collateral in

12   February of this year, and that is an exhibit to Ms. Lane's

13   supplemental affidavit.  That indicated that one of the Ryders

14   had a value of $2 million; and the other Ryder had a value of

15   $1.5 million.  We had an appraiser, whose affidavit was filed,

16   who viewed those -- went to view all of the collateral, was

17   told after being given a bit of a run around, was told that

18   these were the only two pieces available.  They weren't at the

19   gallery.  They were at Mr. Salander's house.  And she viewed

20   them, photographed them, did whatever it is that appraisers do,

21   and subsequently tried to get a certificate of authenticity

22   from the Ryder expert at the Smithsonian, who refused to give

23   it; therefore, she has concluded these things have essentially

24   no value.  They can't be sold as Ryders.  They can be sold as

25   attributed to Ryder, and it's a de minimus value that they're

1    going to have on the market.

2            And then subsequently, and this -- I was able to file

3    this unfortunately only yesterday.  My client received a notice

4    from an attorney in Dallas, Texas, saying that in effect there

5    was going to be a public sale of collateral for some debt.

6    We're unaware of the nature of the debt, to a large amount

7    of -- it was a debt, and it was going to be secured by a large

8    number of paintings owned by the gallery and by Mr. Salander,

9    and that sale was going to occur on May 25th.

10            I spoke to Mr. Doniger about that, and I

11    also -- somebody in my office was able to call the -- a person

12    conducting the auction this morning and was informed that

13    apparently payment is going to be made, so that sale is not

14    going to go forward.  And I want to make that clear.  I didn't

15    learn that until this morning, but I still think it's a

16    significant fact when we're considering the reliability, as it

17    were, and the ability to pay this debt as it comes due of the

18    gallery and of Mr. Salander.  He's playing it close enough to

19    the flame that public sales are being scheduled; although in

20    this particular case, apparently that sale is going to be

21    continued, because the debt is going to be paid.

22            All of that makes me very, very skeptical about

23    accepting collateral, and I think what I would propose to the

24    court to consider is this:  If the court allowed the three

25    prayers and also allowed Mr. Salander and the gallery to

aaf5ae08-dd0f-480e-95f8-f5ca55d8deba

1  substitute collateral to the mutual satisfaction of the

2  parties, and also ordered that any such collateral that was

3  substituted was unencumbered, then I think that would be a

4  reasonable resolution, because, as we know with the Sheeler, we

5  went into the step of filing the UCC, and yet it didn't -- so

6  far it hasn't done us any good, because that painting was sold;

7  and if the parties were able to agree on substitute collateral,

8  if the court ordered that Mr. Salander and the gallery could

9  produce only unencumbered collateral, then I think that would

10  take care of my client's concerns, and I think it would take

11  care of the defendants' concerns.  It would allow them to

12  continue in business.

13      THE COURT:  So let me get this straight.  What you're

14  proposing is that I order the three types of relief you seek,

15  which is basically an injunction against dissipation inventory

16  or assets, an injunction against removing funds, except for

17  certain identified purposes, and transfer of whatever

18  collateral remains; and further providing that what -- that the

19  parties may agree on mutually satisfactory -- I'm trying to

20  think of how this works exactly.  If the parties agree on

21  substitute collateral, and the defendant represents that it's

22  not encumbered, then what, the injunction is off or --

23      MR. SHEA:  Well, the first three prayers would be off,

24  your Honor.  In other words, it would be A, B, C; or in the

25  alternative, D, and the alternative would be that the parties

1    agree on substitute collateral that will be transferred or

2    maintained by the plaintiff; and rather than a representation

3    from the defendant that this is unencumbered, I would ask the

4    court to order the defendant to put into the mix, as it were,

5    only unencumbered collateral.

6             THE COURT:  Mr. Doniger.

7             MR. DONIGER:  On the collateral issue, I do recall,

8    and I want to make sure this is on the record, the -- the

9    nature of the lending facilities that this gallery has may be

10   the kind in which the bank has a general security interest; and

11   in effect, the bank releases its security interest as and when

12   property is sold, so --

13            THE COURT:  So, there may be nothing out there in

14   which there is not a security interest?

