Declaration of Earl Davis

Flemming Zulack Williamson Zauderer LLP
One Liberty Plaza
New York, New York 10006
(212) 412-9500
Dean R. Nicyper, Esq. (DRN-7757)

Attorneys for Plaintiff Earl Davis

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------- X
EARL DAVIS,

        Plaintiff,

   -against-

SALANDER O'REILLY GALLERIES LLC
f/k/a SALANDER O'REILLY GALLERIES INC.,
and LAWRENCE B. SALANDER

        Defendants.
---------------------------------------------------------------- X

Index No. 07 Civ. 4165 (SHS) (DF)

**DECLARATION OF
EARL DAVIS IN SUPPORT
OF MOTION FOR A
PRELIMINARY INJUNCTION
AND EXPEDITED DISCOVERY**

  EARL DAVIS declares under the penalties of perjury as follows:

  1.  I am the son and heir of American artist Stuart Davis and the plaintiff in this action. I am fully familiar with the facts set forth in this declaration in support of Plaintiff's Motion for a Preliminary Injunction and Expedited Discovery.

  2.  My father is a well-known American artist. His works of art are exhibited in many museums around the country and throughout the world. The works of art he created have significant value.

  3.  Aside from their value on the art market, my father's works of art have incalculable personal and emotional significance to me.

  4.  My father died in 1964.

  5.  For decades, I, as an heir of my father's estate, have actively managed the large collection of works of art that remained in the family after my father's death.

295282

6. For more than twenty years, I have had a business and trust relationship with Salander O'Reilly Galleries, LLC (f/k/a Salander O'Reilly Galleries, Inc.) ("SOR" or the "Gallery") and Lawrence B. Salander ("Salander") (SOR and Salander are referred to herein collectively as "Defendants"). During that relationship, I delivered hundreds of works of art created by my father (the "Works") to the Gallery for exhibition and possible sale.

7. Because of the non-monetary significance of the Works to me, I made clear to Defendants that, although I delivered the Works to SOR for exhibition and possible sale, I did not want all of the Works to be sold. To the contrary, I expressly informed SOR that, depending upon which of the Works might first become in demand, I would want to keep at least some of the other remaining Works in my family collection.

8. Defendants and I have had a long-standing practice of regularly reassessing the asking prices for the Works I delivered to the Gallery. In recent years, I informed Defendants that I was to be notified prior to any of the Works being offered for sale to discuss whether to offer the individual work and, if so, the price at which it would be offered.

9. Defendants and I accordingly agreed that the Defendants would offer a work for sale only after consultation with me and only at prices expressly authorized by me, and that, for such sales, SOR would be entitled to commissions as follows:

For each painting:

- 20% of sales proceeds up to $1 million.
- 10% of sales proceeds in excess of $1 million.

For each work of art on paper:

- 30% of sales proceeds up to $20,000.
- 20% of sales proceeds in excess of $20,000.

(See letter agreement between Salander-O'Reilly Galleries and me, attached hereto as Ex. 1.)

10. For more than twenty years, by all appearances from all information I was aware of, I had a successful and close-working business relationship with the Gallery and its director, Larry Salander. In early 2005 -- more than twenty years into our business relationship -- I began to see signs that the Gallery was having bookkeeping problems. I therefore asked the Gallery to print an inventory of the Works, listing the last agreed prices for each Work so that they all could be updated coherently. Each time I made the request, I was told that the Gallery would look into it.

11. I also requested that the Gallery employees verify the location of each of the Works.

12. In response, several weeks after my last request, the Gallery's Registrar, Bill Thibodaux, told me that he personally had confirmed the location of all of the Works in the Gallery's storage facilities, and he expressly told me that he had accounted for everything and that "everything was in order." I was reassured by this representation.

13. Neither he nor anyone else informed me at that time that any of my Works were anywhere other than at the Gallery's New York location or New York warehouse.

14. On November 30, 2005, the Gallery sold four of the most significant works remaining in my collection (the "4-Paintings Sale"). It sold those paintings without informing me and without first seeking my approval of the highly discounted sale prices. When Larry Salander did inform me of the sale after it had been concluded, I demanded that the sale be rescinded. Larry Salander told me, however, that it could not be rescinded. Instead, he told me that the sale price of $2,700,000 was to be paid in installments over three years. He later represented to me, however, that the installment payments were to be made over four years in 48 monthly payments.

