Exhibit 6

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X

DOUGALL ARTS LIMITED,                         :

             Plaintiff,                 :        05 Civ 5299 (WHP)

        v.                                      :

SALANDER-O'REILLY GALLERIES, LLC,             :

             Defendant.                 :

-----------------------------------------------------------X

## PRE-TRIAL MEMORANDUM

Plaintiff, Dougall Arts Limited, by its attorneys, Wormser, Kiely, Galef & Jacobs

LLP, submits this Pre-Trial Memorandum in support of its claim for damages -- in the amount of

approximately $700,000 -- arising out of Defendant's failure to make the last two of three

installment payments for a Sculpture which Defendant purchased from Plaintiff two and one-half

years ago.

## THE PARTIES AND JURISDICTION

Plaintiff is a U.K. Limited Liability Company with a registered office at 20-22

Bedford Row, London WCIR 4JS, England.

Defendant is a limited liability company organized and existing under the laws of

the State of New York with an address and principal place of business located at 20 East 71st

Street, New York, New York 10021.

Subject matter jurisdiction is predicated upon 28 U.S.C. §1332(a)(2) in that this

civil action is between a citizen or subject of a Foreign State (Plaintiff), the Defendant is a citizen

of a State, and the amount in controversy exceeds $75,000.  In particular, the amount in

controversy is EUR450,000, an amount at all relevant times having a value in excess of $500,000.[1]

## PLAINTIFF'S CLAIMS

Plaintiff, Dougall Arts Limited ("Dougall"), acting through an agent, sold a sculpture of St. Jerome (the "Sculpture") to Defendant, Salander-O'Reilly Galleries LLC ("Salander-O'Reilly"), for an agreed price of EUR850,000 on or about March 1, 2004. As reflected in the invoice from Dougall to Salander-O'Reilly (Exhibit 8), payment was to be made in three installments: EUR400,000 on March 1, 2004; EUR250,000 on August 15, 2004; and EUR200,000 on November 1, 2004.

Salander-O'Reilly paid the first installment by wire transfer to the Dougall account described in the invoice on March 9, 2004 (Exhibits 8 and 11), and the funds were credited to the same Dougall account the following day, March 10, 2004 (Exhibit 12).

When the second payment was not made pursuant to the terms of the invoice, attorneys for Dougall corresponded with Salander-O'Reilly seeking full payment via two letters dated August 25, 2004 and September 30, 2004, respectively. (Exhibits 16 and 17). Defendant did not respond to either letter.

On October 13, 2004 Salander-O'Reilly sought -- through Lopez de Aragon S.L. (the Madrid-based art dealer which was the agent for Dougall in the sale) -- to be permitted an extended period of time to make full payment. The fax seeking such extended payments alleged that the "provenance" of the Sculpture was erroneous (Exhibit 19), but did not seek a price reduction.

---

[1] The Parties have stipulated that New York law applies. See Pre-Trial Order at 6(B)(i), Page 8.

Lopez de Aragon forwarded the foregoing fax to the attorneys for Dougall who, in a letter dated October 13, 2004 (Exhibit 18), advised Salander-O'Reilly that all communications concerning the Sculpture had to be addressed to Dougall, not the agent.  Salander-O'Reilly did not communicate with Dougall; it simply failed to pay the EUR250,000 due on August 15, 2004 and the EUR200,000 due on November 1, 2004.

Plaintiff Dougall seeks payment for the foregoing amounts, plus interest, based on the legal theory of breach of contract.  Thus, in accordance with New York law, Plaintiff is entitled to pre-judgment interest at the rate of 9% on EUR250,000 from August 15, 2004 forward, and on EUR200,000 from November 1, 2004, forward.  Including interest, Defendant will owe Dougall EUR533,000 (or $700,000) as of the trial date.