15            MR. DONIGER:  Or that it may be something that has to

16   be negotiated with the bank.  It's -- or with these lending

17   facilities.  I don't know, but I just don't want to represent

18   to the court that it may be that there are, you know,

19   that -- the notion of something being encumbered is a broad

20   notion at this level of commercial dealings, and that is my

21   only concern, and I wanted to put that out there for the court.

22            The -- the real problem I have, or I should say the

23   biggest problem I have with the other two prayers for relief is

24   that they, in effect, will straightjacket this business.  The

25   prayer for relief that no inventory or anything be sold, well,

1    that's the business right there.  So that is a -- that shuts

2    down the business and makes it unable to function, makes it

3    unable to pay off the debts, to pay the banking facilities, and

4    it is a guarantee, I would assume, that the house of cards

5    collapses, because it forces the -- it forces the banks to come

6    in, because they won't be paid, and no one will be paid.  Not

7    only won't, you know, the other Mrs. Lanes, who are -- who are

8    out there.  That's my greatest concern.

9            THE COURT:  Well, it's a genuine concern, but what I'm

10   struggling with is the creditor has -- has certain rights; and

11   I think under the circumstances, and speaking loosely, they do

12   have the right to shut down the gallery at this point given the

13   current posture.  I can see why it's not in their interest or

14   the debtor's to do that, and it may drive the debtor into a

15   bankruptcy proceeding or -- or foreclosure by another creditor,

16   I don't know; but as I sit here, the real issue, from my

17   standpoint, seems to be does the creditor have these rights and

18   remedies; and if that's what the creditor wants to do is push

19   this over the edge, why should I not allow that, even

20   if -- even if I think it's a bad business decision?  Let's put

21   it that way.  I don't make business decisions.  I make legal

22   decisions.  And given that they did have a personal guarantee,

23   a collateral -- security in collateral that has been

24   dissipated, a history of payment problems, including ISF

25   checks, again, I don't know whether it's a good idea or a bad

aaf5ae08-dd0f-480e-95f8-f5ca55d8deba

1    idea.  I'm not in a position to make that judgment, but if the

2    creditor wants to knock over the house of cards, explain to me

3    why I shouldn't let them do that.

4              MR. DONIGER:  Well, I can -- I mean I understand.  I

5    shouldn't be asking you to make a business decision.  You're

6    quite right, it is the creditor who's making that business

7    decision.

8              Fundamentally, I would say --

9              THE COURT:  And this -- you know, this injunction may

10   be a defaulting -- it may itself be a default in bank lending

11   arrangements that may take this out of the creditor's hands.

12             MR. DONIGER:  Exactly.

13             THE COURT:  Right.

14             MR. DONIGER:  Exactly right.  The creditor under

15   these -- under these various papers, you know, has collateral,

16   has the right to proceed against the collateral, and I would

17   say to you that that is -- that is the remedy that the parties

18   contemplated.

19             THE COURT:  Except it has been dissipated.

20             MR. DONIGER:  Well, it has been.  I don't know -- I am

21   even more in the dark about UCC law than my brother here, but

22   that was the security interest that they took and perfected.

23   No effort has been made, as far as I know, to try and get that

24   collateral back; nor am I saying it's their burden at this

25   point to do that.  I think they are entitled to rely on the

aaf5ae08-dd0f-480e-95f8-f5ca55d8deba

1    fact that they have that perfected security interest, but I

2    would think that before -- before we entered this extraordinary

3    kind of relief, moving against the collateral is the

4    appropriate avenue, and it would be most appropriate for your

5    Honor to issue an order about the collateral.  I just think

6    it's an extraordinary -- an extraordinary reach and remedy

7    to -- to basically enter an order that by its terms shuts down

8    the business, because that is -- that is what this injunction,

9    if granted in the form proposed by the plaintiff would do, by

10   definition, and I would urge you not to do that, because I

11   think it is too extraordinary.