15. From time to time Defendants sold other Works on a similar installment payment basis. I do not have information identifying which of my Works recently were sold on an installment basis or what installment payments are still outstanding.

16. After learning that Defendants had concluded the 4-Paintings Sale without consulting me, and in light of recent record auction prices for my father's art, I told the Gallery in the first week of December 2005 to cease selling my Works pending a full price review and revision.

17. In early 2006, I repeated this instruction, specifying that the Gallery must "clearly freeze any further offerings of sales," and I further demanded "the immediate return of all my inventory" of Works. (See January 27, 2006 e-mail from me to Larry Salander included in e-mail correspondence between me and Larry Salander, dated January 27, 2006 and February 7-8, 2006, attached hereto as Ex. 2.)

18. Larry Salander assured me in person that any further sales would cease and that the Works would be returned.

19. To further assuage my concern about the 4-Paintings Sale, Larry Salander emphasized our successful 20-year business relationship and promised: "I will pay you in full whatever it is you think I owe you.... I am prepared to live without my commission deducted or even more (within reason). I will pay in full on or before December 31, 2006." (See February 8, 2006 e-mail from Larry Salander to me included in e-mail correspondence between me and Larry Salander, dated January 27, 2006 and February 7-8, 2006, attached hereto as Ex. 2.)

20. Surmising from the recent events that the Gallery may be having either recordkeeping or liquidity problems, I told Larry Salander at a meeting with him on March

14, 2006, that the Gallery must not mix my sales proceeds with the Gallery's "general pool" of money and that my sales proceeds should instead be kept in a "trust-like account" for me.

21. In May 2006, Larry Salander told me that many of my Works were out of the Gallery at framers, restorers, on consignment, or "on approval" with potential buyers. Until then, I had not been aware that such a large quantity of the Works would be out of the Gallery without my being informed.

22. I therefore demanded that the Gallery provide a full inventory identifying the actual present location of each of the Works and that the Gallery arrange for all of them to be returned immediately.

23. Also in May 2006, Larry Salander persuaded me to sell a Stuart Davis painting, titled *Punchcard Flutter,* in one sale for $2,250,000 and to sell 12 other Stuart Davis works of art for $650,000 in another sale (the "Two Sale Agreements").

24. Larry Salander induced me to agree to the Two Sale Agreements by his making representations (which I later learned were false) regarding the sale price for the works, and by stating that the first sale would be paid within the week, that the buyers of the second sale already had "cash on the table," and that the Gallery, in turn, would pay me immediately.

25. Larry Salander later revealed to me that *Punchcard Flutter* was sold for $2,125,000, not $2,250,000, and that, although he and the Gallery had released it and the other 12 works to the two buyers, he claimed that the buyers had not yet paid for the Works. Larry Salander again sought to erase my concerns about the Gallery's recent practices by reminding me of our 20-year successful relationship and by repeatedly promising to pay me more than the actual sale prices for works sold, plus interest.

26. Defendants, however, to this day have not paid me any of the $2,900,000 proceeds from the Two Sales Agreements or the $2,700,000 for the 4-Paintings Sale.

27. By May 31, 2006, the Gallery and Larry Salander had not returned any of the Works to me despite my repeated demands for them. I therefore reminded one of the Gallery's senior art professionals, Leigh Morse, that I had been demanding that "my entire inventory of works by my father [be] returned immediately ... ." (See May 31, 2006 e-mail from me to Leigh Morse, attached hereto as Ex. 3)

28. I repeated to another senior officer at the Gallery, Andrew Kelly: "I want Everyone involved in sales of my father's work at the gallery to be clearly and unambiguously notified that I wish to Completely Suspend any and all offerings of such works for sale until after such time that they have each been physically returned to my possession and a more reliable system of accounting and record keeping has been established at the gallery." (See June 12, 2006 e-mail from me to Andrew Kelly, attached hereto as Ex. 4 (emphasis in original).)