<u>STATEMENT OF DEFENSES</u>

Defendant contends that it did not enter into a contract with Plaintiff.  Defendant claims, rather, that in or about February of 2004, it negotiated with Lopez de Aragon with respect to the prospective purchase of the Sculpture at issue.  In this respect, Defendant contends that it dealt with Lopez de Aragon and, since Lopez de Aragon is not a party to this action, this action is barred by Plaintiff's lack of standing and by Plaintiff's failure to join an indispensable party.[2]

Defendant also claims that Lopez de Aragon knew that the Sculpture had previously been extensively offered to the trade, and had been bought and sold by various dealers, but (through Diego Lopez de Aragon ("Diego")) represented to Defendant that the Sculpture was being sold from a private collection.  Plaintiff contends, further, that Lopez de

---

[2] As stated in the Pre-Trial Order, Defendant will not assert at trial that the Complaint is barred by the statute of frauds, or that the Complaint is barred by the Plaintiff's attribution of the Sculpture to Girolamo Campagna, as was set forth in its Amended Answer.

3

Aragon represented that the Sculpture was "fresh to the market", and that there had not been previous efforts to sell it, even though Lopez de Aragon knew that its representation that the Sculpture was "fresh to the market" was false.

## STATEMENT OF FACTS [3]

The Sculpture was sold by Lopez de Aragon to Dougall on February 22, 2004, with Lopez de Aragon retaining the right to sell it on behalf of Dougall for a commission. The Sculpture was offered for sale while it was at the "Stand" of Lopez de Aragon shortly before the official opening of the 2004 Maastricht Fair, one of the most important art fairs in Europe. The Sculpture was accompanied by a four page "attribution" prepared by Dr. Charles Avery ("Avery") in which Avery opined that the Sculpture had been done by the 16th/17th Century Venetian artist, Girolamo Campagna. Avery's document included the bases of his attribution. [4]

The Avery Attribution included a reference to a "provenance" which Avery received from Lopez de Aragon. The Provenance states: "Von Bergen Collection, Rome (1924); Private collection, Spain."

The Sculpture was at the Stand of Lopez de Aragon on or about February 26, 2004, shortly prior to the official opening of the Maastricht Fair that year, when it was observed by Lawrence Salander ("Salander") and Dr. Andrew Butterfield ("Butterfield"), representatives of Salander-O'Reilly, a gallery which was also an exhibitor at the 2004 Maastricht Fair. [5] Upon

---

[3] The Statement of Facts is taken, almost entirely, directly from the Agreed Statement of Facts in the Pre-Trial Order (pages 4 through 8), deposition testimony, and the exhibits referenced in the Pre-Trial Order (pages 9 through 12).

[4] The parties also agree that an "attribution" is an opinion by the person making the attribution. It is also agreed that Dr. Avery is an expert with respect to Italian Renaissance and Baroque sculpture and that he has done consulting work for the Defendant. (Pre-Trial Order at page 4)

[5] Salander is the Managing Member of Salander-O'Reilly, and Butterfield, a Senior Vice President at the time of the transaction in suit, is now its Executive Vice President. The Parties have agreed that Dr. Butterfield is an expert with respect to, among other things, Italian Renaissance and Baroque art.

seeing the Sculpture, Butterfield and Salander believed it to have been authored by Alessandro Vittoria, a more prominent Venetian sculptor than Campagna.

During the period between the time when exhibitors at the Maastricht Fair set up their Stands and the official opening of the Fair, Messrs. Salander and Butterfield traveled to Venice, Italy and, among other things, visited and examined two sculptures, located in Venetian churches, which were known to have been rendered by Vittoria. This visit confirmed their conclusion that the Sculpture of St. Jerome was done by Vittoria.