12            THE COURT:  Mr. Shea.

13            MR. SHEA:  Your Honor, my client has no desire to shut

14   down the business.  I think she has displayed a fair bit of

15   concern, frankly, for these debtors.  She does have a desire to

16   be paid.  She is an elderly widow, who views this as her

17   retirement money.  She wants to be paid.  I think she has,

18   again, demonstrated great restraint.  She will continue to do

19   that.  If there is a means that the parties can work out that

20   provides for her security, she'll take it; but we were here,

21   your Honor -- this case was filed in August.  We were here in

22   October.  We were told that the payments would be made.  They

23   haven't been.  Now, we're being told, "Well, the payments will

24   be made; and if they're not, our business might be in trouble."

25            The plaintiff is entitled to this relief; and if there

1   is a way that she could work it out with the debtor to minimize

2   the harm to him, she'll do it, but that's completely

3   independent of her entitlement to the relief.

4        THE COURT:  All right.  I'm convinced she is entitled

5   to the relief.  I guess to be technical about it, I am

6   convinced that she has a likelihood of success on the merits in

7   that she has demonstrated immediate irreparable harm.  I'm at

8   the balancing of the equities stage of the preliminary

9   injunction analysis; and just to be clear, there's, I think,

10  not the slightest doubt, based on the record, that there is

11  immediate irreparable harm in the sense that the defendant's

12  security for this debt has been -- the debt has not been paid,

13  and the security is -- a large part of it has been dissipated,

14  and what remains is of unclear value; and that there is a

15  likelihood of success on the merits given the fact that the

16  defendant acknowledges that the payments have not been made.

17        In terms of balancing the equities, let me ask this.

18  What if I gave you B and C, but not A?  I mean how is it -- if

19  I do -- if I order the relief that you seek in A, preventing

20  them from selling or moving any inventory or assets, how do

21  they stay in business as a gallery?

22        MR. SHEA:  Well, one thing they could do, your Honor,

23  would be in effect give us a veto over the transfers, but if

24  the representation is that they need this to continue the

25  business and preserve their ability as a going concern --

1        THE COURT:  Well, I would assume a gallery has got to

2   sell inventory -- I mean any business is going to have to sell

3   inventory, right, I mean --

4        MR. SHEA:  Yes, your Honor, although as we discussed a

5   moment ago, there was also the possibility of substituting the

6   collateral; and if we could reach that agreement, then I think

7   prayer A would not be necessary.  And I guess to answer

8   your -- the court's original question, if prayer B, assuming

9   that the money from the sales in prayer A flows into the

10  account referenced in prayer B, then I don't think it matters;

11  and if that would be helpful to the defendants then that would

12  be fine.  We would not need prayer A.  Again, assuming the

13  money is transferred into the account in prayer B, but

14  otherwise we don't know where the money is going.

15       THE COURT:  And would the term "trade debt" under B

16  include payment on any bank financing?  I mean assuming that

17  there is bank financing, and that the bank does have a security

18  interest in the collateral?

19       MR. SHEA:  That was my understanding.  I tried to

20  draft this to be relatively broad so we didn't have to get into

21  minutiae, but I thought of the things that I could think of.  I

22  knew they had rent.  I knew they had salaries.  But, yeah, the

23  regular trade, that I think would be included there, and I'll

24  represent that's my understanding of that prayer.

25       THE COURT:  All right.  Mr. Doniger, what if

1    we -- what if did it that way?  What if we said they are to

2    deliver what is deliverable under C, and -- and I put a

3    straightjacket on the funds such that -- so that payroll and

4    trade debts, including whatever financing obligations they

5    have, as well as rent, utilities and taxes and so forth can be

6    paid; but as artwork is sold, that the proceeds go into the

7    operating account and be subject to the injunction and not be

8    dissipated without further order?