29. To mollify my growing concerns as were reflected in my e-mails to Leigh Morse and Andrew Kelly, Larry Salander again reminded me about our good long-standing relationship and that he would do whatever it took to pay me in full. Then, at a meeting with his accountant on June 21, 2006, without any prior discussion with me, he handed me a stack 24 post-dated checks (each in the amount of $222,083). The checks were to pay over 24 months the Gallery's debt to me -- at least to the extent that he and the Gallery had disclosed their debt to me as of that date. The checks therefore were purportedly to cover

the 4-Paintings Sale, the Two Sale Agreements, and two earlier partnership transactions Defendants and I had entered into.

30. The two partnership transactions were deals the Gallery and I had entered into in 2003. Pursuant to those deals, Defendants and I jointly purchased a Courbet painting and a pair of bronze sculptures. (See copies of a January 4, 2005 letter agreement confirming the 2003 agreement regarding the Courbet painting and a January 4, 2005 letter agreement confirming the 2003 agreement regarding the pair of bronze sculptures, attached hereto as Ex. 5.) The checks Larry Salander handed to me on June 21, 2006 resolved the Gallery's debt for the two partnership transactions, and those transactions are not at issue in this lawsuit. (As is explained below, only three of the checks ultimately cleared and therefore only the debt for the two partnership transactions was paid.)

31. I was surprised to be handed the 24 post-dated checks without agreeing to them. I told Larry Salander that I did not want a 24-month payout. In response, he said the checks were merely to serve as back-up security for me and reassurance that he and the Gallery planned to pay me in full.

32. In June 2006, Defendants began to return some of the Works to me. In nine separate deliveries between June 1, 2006 and January 11, 2007, Defendants returned 102 Works to me. The fact that works were being returned to me significantly reduced my concerns about the Gallery's bookkeeping, although I was later to learn when the returns ended in January 2007 that the returns included few paintings and for the most part were the least significant and least valuable works I had delivered to the Gallery.

33. After my repeated demands for an inventory listing all of my Works and their locations, the Gallery finally produced a list to me in late July 2006. (See list provided by SOR's Andrew Kelly to me in late July 2006 (the "2006 List"), attached hereto as Ex. 6.)

34. The 2006 List identified 124 Stuart Davis works of art that I had delivered to the Gallery which, at that time in August, had not yet been returned to me. In the 2006 List, the Gallery represented to me that 103 of the 124 Works listed were out on consignment with other galleries or dealers, eight others were either on consignment or on approval with various private collectors or museums, nine purportedly were in SOR's possession, and four were missing. The 2006 List did not disclose that any of the 124 listed Works had been sold. To the contrary, Gallery employee Andrew Kelly handwrote on the 2006 List the last agreed-upon prices at which the Gallery would offer each of the listed Works and the years in which the Gallery and I had agreed to those prices.

35. Learning for the first time from the 2006 List that all but nine of my Works were outside the Gallery, I reiterated to Larry Salander: "I want to be clear that the WORKS OUT really have all actually been called in for immediately return." (See July 27, 2006 email from me to Larry Salander and Andrew Kelly, attached hereto as Ex. 7) (emphasis in original).)

36. In mid-September through October 2006, however, I learned from people not associated with the Gallery that several of the Works designated in the 2006 List as having been on consignment in fact had been sold. I had not been informed about the sales and none of the sales proceeds have been forwarded to me.

37. Specifically, a Gallery client, Joseph Carroll, told me that he owned 10 of my Works, contrary to the Gallery's representation to me that all the Works merely were

out on consignment. In addition, a show at the Whitney Museum included two of the Works and identified them as being owned by someone other than me. Finally, another art gallery, the Babcock Gallery, was selling five of the Works, contrary to Larry Salander's assurances that he would arrange the return of all outstanding Works.

38. I also learned from a lawyer who had represented the person who bought *Punchcard Flutter* (see, supra, ¶ 25) that the buyer had paid an intermediary dealer in full for the painting on June 1, 2006 and that the dealer said he had paid the Gallery in full for the painting on June 2, 2006. This information contradicted Larry Salander's repeated representations to me that the Gallery was never paid for *Punchcard Flutter*.

39. When I confronted Larry Salander with all of these previously undisclosed, apparent, sales and issues, he claimed he was surprised and said that he would look into them.

40. I again repeated to him my demand that the Gallery send a notice to every consignee on the 2006 List informing each that my Works were no longer for sale and must be returned. He again confirmed to me that he and the Gallery would do this.