On or about March 1, 2004, Salander negotiated the purchase of the Sculpture by Salander-O'Reilly for the sum of EUR850,000 to be paid in three installments -- March 1, 2004 (EUR400,000); August 15, 2004 (EUR250,000); and November 1, 2004 (EUR200,000).[6] During the negotiations, Diego Lopez de Aragon made clear that the Sculpture was not owned by his company, but by an English company, Dougall (Exhibit 4). In fact, Dougall immediately sent Salander-O'Reilly an invoice reflecting this transaction (Exhibit 8) and, shortly thereafter, Salander-O'Reilly paid Dougall the first installment (Exhibits 11 and 12).

When the 2004 Maastricht Fair officially opened, the Sculpture of St. Jerome was at the Stand of Salander-O'Reilly. At that time, both Salander and Butterfield believed the Sculpture to be a work by Vittoria, and offered it as such without referencing Dr. Avery's contrary attribution.[7]

The parties agree that sculptures by Vittoria are generally considered to be more valuable than sculptures by Campagna. At the time of the Maastrict Fair in 2004, Butterfield

---

[6] As the testimony will make clear, Diego Lopez de Aragon negotiated for Dougall but had to call Sr. Adolfo Fernandez-Victorio Cacheire -- who, in turn, spoke with Dougall -- for the approvals regarding price and payment terms.

[7] Until Avery's attribution of the Sculpture to Campagna, the Sculpture had been described as a work by Alessandro Vittoria in a book by Dr. A.E. Brinckmann (Exhibit 1).

5

considered EUR850,000 to be a low price if the Sculpture had been rendered by Campagna. (Butterfield Dep. at 26)  Hence, it was a very low price if it was a Vittoria.

After it obtained the Sculpture, Salander-O'Reilly sought to resell it while still at the Fair.  Specifically, Salander-O'Reilly prepared a fact sheet stating that the Sculpture was "by" Vittoria without reference to the Avery Attribution to Campagna.  (The parties agree that a statement that a work of art is "by" an artist goes beyond an attribution. An attribution is an opinion that the work is by a particular artist; stating that a work of art is "by" an artist is a more definite statement of authorship.  Pre-Trial Order at 6).

During the Maastricht Fair, Salander-O'Reilly offered the Sculpture for sale at a price of $4,000,000.  Also during the Fair, Salander-O'Reilly rejected an offer made by Gimmo Etro, a well-known Italian collector, to purchase the Sculpture for $2,000,000.[8]  (Pre-Trial Order at 6)

Salander-O'Reilly wired the initial payment to Dougall, in the amount of EUR400,000 on March 8, 2004, and it was received by Dougall on March 9, 2004. (Exhibits 11 and 12)

On August 25, 2004, attorneys for Dougall demanded payment for the August 15, 2004 installment payment. (Exhibit 16)  Salander-O'Reilly did not respond to this demand. In early September 2004, Gimmo Etro made a $1,250,000 offer for the Sculpture, which offer was rejected.   (Pre-Trial Order at 6)   On September 30, 2004, attorneys for Dougall wrote to Salander-O'Reilly and again demanded that the August 15, 2004 installment payment be made. (Exhibit 17) Salander-O'Reilly made no response to Dougall's attorneys' letter but, instead,

---

[8] After the Maasticht Fair, the Sculpture was shipped to the Salander-O'Relly Galleries in New York, where it continued to be offered for sale for many months as a Vittoria.

contacted Diego by telephone. (Exhibit 18)  In that conversation, Salander-O'Reilly indicated an interest in renegotiating the terms of payment for the Sculpture.  Upon learning that Salander-O'Reilly had contacted Diego, Dougall's attorneys' faxed and mailed a letter to Salander-O'Reilly on October 13, 2004 stating that any communication concerning the re-negotiation of payments had to be directed to Dougall, and otherwise demanding the payments then due. (Exhibit 18)

On October 13, 2004, after receiving the letter of the same date from the attorneys for Dougall, Salander-O'Reilly wrote to Diego (Exhibit 19) stating that Salander-O'Reilly was "disregarding" the October 13, 2004 letter from Dougall's attorneys and, among other things, made three other points:

First, that Salander-O'Reilly's agreement to purchase the Sculpture was with Diego and his father, and not with Dougall;

Second, that Salander-O'Reilly had stopped making payments because Lopez de Aragon had misrepresented the provenance of the Sculpture; and

Third, that Salander-O'Reilly be permitted to make the remaining payments of EUR450,000 in monthly installments of EUR50,000.[9]

Neither Lopez de Aragon nor Dougall responded to this October 13, 2004 letter from Salander-O'Reilly.