9            Would that keep him alive?

10           MR. DONIGER:  Well, let me just throw out a couple of

11   situations that come immediately to mind, and let's see if that

12   would work.  He has other, not only bank debt, but other debts

13   to other Mrs. Lanes --

14           THE COURT:  Okay.

15           MR. DONIGER:  -- I have no doubt.

16           THE COURT:  Does he sell on consignment; do you know,

17   or --

18           MR. DONIGER:  Yes --

19           THE COURT:  All right.

20           MR. DONIGER:  -- I mean he sells on consignment.  As

21   long as I have been familiar with him and his operation

22   virtually everything is done on installments like this for

23   whatever reason.  That's just the way he has done -- carried on

24   his business.

25           So, he would be -- I fear he would be constrained by

aaf5ae08-dd0f-480e-95f8-f5ca55d8deba

1    Part B from paying those obligations, and that would trigger

2    the same problem.  On the other hand, if we recognize that

3    trade debt encompasses that, part of -- and very much part of

4    his business then I guess the only thing he would be prevented

5    from doing is going out and buying new -- getting new

6    inventory, you know.

7              THE COURT:  Or paying himself or --

8              MR. DONIGER:  Or paying himself, exactly.

9              THE COURT:  At least as a dividend.

10             MR. DONIGER:  I don't know how, you know, how

11   hamstrung that would make him, but it might be a situation

12   where, if that were the court's order, if he wanted to go out

13   and buy a new painting in order to sell it, we would have to

14   talk to, you know, Mr. Shea, and work something out about that,

15   I mean --

16             THE COURT:  Could I put a safety valve in there that

17   they are not to dissipate any funds without the express written

18   permission of Ms. Lane, or her counsel; in other words, that

19   would -- I don't want you running here to modify the

20   injunction, and I'm just -- I'm thinking out loud here,

21   obviously.

22             If the idea is to keep him in business while -- while

23   giving the plaintiff a grip on what assets remain, it seems to

24   me it would be in everyone's interest to have a safety valve

25   that the plaintiff could permit certain events to occur.

1        MR. DONIGER:  Uh-huh.

2        THE COURT:  So that you don't have to come and see me

3    every time something comes up.

4        MR. DONIGER:  Right.

5        THE COURT:  Mr. Shea, let me hear from you on this.

6        MR. SHEA:  The only thing I would add, your Honor, was

7    while Mr. Doniger and the court were talking, in regards to

8    prayer B, I thought perhaps the language after trade debt

9    including preexisting written obligations might be helpful

10   there to clarify that we're talking about written obligations,

11   and we don't have forgotten aunts and nieces, who are owed a

12   lot of money.  I'm picking up on the court's final point about

13   running back into court every few weeks.  In addition to that

14   general point, there is another thought I had, if, in fact, the

15   parties were able to reach an agreement on substitute

16   collateral, would the court be open to a stipulated injunction,

17   which we could file, the idea being --

18       THE COURT:  Yes.

19       MR. DONIGER:  -- would be along the lines of we have

20   reached that agreement.

21       THE COURT:  Yes, of course.

22       MR. SHEA:  Thank you.

23       THE COURT:  All right.  The other wrinkle in this,

24   just so that you know, because things may be moving quickly, I

25   am out of the country next week; and so if something needs to

aaf5ae08-dd0f-480e-95f8-f5ca55d8deba

Page 22

1    be done quickly, if I do something today, and it needs to be

2    modified, you're going to have to go to the emergency judge. I

3    don't know who that is, but I will not be reachable.

4        Well, I mean I guess under the circumstances what I

5    would be prepared to do is to do what we indicated, which is

6    essentially enjoin dissipation of the funds from the account,

7    or revenues of the business, except for certain express

8    payments, payroll, trade debts, preexisting written

9    obligations, rent, utilities, taxes, provided however that the

10   plaintiff may consent to any such payments; order the delivery

11   of the collateral set forth in C, to the extent it's still in

12   possession of the defendants.