41. For the first three months after Larry Salander handed me 24-post-dated checks, the checks cleared, but in November 2006, the Gallery's accountant told me not to deposit any more checks because they were unlikely to clear. The checks that did clear, therefore, were only sufficient to cover the Gallery's debt for the two partnership deals I had entered into with Larry Salander and the Gallery in 2003 (which are not at issue in this action). The checks that cleared were for amounts insufficient to cover any of the proceeds from sales of any of the Works at issue in this action.

42. In mid-December 2006, a high-level Gallery employee, Diane Buckley, informed me that the Gallery had sent letters for return of my Works to only four of the numerous people and entities that the 2006 List described as consignees of my Works. When I raised this issue with Larry Salander, he threatened me saying he would go on the attack against me if I told anyone anything that he might consider to be damaging to his reputation. I therefore became concerned about contacting the other galleries and dealers myself and refrained from doing so.

43. I continued my requests for return of my Works and for a more accurate list identifying the status of my Works. The Gallery continued to return Works, but the returns slowed and then ceased after January 11, 2007, leaving at least 99 Works unaccounted for. On January 5, 2007, the Gallery provided an updated list to me dated January 4, 2007 (the "January 4, 2007 List"). In stark contrast to the 2006 List, which had identified 124 of the Works and their locations, the January 4, 2007 List identified 73 of the Works and for the first time reported that they *all had been sold*. (See List dated January 4, 2007 (the "January 4, 2007 List") attached hereto as Ex. 8.)

44. I asked for clarification of information in the January 4, 2007 List and the location of my other Works. In response, the Gallery provided several revised lists, culminating in a revised list dated February 2, 2007 (the "February 2, 2007 List"). (See February, 2, 2007 List attached hereto as Ex. 9.) The February 2, 2007 List identifies 116 works. To my surprise, the revised lists all represented that many of the previously undisclosed sales of my Works had actually occurred several years ago.

45. With respect to all of the 73 Works that, according to the new lists, purportedly had been sold by the Gallery, neither Larry Salander nor anyone else at the Gallery

had consulted me regarding the sale prices for the works, and they never gave me a chance to keep some of the Works for my family collection.

46. If the sales information in the Gallery's lists is accurate, the Gallery sold 73 of my Works for a total of $9,378,875. The Gallery has never paid me any of the $9,378,875.00 in sales proceeds.

47. In addition to not disclosing to me that they had sold dozens of my Works and in addition to not paying me any of the proceeds from those sales, Larry Salander and the Gallery sold all or nearly all of the 73 Works at prices well below the prices I would have assigned had I been consulted. Indeed, they sold many of the Works at prices well below the prices that I had discussed with them years earlier, even though the Works had significantly appreciated in value since that time. For example, Andrew Kelly states in the 2006 List, with respect to Work number Y.65, that the Gallery and I had agreed in 1999 (see the 2006 List) that it would be sold for $450,000, and then agreed in 2003 that the price would be $850,000 (see the 2006 List), but the February 2, 2007 List shows that Defendants sold it in 2005 for only $290,000. As another example, with respect to Work number Y.88, the Gallery and I had agreed in 1999 to sell it for $475,000 (see 2006 List), but the February 2, 2007 List shows that Defendants sold it for only $375,000. As another example, with respect to Work number Y.84A, the Gallery and I had agreed in 2005 (see 2006 List) that this work would be sold for $850,000, but the February 2, 2007 List shows that Defendants sold it for only $500,000.

48. Defendants have repeatedly acknowledged to me that they owe to me all sales proceeds for all Works sold. For example, in a December 13, 2006 e-mail to me, the Gallery's Managing Director, individual Defendant Larry Salander, stated: "The only thing

that could stand in the way of paying you would be my death.... The fact is your trust was, is and will be well placed with me. You will get paid every cent you are owed." (Ex. 10 hereto.)

49. As another example, in a March 12, 2007 e-mail to me, Larry Salander stated: "So it comes down to money, and a lot of it. I have already promised you I will pay you every cent I owe you and as quickly as I possibly can.... You have the right to say, 'Yeah, but it's my money' – and that it is." (Ex. 11 hereto.)