Salander-O'Reilly wrote a second letter to Diego on October 15, 2004. (Exhibit 20), stating that Mr. Butterfield had called him repeatedly, but had received no response.  Neither Diego nor Dougall responded to this letter.

---

[9] Salander-O'Reilly did not propose a reduction in the purchase price or offer to return the Sculpture.

Salander-O'Reilly has not made any payments to Dougall -- or anyone else -- for the Sculpture subsequent to its initial EUR400,000 payment to Dougall on March 9, 2004.

After having claimed for several months that the Sculpture was "by Vittoria", Salander-O'Reilly now asserts that the Sculpture is by Angelo Gabriello Pio, an 18th Century Bolognese artist. Pio is a lesser sculptor than either Vittoria or Campagna. (Pre-Trial Order at 7) Salander-O'Reilly also has produced an invoice to Mr. Murray Frum ("Frum"), a Canadian businessman well known for collecting African Art, which indicates the Sculpture was sold to him for U.S. $850,000 on January 3, 2005. (Exhibit 21)

The invoice to Frum indicates that the Sculpture of St. Jerome is by "Angelo Gabriello Pio (Bologna 1690-1770)". (Exhibit 21)   The invoice further recites the following provenance: "Von Bergen Collection, Rome (1924); Private Collection, Spain."  Significantly, that provenance is identical to the provenance contained in the Avery Attribution which, Defendant claimed in October 2004, was a misrepresentation by Lopez de Aragon.  (Exhibit 19)

On October 27, 2006—nearly two years after the sale to Frum -- Salander sent a "corrected" provenance to Frum which states in relevant part:

"Von Bergen Collection Rome (1924)

Simois Gestion de Arte, Madrid

Lopez de Aragon, Madrid"[10]

## AGREED LAW

The parties agree that New York law applies to the transaction in suit.

---

[10] See Exhibit C.

<u>ARGUMENT</u>

At issue is Dougall's attempt to recover from Defendant the unpaid balance of the agreed upon price of EUR850,000 which Defendant agreed to pay for a Sculpture of St. Jerome. Defendant made the first of three installment payments (i.e., EUR400,000) on March 9, 2004, but failed to pay the remaining EUR450,000 -- EUR250,000 of which was due on August 15, 2004, and EUR200,000 of which was due on November 15, 2004.

Dougall acquired the Sculpture on or about February 22, 2004 from a Spanish collector/dealer -- Lopez de Aragon -- for EUR400,000. (Exhibits 5 and 6) Lopez de Aragon had acquired it shortly before from a dealer in Spain (which had acquired it from a private collector) for EUR330,000. (Exhibits 3, 9 and 10)

In accordance with Lopez de Aragon's agreement with Dougall, Lopez de Aragon had the exclusive right to sell the Sculpture on Dougall's behalf for a period of time. Pursuant to that arrangement, Lopez de Aragon (i) contacted a dealer in London (Danny Katz) who expressed an interest in acquiring the Sculpture for EUR900,000, (ii) prepared an advertisement which ran in the Burlington Magazine (well known in the art world) during the Maastricht Fair in 2004; and (iii) traveled to Maastricht, the Netherlands, with the Sculpture.

Shortly before the Fair opened, the Sculpture was seen at the 'Stand' of Lopez de Aragon by the owner of the Defendant (Salander) and by his Senior Vice President (Dr. Butterfield), an expert in Italian sculpture of the Renaissance and Baroque periods.