13       And I think I would probably leave it there, that if

14   the parties come to an agreement on substitute collateral, or

15   other arrangements, you could either do it by way of stipulated

16   injunction, or otherwise come and seek relief to modify the

17   injunction.  I'm -- I'm struggling with the hypothetical

18   injunction here if you do X then Y.  I think we're better off

19   just leaving it and -- and, you know, Mr. Doniger, just to be

20   clear, this is done at some level with the indulgence of the

21   plaintiff, that is, if the plaintiff really wants me to push

22   the business over the cliff, I think I have the power to do

23   that and probably ought to do that and -- and let the chips

24   fall where they may.

25       MR. DONIGER:  I appreciate that, your Honor, and I

aaf5ae08-dd0f-480e-95f8-f5ca55d8deba

1  agree with you.  I agree she does -- she does have that right.

2       THE COURT:  All right.

3       MR. DONIGER:  Just --

4       THE COURT:  Yeah, Mr. Doniger.

5       MR. DONIGER:  Just if we could be clear, that -- that

6  is fine, as long as we could put the exception as articulated

7  by Mr. Shea about the trade debts so that we are at least, so

8  if a bank looks at this, the bank will know -- I think we

9  just -- we just say with the exception of -- how did Mr. Shea

10  put it, written, written obligations.

11       MR. SHEA:  My language was including preexisting

12  written obligations.

13       THE COURT:  We can even specifically give, as an

14  example, preexisting debt obligations to other lenders or

15  creditors.

16       MR. DONIGER:  Exactly.  That would be fine.

17       THE COURT:  All right.  What I propose we do now is

18  stand in recess.  Let me try to fiddle with the language.

19       Can you all stay while I do that, and then I can give

20  you a draft, and we can talk about it?

21       MR. SHEA:  Of course, your Honor.

22       THE COURT:  All right.  Why don't we --

23       MR. DONIGER:  That would be great.

24       THE COURT:  Why don't we do that.  I don't know how

25  quickly I can get that out, but do you all have cell phones

Page 24

1    with you?

2            MR. DONIGER:  Yes.

3            MR. SHEA:  Yes.

4            THE COURT:  All right.  Why don't you let Mr. Castles

5    know where you can be found just in case this takes a little

6    longer than 10 or 15 minutes, and we will reconvene.

7            MR. DONIGER:  We'll probably just hang out here.

8            MR. SHEA:  Thank you, your Honor.

9            (The Court conferred with the law clerk.)

10           THE COURT:  Okay.  Yes, one other detail.  We have

11   been operating on the assumption that this First Republic Bank

12   account is the account.  It probably makes sense to -- to --

13   well, I don't know if they have a separate payroll account; in

14   other words, if it's their normal practice to have a different

15   account, but it seems to me all the funds need to go into --

16           MR. SHEA:  The right account.

17           THE COURT:  -- the right account.

18           Mr. Doniger, do you know the answer to that?

19           MR. DONIGER:  I don't.  I do know that -- I'm looking

20   at one of these $500,000 checks, and it's drawn on First

21   Republic so --

22           MR. SHEA:  Yeah, I can tell you, your Honor, if it

23   helps, that the checks, all the checks we've received have been

24   on the First Republic account, which is why I mentioned it;

25   however, the UCC filings we checked indicate that there are

aaf5ae08-dd0f-480e-95f8-f5ca55d8deba

1    three banks:  The First Republic and Citibank, and I forget the

2    third, but I can learn it obviously.  I just don't remember it

3    right now.

4            THE COURT:  All right.  Let me -- let me play with

5    some language in that regard.

6            All right.  We'll stand in recess.

7            MR. SHEA:  Thank you.

8            MR. DONIGER:  Thank you.

9            (At 11:39 a.m., the court was in recess.)

10            (At 12:36 p.m. the court reconvened.)

11            THE CLERK:  All rise.  Court is now open.  You may be

12    seated.

13            THE COURT:  I will have Mr. Castles distribute the

14    proposed order.

15            (The clerk distributed the proposed order.)

16            THE COURT:  Why don't you take a moment and look at

17    that.