50. When the Gallery ceased returning Works to me in mid-January (revealing that 99 Works were not accounted for) and produced lists in January and February showing 73 Works sold (consisting of 56 of the 99 Works that had not been returned plus the 4-Paintings, the 12 Works and *Punchcard Flutter*) and 43 Works still unaccounted for, I lost faith in the trust I had relied on in my more than 20-year relationship with Larry Salander and the Gallery. I therefore retained a law firm to assist me. We tried to avoid litigation by attempting to negotiate a binding resolution with the Gallery. We were unsuccessful and therefore initiated this lawsuit.

51. Mr. Carroll contacted me again recently. During our discussion he told me that the Gallery did generate and provide invoices to him for the Stuart Davis works of art he had purchased from the Gallery. He also told me that he had filed several UCC financial statements. Our search of the UCC filings uncovered many instances in which the Gallery had pledged my Works as collateral for its own debts. At no time did I authorize the Gallery to pledge my Works as collateral.

52. The Defendants' sales of my Works without consulting me already has caused me irreparable damage. The Works I delivered to the Gallery were the only Works of

my father's art remaining in my family's possession. I had specifically agreed with the Gallery that they would contact me prior to any sales so that I could determine whether I wanted to sell a particular work and, if so, at what price. We established this procedure to enable me to determine which of my father's works I would keep upon learning which works people were interested in buying.

53. The Defendants' sales of dozens of the most important of my Works has deprived me of the opportunity to retain significant Works created by my father as well as the ability to mount future exhibitions to promote his work.

54. Any further sales of my Works will cause me further irreparable damage. Defendants claim that 73 Works have been sold. They have not explained what happened to the 43 other Works. My instructions to Defendants to cease selling my father's Works and return them to me have been disregarded. I respectfully request that this Court order the Defendants to: cease selling or encumbering my Works; retrieve any that are unsold or which have been pledged as collateral; and return all unsold Works to me.

55. Defendants have declared that they have a liquidity crisis. (See accompanying Declaration of Dean R. Nicyper in Support of Motion for a Preliminary Injunction and Expedited Discovery, ¶ 5.) The Defendants' declaration is confirmed by Defendants' repeated failed promises to pay me all money they owe. The proceeds from sales of my Works are mine alone. Defendants have no right to those funds. Given Defendants' liquidity crisis, the longer Defendants withhold payment to me, the greater the likelihood that Defendants will never deliver the sales proceeds to me. I therefore respectfully request that this Court order Defendants to deliver to me all proceeds from sales of my Works and forward

to me any future installment payments, immediately as Defendants receive them, for prior sales of my Works.

56. I have asked Defendants for records concerning sales of my Works and the proceeds from those sales. They expressly refused to provide the agreements for the 4-Paintings Sale, *Punchcard Flutter* and the 12 Works Sale. Nor have they provided any information regarding the location of my sales proceeds or the location of unsold Works. The only documents they provided were the few invoices they delivered to my attorney a few weeks ago concerning 42 of the 116 outstanding Works. Defendants claim to have no other invoices, even though they listed sales prices for 31 additional Works. Other people do have invoices for sales by Defendants. For example, Joseph Carroll informed me that he has invoices for sales to him even though Defendants claim they do not. Galleries who purchased Works also are likely to have sales documentation. These documents will reveal: the status of the 43 Works that have not been accounted for; the sale prices and dates for all Works that were sold; and the terms of any agreements for sales of the Works including identification of any installment payments still due.

57. Accordingly, I respectfully request that this Court (A) award preliminary injunctive relief to me, pending final determination of this action, by entering an order: (1) enjoining Defendants from selling or otherwise disposing of or encumbering any of my Works and from using any proceeds from sales of those Works for Defendants' own purposes; (2) mandating that Defendants retrieve and deliver to me all unsold Works, and segregate in a separate bank account and deliver to me all proceeds that Defendants already have received from sales of my Works; and (3) segregate in a separate bank account and deliver to me immediately upon receipt all incoming installment payments that constitute proceeds from prior sales of my

Works; and (B) authorize expedited discovery to: (i) locate all of the Works and proceeds from sales of any Works; (ii) determine which of the Works have been sold and for what amount and the location of proceeds from those sales; (iii) identify all persons and entities that owe installment payments on any previously sold Works; and (iv) locate any of the Works that were improperly pledged as collateral by Defendants.

      I declare under penalty of perjury that the foregoing is true and correct.

Executed on:  June 27, 2007
New York, New York

_____
EARL DAVIS