Lopez de Aragon had retained an expert in early 2004 – Dr. Charles Avery -- who attributed the Sculpture to the highly respected 16th Century Venetian artist Girolamo Campagna, and Lopez de Aragon provided the expert's attribution to Salander and Butterfield. Salander and Butterfield were of the opinion that the Sculpture was rendered by the more highly valued Venetian artist of the same period, Alessandro Vittoria. (Indeed, and as we have noted, just

9

before the Fair officially opened, Salander and Butterfield flew to Venice to look at sculptures known to have been done by Vittoria in order to confirm their opinions).

After some dealing, a price was agreed upon and an invoice was prepared by Dougall, dated March 1, 2004, which provided for the purchase price (EUR850,000) to be paid in three installment payments referenced above. (Exhibit 8)  Before making any payment, Defendant removed the Sculpture to its Stand on the first day of the Fair and offered it for sale for $4,000,000, claiming it to have been rendered by Vittoria -- not Campagna.[11]  During the Fair, Defendant declined an offer of $2,000,000 (about EUR1,575,000)

Salander-O'Reilly's initial payment of EUR400,000 was made to Dougall on March 9, 2004 in accordance with the terms set out in Dougall's invoice.  Defendant did not sell the Sculpture at the Fair, however, and it removed the Sculpture to its gallery in New York City in April 2004.  Defendant continued for several months to claim that the Sculpture was by Vittoria.

Following Defendant's failure to pay the second installment, attorneys for Dougall demanded payment.  Salander-O'Reilly did not respond to Dougall's lawyers, but in correspondence between Salander-O'Reilly and Lopez de Aragon in mid-October 2004, Salander-O'Reilly said it wanted to pay the remaining EUR450,000 in monthly increments of EUR50,000.  At the same time, it claimed that the "provenance" (i.e., the Sculpture's ownership history) stated by Lopez de Aragon during negotiations (and found in the Avery attribution) was in error because it did not include the Spanish dealer (Simois) which -- Salander-O'Reilly had learned -- sold the Sculpture to Lopez de Aragon.[12]  Salander-O'Reilly was told it had to deal

---

[11] The $4,000,000 offer was worth about EUR3,200,000.

[12] Salander-O'Reilly had already been aware that the Sculpture had been offered for sale to a British dealer (Danny Katz), and the "offer" made in the Burlington Magazine had been public as of the end of February 2004.

with Dougall (the owner of the Sculpture), but Salander refused to do so and never made any further payment.

Defendant later re-attributed the Sculpture to a lesser known artist (Pio) and -- so it claims -- sold the Sculpture for $850,000 to Murray Frum, a Canadian collector, on January 3, 2005. (In effect, Salander-O'Reilly has had the "benefit" of interest on the $850,000 for the 1 ¾ years since Frum allegedly purchased the Sculpture.)

Defendant now claims that the alleged error by Lopez de Aragon in describing the Sculpture's "provenance" is the reason that it should pay less than the purchase price (plus interest) -- even though Defendant's executives were well aware of all but one of the Sculpture's known prior owners in March 2004, and were aware of all known prior owners -- including Simois -- by October 2004 (at which time it agreed to make full payment over an additional nine month period).

Moreover, and despite the claim by Defendant that the erroneous provenance is the reason it has not made full payment, the Defendant used the very same provenance (in haec verba) when it sold the Sculpture to Frum in January 2005.

The "provenance" issue is, in reality, a red herring. Defendant never considered the provenance when it acquired the Sculpture. Instead, Defendant believed the Sculpture was by Vittoria and was far more valuable than the price it agreed to pay Dougall. Indeed, and as previously noted, it offered the Sculpture for sale for $4,000,000 -- nearly four times as much as it promised to pay -- the day after it acquired possession of the Sculpture.