18            While you're doing that, let me state for the record

19    that I am going to order a preliminary injunction under

20    Rule 65.  I find that the plaintiff has a substantial

21    likelihood of success on the merits, and immediate irreparable

22    harm will issue if the -- or will incur if the injunction does

23    not issue; that the balance of equities favors the plaintiff;

24    and that the public interest is not implicated.

25            To the extent that the request was for a temporary

aaf5ae08-dd0f-480e-95f8-f5ca55d8deba

Page 26

1    restraining order, it's denied as moot.

2         And we need to take up the question of a bond, which

3    is mandatory under the rule.

4         Mr. Shea.

5         MR. SHEA:  Your Honor, I've had a chance to review the

6    order.  I don't have any comments on it.

7         THE COURT:  Mr. Doniger.

8         MR. DONIGER:  It's fine, your Honor.

9         THE COURT:  All right.  Let's take up the question of

10   the bond.

11        Mr. Doniger, how much bond do you think is appropriate

12   under the circumstances?

13        MR. DONIGER:  Well, I -- your Honor, I would urge the

14   Court not to order a bond under these circumstances,

15   particularly in view of the fact that there will be collateral

16   that I think would serve the function as the security, and

17   ironically we're talking about security here for this --

18        THE COURT:  All right.

19        MR. DONIGER:  -- for this debt.

20        THE COURT:  The rule requires that I order it.  What

21   I'll do, under the circumstances, is just direct the plaintiff

22   to post a bond in a relatively token amount, $1,000, let's say,

23   by next Tuesday.

24        Does that give you enough time to get that

25   accomplished?

1          MR. SHEA:  I believe it does, your Honor, but if I

2    may, I believe that the substance of the statute here is the

3    Massachusetts -- well, strike that.  It's not the Massachusetts

4    statute.

5          THE COURT:  Well, it's Rule 65(c) says no order shall

6    issue, except upon the giving of security by the applicant, in

7    such sum as the court deems proper.

8          Well, let's do this, all right.  Since Mr. Doniger has

9    indicated he doesn't think any bond is really necessary, let's

10   make it $100, all right, and it will make it simpler.  You can

11   probably --

12         MR. SHEA:  Yes, your Honor, that's fine.

13         THE COURT:  -- write out a check and not have to deal

14   with the insurance company and pay the fee; and obviously, the

15   bond would be returned.

16         MR. SHEA:  Right.

17         THE COURT:  Let's leave it that way.

18         All right.  I'm going to sign the order and date it at

19   12:42.  All of this, as we indicated, it's absolutely without

20   prejudice to the parties coming forward with their own

21   stipulated injunction that no doubt would improve on this.

22   This is something of a blunt instrument; and the preliminary

23   injunction, like any preliminary injunction, may be modified

24   for good cause shown; but if it needs to be modified next week,

25   you'll have to find the emergency judge and get him or her to

1   modify it, because I won't be around.

2          Okay.  Anything further?

3          MR. SHEA:  No, your Honor.  I realize you've spent a

4   lot of time -- you've spent a lot of time on this matter today,

5   and I appreciate that.

6          THE COURT:  Well, that's fine.  It's a lot more

7   interesting than most of the things I deal with.  I just wish

8   we had the paintings in here so we could look at them.

9          MR. DONIGER:  Thank you, your Honor.  Have a good

10  vacation.

11         THE COURT:  Okay.

12         (At 12:42 p.m., the court was adjourned.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              C E R T I F I C A T E

2

3              I, Marianne Kusa-Ryll, Certified Realtime

4     Reporter, do hereby certify that the foregoing transcript,

5     consisting of 28 pages inclusive, is a true and accurate

6     transcription of my stenographic notes in Case No. 06-40178,

7     Saundra Lane, Plaintiff, versus Lawrence Salander, et al.,

8     Defendant, before F. Dennis Saylor, IV, on April 13, 2007, to

9     the best of my skill, knowledge, and ability.

10

11

12                              . . . . . . . . . . . . . . . . . . . . . . . . . . .

13                              Marianne Kusa-Ryll, RMR, CRR

14                              Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25

aaf5ae08-dd0f-480e-95f8-f5ca55d8deba