Further, Dr. Butterfield testified at his deposition -- and undoubtedly will concede at trial -- that at the time he told Diego Lopez de Aragon that Salander-O'Reilly wanted to pay the remaining balance of $450,000 in nine $50,000 increments (Exhibit 19), Salander-O'Reilly

11

was well aware that Lopez de Aragon bought the Sculpture from Simois. In fact, Dr. Butterfield testified at his deposition that, at the time it learned Lopez de Aragon had bought the Sculpture from Simois, it had also learned that Simois had offered the Sculpture to a number of "interested" parties. (Butterfield Dep. at 68-69). And there is no dispute (i) that Defendant was aware that the Sculpture had been offered to London dealer Danny Katz before Salander-O'Reilly bought it from Dougall and (ii) that Lopez de Aragon advertised the Sculpture in Burlington Magazine in time for the commencement of the fair. (Exhibit 7)

Despite the foregoing facts, when it wrote Diego Lopez de Aragon on October 13, 2004, Salander-O'Reilly did not claim the Sculpture was less valuable as a consequence of these transactions and events, and it did not suggest that the transaction be rescinded. The fact that Defendant was still willing to pay the full price even after learning that the provenance did not include Simois and that it was not "fresh to the market" reflects how little the purported provenance issue meant.

Another measure of why the "provenance" is of little relevance here lies in the meaning of the word itself: "place or source of origin".[13] Historically, "provenance" would alert prospective buyers to prior owners not so much to prove the origin of the work of art, but, rather, to help substantiate the author of the work when authorship could not be verified. Thus, for example, if the work was owned by a wealthy, noble or renowned family, the likelihood that the work was by an important artist was enhanced.

The concept of provenance is related to attribution in the sense that it may assist the expert who is attempting to determine the author of a given work. Here, the "provenance" is

---

[13] See Dictionary.com Unabridged (v.1.0.1) based on the Random House Unabridged Dictionary, © Random House, Inc. 2006.

12

of little use in verifying the history of ownership as ownership can be traced back only to the "Von Bergen Collection Rome 1924" whereas the work was 16th or 17th Century Italian. Moreover, neither of the experts who have assessed attribution here -- Dr. Avery (who attributed the work to Campagna) and Dr. Butterfield (who initially attributed the Sculpture to Vittoria and advertised the work as such for many months, but later changed his attribution to Pio) -- took the "provenance" into account in making that assessment. This can be determined by looking at the opinions of Drs. Avery and Butterfield (Exhibits 2 and C).

The relevance of provenance to value may be gleaned from Dr. Avery's deposition testimony. Dr. Avery testified, in answering questions by Defendant's counsel that in valuing a particular work of art, the fact that a dealer had been trying to sell or auction it "for several years" would make a difference if those marketing efforts were "publicly known". (Avery Dep. at page 47) And he also noted that when auction houses such as Christie's (for whom he used to work) sell a work of art owned by a dealer, such a fact is not disclosed. Id.

Here, the Sculpture was not extensively offered for sale in any public way. Indeed, while it changed hands a number of times in early 2004 (i.e., Simois to Lopez de Aragon, to Dougall, to Salander-O'Reilly in the period of January 20 through March 1st),[14] it did so entirely under the radar. Indeed, the work was one with which Avery himself was entirely unfamiliar, but he immediately recognized it to be a very important object. (Avery Dep. at 18)

Moreover, in his deposition, Diego Lopez de Aragon pointed out that he did not want to give Defendant the name of the dealer from whom he acquired the Sculpture because he was concerned that Salander-O'Reilly could, in the future, simply by-pass him and go directly to his source.

---

[14] See Exhibits 4, 5, and 8.

Perhaps the best way to look at the relative unimportance of provenance is this: if one knows a work of art is by Picasso, its history of ownership is essentially unrelated to its value; rather, its value is determined by author. Here, the price of the Sculpture had nothing to do with provenance; it was based entirely on the fact that Salander-O'Reilly believed it to be the product of a very important Venetian sculptor (Vittoria) and it believed it was getting a bargain (as could be seen by the facts that it offered the Sculpture for sale for four times as much as it bought it for the day after it acquired the Sculpture ($4,000,000) and it turned down an offer of $2,000,000 -- twice what it bought it for -- within a week after it acquired the work. (Pre-Trial Order at 6)

Thus, even if -- for the sake of argument -- the provenance was in error, it did not in any way influence the purchase by Salander-O'Reilly or the purchase price it agreed to pay for the Sculpture.[15]    Moreover, it should be noted that, despite its current claims of misrepresentations with respect to provenance, Defendant never sought its money back. Rather, it kept the Sculpture and sold it.

## DOUGALL HAS STANDING TO SUE

Defendant argues that Dougall does not have "standing" to sue because, Salander-O'Reilly claims, it bought the Sculpture in suit from Lopez de Aragon, not Dougall.

---

[15] As reflected in Exhibit D, Defendant sent Mr. Frum a letter ten days ago advising him that the provenance contained in the invoice delivered to him when he bought the Sculpture in January 2005 was in error. Interestingly, the new "provenance" does not include any reference to Dougall from which Salander-O'Reilly acquired the Sculpture. Nor does it suggest that its "error" in providing the wrong provenance should in any way affect the price. As was made clear in discovery, and as will be made clear at this trial, the reason for the relatively low price appears to be based on Salander-O'Reilly's reattribution of the Sculpture to Pio, a decidedly lesser artist than Vittoria or Campagna.

This contention -- another attempt to avoid or delay payment of a debt which has been outstanding for well over two years on a Sculpture which Defendant sold almost two years ago -- is both unseemly and without basis.

To begin with, the documentation reflects the authorization from Simois to Lopez de Aragon to sell the Sculpture and, once sold, to remit payment to Simois in the amount of EUR300,000 plus 20% of the sale price above that amount (Exhibit 4).  On February 22, 2004, Lopez de Aragon sold the Sculpture to Dougall for EUR400,000 (Exhibit 5), Dougall paid Lopez de Aragon on March 24, 2004 (Exhibit 6), and Lopez de Aragon paid Simois EUR330,000 (Exhibit 10).

The testimony of Diego will demonstrate that Dougall authorized him to re-sell the Sculpture and that he did so immediately before the opening of the Maastricht Fair. Moreover, Diego will make clear that he offered the Sculpture on behalf of Dougall and that Salander-O'Reilly bought it knowing that Diego was selling it on behalf of Dougall.

Moreover, Dougall sent an invoice to Salander-O'Reilly dated March 1, 2004, showing that Dougall was the seller, outlining the payment terms, and advising Salander-O'Reilly where to wire the funds in payment.  (Exhibit 8)  Thereafter, on March 9, 2004, Lawrence Salander sent a fax to one of his employees, Erin Fitzpatrick (who was still in Maastricht), confirming that Salander-O'Reilly had wired EUR400,000 to the HSBC Bristol account of Dougall per its invoice 00042-3/2004 (Exhibit 11), and HSBC confirmed to Dougall that EUR400,000 had been wired into the Dougall account specified in the Dougall invoice.

The foregoing documents and the testimony of Lopez de Aragon are supported by the deposition testimony of Adolfo Fernandez-Victorio Cacheire, a Spanish lawyer who represents Dougall in Spain and who testified with respect to his role in this transaction as an

15

intermediary between Dougall and Lopez de Aragon.    (See Pre-Trial Order, Cacheire's designated Deposition testimony)

In addition, a letter from Diego to the Spanish Ministry of Education and Cultural Affairs dated March 25, 2004, states that the Sculpture had been sold to an "English firm" during the 2004 Maastricht Fair (Exhibit 14). And, finally, the Certificate of Shipment to Salander-O'Reilly, dated April 7, 2004, shows Dougall Arts Limited as the exporter (Exhibit 15).

Defendant's efforts to support its argument that it did not buy the Sculpture from Dougall are specious and wholly insufficient to support the "lack of standing" defense.

First, Defendants wrote Diego on March 19, 2004, informing him that "the St. Jerome we purchased from you at the Maastricht Fair" was being shipped to London where it was to be exported to New York and sought confirmation that Diego had notified Spanish authorities of its sale and the fact that it was leaving the E.C. (exhibit A)

Diego's confirmation to the Spanish authorities (Exhibit 14) states that the buyer from Lopez de Aragon as an "English firm."

Exhibit A does nothing to detract from the fact that Diego was serving as Dougall's agent when the Sculpture was sold. And, as previously noted, Salander-O'Reilly's shipping documents (Exhibit 15) showed "Dougall Arts Limited" as the exporter.

Finally, when three letters were sent by Jorge Loaiza, Esq. to Salander-O'Reilly in August, September and October 2004 following Salander-O'Reilly's failure to pay the second installment (Exhibits16, 17, and 18), Salander-O'Reilly never claimed in response that Dougall was not the seller. And in the letter Salander-O'Reilly sent to Diego (Exhibit 19) asserting misrepresentations concerning the sale made by "Lopez de Aragon", Salander-O'Reilly does not claim that Dougall was not the seller. Rather, the letter asserts that Salander-O'Reilly made an

agreement with "you and your father" and never met with any principals of Dougall. Plainly, this does not establish that Dougall was not the seller. Indeed, the letter is perfectly consistent with the fact that Lopez de Aragon, through Diego, was the agent for Dougall in the transaction.

In fact, after learning about Salander-O'Reilly's attempts to renegotiate the terms of payment with Lopez de Aragon, Dougall's attorneys advised that Salander-O'Reilly had to contact Dougall, not Lopez de Aragon (to whom the letter referred as Dougall's agent). (Exhibit 18) But Dougall heard nothing more from Salander-O'Reilly; not even a suggestion that Dougall was not the seller.

In short, all the documentation and relevant testimony demonstrate that Lopez de Aragon sold the Sculpture to Dougall and served as agent for Dougall when the Sculpture was sold to Salander-O'Reilly.

None of Defendant's after-the-fact gesticulating and disreputable conduct in seeking to delay payment detracts from the fact that Defendant bought the Sculpture from Dougall and must now pay the balance of what it owes -- plus interest.

## INTEREST

The parties have agreed that New York law governs this case. As this is a breach of contract case, CPLR 5001 and 5004 govern. (See, also, Zimmerman v. Tarshis, 300 A.D.2d 477, 751 N.Y.S.2d 418 (2d Dept. 2002), and Abiele Contracting Inc. v. New York City School Construction Authority, 6 A.D.3d 366, 774 N.Y.S.2d 380 (2d Dept. 2004)). And, based on the same CPLR sections and the case law, interest accrues from the time of the breach at 9% per annum.

As there were breaches on August 15, 2004 (with respect to the EUR250,000 payment) and on November 1, 2004 (with respect to the EUR 200,000 payment) interest (at the

17

rate of 9%) is approximately EUR83,000.    Thus, Dougall is, as of the trial date, due EUR533,000.

CONCLUSION

For all of the foregoing reasons, this Court should determine that Defendant has breached its obligation to pay plaintiff EUR450,000, and that Defendant therefore owes Plaintiff EUR450,000 plus interest at the rate of 9% from, respectively, August 15, 2004 (EUR250,000), and November 1, 2004 (in EUR200,000), for a total of EUR553,000 -- approximately US $700,000.

Dated: New York, New York
     November 7, 2006

Respectfully Submitted

Wormser, Kiely, Galef & Jacobs LLP
Attorneys for Plaintiff

By:               
        John T. Morin
        Robert F. Jacobs
        825 Third Avenue
        New York, New York 10022
        (212) 687-4900

18