# Exhibit D

Flemming Zulack Williamson Zauderer LLP
One Liberty Plaza
New York, New York 10006
(212) 412-9500
Dean R. Nicyper, Esq. (DRN-7757)

Attorneys for Plaintiff Earl Davis

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ X
EARL DAVIS,                                            :
                                                       :     Index No. 07 Civ. 4165 (SHS) (DF)
                              Plaintiff,               :
                                                       :
        -against-                                      :
                                                       :     **DECLARATION OF**
                                                       :     **EARL DAVIS IN SUPPORT**
SALANDER O'REILLY GALLERIES LLC                        :     **OF MOTION FOR A**
f/k/a SALANDER O'REILLY GALLERIES INC.,                :     **PRELIMINARY INJUNCTION**
and LAWRENCE B. SALANDER                               :     **AND EXPEDITED DISCOVERY**
                                                       :
                              Defendants.              :
------------------------------------------------------------------ X

        EARL DAVIS declares under the penalties of perjury as follows:

        1.      I am the son and heir of American artist Stuart Davis and the plaintiff in

this action.  I am fully familiar with the facts set forth in this declaration in support of Plaintiff's

Motion for a Preliminary Injunction and Expedited Discovery.

        2.      My father is a well-known American artist.  His works of art are exhibited

in many museums around the country and throughout the world.  The works of art he created

have significant value.

        3.      Aside from their value on the art market, my father's works of art have

incalculable personal and emotional significance to me.

        4.      My father died in 1964.

        5.      For decades, I, as an heir of my father's estate, have actively managed the

large collection of works of art that remained in the family after my father's death.

295282

6.     For more than twenty years, I have had a business and trust relationship with Salander O'Reilly Galleries, LLC (f/k/a Salander O'Reilly Galleries, Inc.) ("SOR" or the "Gallery") and Lawrence B. Salander ("Salander") (SOR and Salander are referred to herein collectively as "Defendants"). During that relationship, I delivered hundreds of works of art created by my father (the "Works") to the Gallery for exhibition and possible sale.

7.     Because of the non-monetary significance of the Works to me, I made clear to Defendants that, although I delivered the Works to SOR for exhibition and possible sale, I did not want all of the Works to be sold. To the contrary, I expressly informed SOR that, depending upon which of the Works might first become in demand, I would want to keep at least some of the other remaining Works in my family collection.

8.     Defendants and I have had a long-standing practice of regularly reassessing the asking prices for the Works I delivered to the Gallery. In recent years, I informed Defendants that I was to be notified prior to any of the Works being offered for sale to discuss whether to offer the individual work and, if so, the price at which it would be offered.

9.     Defendants and I accordingly agreed that the Defendants would offer a work for sale only after consultation with me and only at prices expressly authorized by me, and that, for such sales, SOR would be entitled to commissions as follows:

For each painting:

- 20% of sales proceeds up to $1 million.
- 10% of sales proceeds in excess of $1 million.

For each work of art on paper:

- 30% of sales proceeds up to $20,000.
- 20% of sales proceeds in excess of $20,000.

(See letter agreement between Salander-O'Reilly Galleries and me, attached hereto as Ex. 1.)

10.     For more than twenty years, by all appearances from all information I was aware of, I had a successful and close-working business relationship with the Gallery and its director, Larry Salander. In early 2005 -- more than twenty years into our business relationship -- I began to see signs that the Gallery was having bookkeeping problems. I therefore asked the Gallery to print an inventory of the Works, listing the last agreed prices for each Work so that they all could be updated coherently. Each time I made the request, I was told that the Gallery would look into it.

11.     I also requested that the Gallery employees verify the location of each of the Works.

12.     In response, several weeks after my last request, the Gallery's Registrar, Bill Thibodaux, told me that he personally had confirmed the location of all of the Works in the Gallery's storage facilities, and he expressly told me that he had accounted for everything and that "everything was in order." I was reassured by this representation.

13.     Neither he nor anyone else informed me at that time that any of my Works were anywhere other than at the Gallery's New York location or New York warehouse.

14.     On November 30, 2005, the Gallery sold four of the most significant works remaining in my collection (the "4-Paintings Sale"). It sold those paintings without informing me and without first seeking my approval of the highly discounted sale prices. When Larry Salander did inform me of the sale after it had been concluded, I demanded that the sale be rescinded. Larry Salander told me, however, that it could not be rescinded. Instead, he told me that the sale price of $2,700,000 was to be paid in installments over three years. He later represented to me, however, that the installment payments were to be made over four years in 48 monthly payments.

15.    From time to time Defendants sold other Works on a similar installment payment basis. I do not have information identifying which of my Works recently were sold on an installment basis or what installment payments are still outstanding.

16.    After learning that Defendants had concluded the 4-Paintings Sale without consulting me, and in light of recent record auction prices for my father's art, I told the Gallery in the first week of December 2005 to cease selling my Works pending a full price review and revision.

17.    In early 2006, I repeated this instruction, specifying that the Gallery must "clearly freeze any further offerings of sales," and I further demanded "the immediate return of all my inventory" of Works. (See January 27, 2006 e-mail from me to Larry Salander included in e-mail correspondence between me and Larry Salander, dated January 27, 2006 and February 7-8, 2006, attached hereto as Ex. 2.)

18.    Larry Salander assured me in person that any further sales would cease and that the Works would be returned.

19.    To further assuage my concern about the 4-Paintings Sale, Larry Salander emphasized our successful 20-year business relationship and promised: "I will pay you in full whatever it is you think I owe you.... I am prepared to live without my commission deducted or even more (within reason). I will pay in full on or before December 31, 2006." (See February 8, 2006 e-mail from Larry Salander to me included in e-mail correspondence between me and Larry Salander, dated January 27, 2006 and February 7-8, 2006, attached hereto as Ex. 2.)

20.    Surmising from the recent events that the Gallery may be having either recordkeeping or liquidity problems, I told Larry Salander at a meeting with him on March

14, 2006, that the Gallery must not mix my sales proceeds with the Gallery's "general pool" of money and that my sales proceeds should instead be kept in a "trust-like account" for me.

21.    In May 2006, Larry Salander told me that many of my Works were out of the Gallery at framers, restorers, on consignment, or "on approval" with potential buyers. Until then, I had not been aware that such a large quantity of the Works would be out of the Gallery without my being informed.

22.    I therefore demanded that the Gallery provide a full inventory identifying the actual present location of each of the Works and that the Gallery arrange for all of them to be returned immediately.

23.    Also in May 2006, Larry Salander persuaded me to sell a Stuart Davis painting, titled *Punchcard Flutter,* in one sale for $2,250,000 and to sell 12 other Stuart Davis works of art for $650,000 in another sale (the "Two Sale Agreements").

24.    Larry Salander induced me to agree to the Two Sale Agreements by his making representations (which I later learned were false) regarding the sale price for the works, and by stating that the first sale would be paid within the week, that the buyers of the second sale already had "cash on the table," and that the Gallery, in turn, would pay me immediately.

25.    Larry Salander later revealed to me that *Punchcard Flutter* was sold for $2,125,000, not $2,250,000, and that, although he and the Gallery had released it and the other 12 works to the two buyers, he claimed that the buyers had not yet paid for the Works. Larry Salander again sought to erase my concerns about the Gallery's recent practices by reminding me of our 20-year successful relationship and by repeatedly promising to pay me more than the actual sale prices for works sold, plus interest.

26.     Defendants, however, to this day have not paid me any of the $2,900,000 proceeds from the Two Sales Agreements or the $2,700,000 for the 4-Paintings Sale.

27.     By May 31, 2006, the Gallery and Larry Salander had not returned any of the Works to me despite my repeated demands for them. I therefore reminded one of the Gallery's senior art professionals, Leigh Morse, that I had been demanding that "my entire inventory of works by my father [be] returned immediately ... ." (See May 31, 2006 e-mail from me to Leigh Morse, attached hereto as Ex. 3)

28.     I repeated to another senior officer at the Gallery, Andrew Kelly: "I want Everyone involved in sales of my father's work at the gallery to be clearly and unambiguously notified that I wish to Completely Suspend any and all offerings of such works for sale until after such time that they have each been physically returned to my possession and a more reliable system of accounting and record keeping has been established at the gallery." (See June 12, 2006 e-mail from me to Andrew Kelly, attached hereto as Ex. 4 (emphasis in original).)

29.     To mollify my growing concerns as were reflected in my e-mails to Leigh Morse and Andrew Kelly, Larry Salander again reminded me about our good long-standing relationship and that he would do whatever it took to pay me in full. Then, at a meeting with his accountant on June 21, 2006, without any prior discussion with me, he handed me a stack 24 post-dated checks (each in the amount of $222,083). The checks were to pay over 24 months the Gallery's debt to me -- at least to the extent that he and the Gallery had disclosed their debt to me as of that date. The checks therefore were purportedly to cover

the 4-Paintings Sale, the Two Sale Agreements, and two earlier partnership transactions Defendants and I had entered into.

30.    The two partnership transactions were deals the Gallery and I had entered into in 2003.  Pursuant to those deals, Defendants and I jointly purchased a Courbet painting and a pair of bronze sculptures.  (See copies of a January 4, 2005 letter agreement confirming the 2003 agreement regarding the Courbet painting and a January 4, 2005 letter agreement confirming the 2003 agreement regarding the pair of bronze sculptures, attached hereto as Ex. 5.)  The checks Larry Salander handed to me on June 21, 2006 resolved the Gallery's debt for the two partnership transactions, and those transactions are not at issue in this lawsuit.  (As is explained below, only three of the checks ultimately cleared and therefore only the debt for the two partnership transactions was paid.)

31.    I was surprised to be handed the 24 post-dated checks without agreeing to them.  I told Larry Salander that I did not want a 24-month payout.  In response, he said the checks were merely to serve as back-up security for me and reassurance that he and the Gallery planned to pay me in full.

32.    In June 2006, Defendants began to return some of the Works to me.  In nine separate deliveries between June 1, 2006 and January 11, 2007, Defendants returned 102 Works to me.  The fact that works were being returned to me significantly reduced my concerns about the Gallery's bookkeeping, although I was later to learn when the returns ended in January 2007 that the returns included few paintings and for the most part were the least significant and least valuable works I had delivered to the Gallery.

33.     After my repeated demands for an inventory listing all of my Works and their locations, the Gallery finally produced a list to me in late July 2006. (See list provided by SOR's Andrew Kelly to me in late July 2006 (the "2006 List"), attached hereto as Ex. 6.)

34.     The 2006 List identified 124 Stuart Davis works of art that I had delivered to the Gallery which, at that time in August, had not yet been returned to me. In the 2006 List, the Gallery represented to me that 103 of the 124 Works listed were out on consignment with other galleries or dealers, eight others were either on consignment or on approval with various private collectors or museums, nine purportedly were in SOR's possession, and four were missing. The 2006 List did not disclose that any of the 124 listed Works had been sold. To the contrary, Gallery employee Andrew Kelly handwrote on the 2006 List the last agreed-upon prices at which the Gallery would offer each of the listed Works and the years in which the Gallery and I had agreed to those prices.

35.     Learning for the first time from the 2006 List that all but nine of my Works were outside the Gallery, I reiterated to Larry Salander: "I want to be clear that the WORKS OUT really have all actually been called in for immediately return." (See July 27, 2006 email from me to Larry Salander and Andrew Kelly, attached hereto as Ex. 7) (emphasis in original).)

36.     In mid-September through October 2006, however, I learned from people not associated with the Gallery that several of the Works designated in the 2006 List as having been on consignment in fact had been sold. I had not been informed about the sales and none of the sales proceeds have been forwarded to me.

37.     Specifically, a Gallery client, Joseph Carroll, told me that he owned 10 of my Works, contrary to the Gallery's representation to me that all the Works merely were

out on consignment. In addition, a show at the Whitney Museum included two of the Works and identified them as being owned by someone other than me. Finally, another art gallery, the Babcock Gallery, was selling five of the Works, contrary to Larry Salander's assurances that he would arrange the return of all outstanding Works.

38.     I also learned from a lawyer who had represented the person who bought *Punchcard Flutter* (<u>see</u>, <u>supra</u>, ¶ 25) that the buyer had paid an intermediary dealer in full for the painting on June 1, 2006 and that the dealer said he had paid the Gallery in full for the painting on June 2, 2006. This information contradicted Larry Salander's repeated representations to me that the Gallery was never paid for *Punchcard Flutter*.

39.     When I confronted Larry Salander with all of these previously undisclosed, apparent, sales and issues, he claimed he was surprised and said that he would look into them.

40.     I again repeated to him my demand that the Gallery send a notice to every consignee on the 2006 List informing each that my Works were no longer for sale and must be returned. He again confirmed to me that he and the Gallery would do this.

41.     For the first three months after Larry Salander handed me 24-post-dated checks, the checks cleared, but in November 2006, the Gallery's accountant told me not to deposit any more checks because they were unlikely to clear. The checks that did clear, therefore, were only sufficient to cover the Gallery's debt for the two partnership deals I had entered into with Larry Salander and the Gallery in 2003 (which are not at issue in this action). The checks that cleared were for amounts insufficient to cover any of the proceeds from sales of any of the Works at issue in this action.

42.    In mid-December 2006, a high-level Gallery employee, Diane Buckley, informed me that the Gallery had sent letters for return of my Works to only four of the numerous people and entities that the 2006 List described as consignees of my Works. When I raised this issue with Larry Salander, he threatened me saying he would go on the attack against me if I told anyone anything that he might consider to be damaging to his reputation. I therefore became concerned about contacting the other galleries and dealers myself and refrained from doing so.

43.    I continued my requests for return of my Works and for a more accurate list identifying the status of my Works. The Gallery continued to return Works, but the returns slowed and then ceased after January 11, 2007, leaving at least 99 Works unaccounted for. On January 5, 2007, the Gallery provided an updated list to me dated January 4, 2007 (the "January 4, 2007 List"). In stark contrast to the 2006 List, which had identified 124 of the Works and their locations, the January 4, 2007 List identified 73 of the Works and for the first time reported that they *all had been sold*. (See List dated January 4, 2007 (the "January 4, 2007 List") attached hereto as Ex. 8.)

44.    I asked for clarification of information in the January 4, 2007 List and the location of my other Works. In response, the Gallery provided several revised lists, culminating in a revised list dated February 2, 2007 (the "February 2, 2007 List"). (See February, 2, 2007 List attached hereto as Ex. 9.) The February 2, 2007 List identifies 116 works. To my surprise, the revised lists all represented that many of the previously undisclosed sales of my Works had actually occurred several years ago.

45.    With respect to all of the 73 Works that, according to the new lists, purportedly had been sold by the Gallery, neither Larry Salander nor anyone else at the Gallery

had consulted me regarding the sale prices for the works, and they never gave me a chance to keep some of the Works for my family collection.

46. If the sales information in the Gallery's lists is accurate, the Gallery sold 73 of my Works for a total of $9,378,875. The Gallery has never paid me any of the $9,378,875.00 in sales proceeds.

47. In addition to not disclosing to me that they had sold dozens of my Works and in addition to not paying me any of the proceeds from those sales, Larry Salander and the Gallery sold all or nearly all of the 73 Works at prices well below the prices I would have assigned had I been consulted. Indeed, they sold many of the Works at prices well below the prices that I had discussed with them years earlier, even though the Works had significantly appreciated in value since that time. For example, Andrew Kelly states in the 2006 List, with respect to Work number Y.65, that the Gallery and I had agreed in 1999 (see the 2006 List) that it would be sold for $450,000, and then agreed in 2003 that the price would be $850,000 (see the 2006 List), but the February 2, 2007 List shows that Defendants sold it in 2005 for only $290,000. As another example, with respect to Work number Y.88, the Gallery and I had agreed in 1999 to sell it for $475,000 (see 2006 List), but the February 2, 2007 List shows that Defendants sold it for only $375,000. As another example, with respect to Work number Y.84A, the Gallery and I had agreed in 2005 (see 2006 List) that this work would be sold for $850,000, but the February 2, 2007 List shows that Defendants sold it for only $500,000.

48. Defendants have repeatedly acknowledged to me that they owe to me all sales proceeds for all Works sold. For example, in a December 13, 2006 e-mail to me, the Gallery's Managing Director, individual Defendant Larry Salander, stated: "The only thing

that could stand in the way of paying you would be my death.... The fact is your trust was, is and will be well placed with me. You will get paid every cent you are owed." (Ex. 10 hereto.)

49.    As another example, in a March 12, 2007 e-mail to me, Larry Salander stated: "So it comes down to money, and a lot of it. I have already promised you I will pay you every cent I owe you and as quickly as I possibly can.... You have the right to say, 'Yeah, but it's my money' – and that it is." (Ex. 11 hereto.)

50.    When the Gallery ceased returning Works to me in mid-January (revealing that 99 Works were not accounted for) and produced lists in January and February showing 73 Works sold (consisting of 56 of the 99 Works that had not been returned plus the 4-Paintings, the 12 Works and *Punchcard Flutter*) and 43 Works still unaccounted for, I lost faith in the trust I had relied on in my more than 20-year relationship with Larry Salander and the Gallery. I therefore retained a law firm to assist me. We tried to avoid litigation by attempting to negotiate a binding resolution with the Gallery. We were unsuccessful and therefore initiated this lawsuit.

51.    Mr. Carroll contacted me again recently. During our discussion he told me that the Gallery did generate and provide invoices to him for the Stuart Davis works of art he had purchased from the Gallery. He also told me that he had filed several UCC financial statements. Our search of the UCC filings uncovered many instances in which the Gallery had pledged my Works as collateral for its own debts. At no time did I authorize the Gallery to pledge my Works as collateral.

52.    The Defendants' sales of my Works without consulting me already has caused me irreparable damage. The Works I delivered to the Gallery were the only Works of

my father's art remaining in my family's possession. I had specifically agreed with the Gallery that they would contact me prior to any sales so that I could determine whether I wanted to sell a particular work and, if so, at what price. We established this procedure to enable me to determine which of my father's works I would keep upon learning which works people were interested in buying.

53.    The Defendants' sales of dozens of the most important of my Works has deprived me of the opportunity to retain significant Works created by my father as well as the ability to mount future exhibitions to promote his work.

54.    Any further sales of my Works will cause me further irreparable damage. Defendants claim that 73 Works have been sold. They have not explained what happened to the 43 other Works. My instructions to Defendants to cease selling my father's Works and return them to me have been disregarded. I respectfully request that this Court order the Defendants to: cease selling or encumbering my Works; retrieve any that are unsold or which have been pledged as collateral; and return all unsold Works to me.

55.    Defendants have declared that they have a liquidity crisis. (See accompanying Declaration of Dean R. Nicyper in Support of Motion for a Preliminary Injunction and Expedited Discovery, ¶ 5.) The Defendants' declaration is confirmed by Defendants' repeated failed promises to pay me all money they owe. The proceeds from sales of my Works are mine alone. Defendants have no right to those funds. Given Defendants' liquidity crisis, the longer Defendants withhold payment to me, the greater the likelihood that Defendants will never deliver the sales proceeds to me. I therefore respectfully request that this Court order Defendants to deliver to me all proceeds from sales of my Works and forward

to me any future installment payments, immediately as Defendants receive them, for prior sales of my Works.

56.    I have asked Defendants for records concerning sales of my Works and the proceeds from those sales. They expressly refused to provide the agreements for the 4-Paintings Sale, *Punchcard Flutter* and the 12 Works Sale. Nor have they provided any information regarding the location of my sales proceeds or the location of unsold Works. The only documents they provided were the few invoices they delivered to my attorney a few weeks ago concerning 42 of the 116 outstanding Works. Defendants claim to have no other invoices, even though they listed sales prices for 31 additional Works. Other people do have invoices for sales by Defendants. For example, Joseph Carroll informed me that he has invoices for sales to him even though Defendants claim they do not. Galleries who purchased Works also are likely to have sales documentation. These documents will reveal: the status of the 43 Works that have not been accounted for; the sale prices and dates for all Works that were sold; and the terms of any agreements for sales of the Works including identification of any installment payments still due.

57.    Accordingly, I respectfully request that this Court (A) award preliminary injunctive relief to me, pending final determination of this action, by entering an order: (1) enjoining Defendants from selling or otherwise disposing of or encumbering any of my Works and from using any proceeds from sales of those Works for Defendants' own purposes; (2) mandating that Defendants retrieve and deliver to me all unsold Works, and segregate in a separate bank account and deliver to me all proceeds that Defendants already have received from sales of my Works; and (3) segregate in a separate bank account and deliver to me immediately upon receipt all incoming installment payments that constitute proceeds from prior sales of my

Works; and (B) authorize expedited discovery to: (i) locate all of the Works and proceeds from sales of any Works; (ii) determine which of the Works have been sold and for what amount and the location of proceeds from those sales; (iii) identify all persons and entities that owe installment payments on any previously sold Works; and (iv) locate any of the Works that were improperly pledged as collateral by Defendants.

       I declare under penalty of perjury that the foregoing is true and correct.

Executed on:  June 27, 2007
              New York, New York

_____
            EARL DAVIS

# Exhibit E

Flemming Zulack Williamson Zauderer LLP
One Liberty Plaza
New York, New York 10006
(212) 412-9500
Dean R. Nicyper, Esq. (DRN-7757)

Attorneys for Plaintiff Earl Davis

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ X
EARL DAVIS,                                                 :
                                                           :    Index No. 07 Civ. 4165 (SHS) (DF)
                              Plaintiff,                    :
                                                           :
        -against-                                          :
                                                           :    **DECLARATION OF**
                                                           :    **DEAN R. NICYPER**
SALANDER O'REILLY GALLERIES LLC                            :    **IN SUPPORT OF MOTION**
f/k/a SALANDER O'REILLY GALLERIES INC.,                    :    **FOR A PRELIMINARY**
and LAWRENCE B. SALANDER                                   :    **INJUNCTION AND**
                                                           :    **EXPEDITED DISCOVERY**
                              Defendants.                   :
------------------------------------------------------------------ X

        DEAN R. NICYPER declares under the penalties of perjury as follows:

        1.      I am admitted to practice law in the State of New York and am a member

of Flemming Zulack Williamson Zauderer LLP, attorneys for plaintiff, Earl Davis ("Davis" or

"Plaintiff") in this action. I am fully familiar with the facts set forth in this declaration in support

of the Order to Show Cause for Plaintiff's Motion for a Preliminary Injunction and Expedited

Discovery against Defendants Salander O'Reilly Galleries, LLC (f/k/a Salander O'Reilly

Galleries, Inc.) ("SOR" or the "Gallery") and Lawrence B. Salander ("Salander") (SOR and

Salander are referred to herein collectively as "Defendants".) A copy of the Complaint is

attached hereto as Ex. 1.

        2.      Shortly after our firm was retained by Plaintiff, I met several times with

the Gallery. The meetings continued for several weeks (we met March 28, 2007, April 4,

295304

2007, April 10, 2007 and April 18, 2007). At the meetings, I requested invoices for all sales of any of the works of art Plaintiff had delivered to the Defendants (the "Works"). At a meeting on April 18, 2007, Defendants provided invoices for 42 of the 73 Works that Defendants had listed as having been sold at purportedly specified prices on a February 2, 2007 list, which Defendants previously had provided to Plaintiff (the "February 2, 2007 List"). At the same time, Defendants handed to me a modified version of the February 2, 2007 List. The new list contained handwritten notes identifying those Works for which Defendants were producing sales invoices (the "Annotated List"). (A copy of the Annotated List with attached copies of all invoices Defendants provided at that time is attached hereto as Ex. 2.)

3.     The Defendants told me that they were unable to locate any invoices for sales of any of the other 74 Works, even though the lists they had provided to Plaintiff identified sale prices for at least 31 Works in addition to the 42 Works for which Defendants did produce invoices.

4.     The inventory lists Defendants provided to Plaintiff this year all show that Defendants sold many of Plaintiff's Works years ago for millions of dollars in the aggregate, although Defendants never paid Plaintiff any of the proceeds from those sales. During that same time, in contrast, Defendants paid millions of dollars to others, as is demonstrated in part in pleadings filed against Defendants in the following other actions:

a.     To settle a claim by Compagnie de Beaux Arts Ltd. ("CBA"), the Gallery paid CBA $475,000 in the period November 30, 2005 to January 31, 2006. The Gallery owed an additional $635,000. The lawsuit by Compagnie against the Gallery, filed February 2, 2006, has since been settled and therefore all or some of that

$635,000 amount appears to have been paid since January 2006. (Complaint and attachments in <u>Compagnie de Beaux Arts, Ltd v. Salander O'Reilly Galleries LLC</u>, 06/600338 (Sup. Ct. N.Y. Co.), a copy of which is attached hereto as Ex. 3.)

b.    On March 16, 2005, the Gallery purchased an Edouard Manet painting and a sculpture from Renaud-Giquello & Associes for EUR 489,149.58, and paid EUR 146,745 on that date. A lawsuit Renaud-Giquello filed against the Gallery on February 28, 2006 for the remaining amount has now been settled, and therefore it appears that all or some of the remaining EUR 342,404.58 has been paid since the complaint was filed. (Complaint in <u>Renaud-Giquello & Associes v. Salander O'Reilly Galleries LLC</u>, 06/600661 (Sup. Ct. N.Y. Co.), a copy of which is attached hereto as Ex. 4.)

c.    The Gallery purchased a sculpture from Dougal Arts Limited on March 1, 2004, for EUR 850,000, and Defendants paid EUR 400,000 to Dougal on March 9, 2004. A lawsuit Dougal Arts filed against the Gallery for nonpayment of the remainder has now been settled and therefore it appears that the Gallery paid all or some of the remaining EUR 450,000 to Dougal since the filing of a pre-trial memorandum in the action on November 7, 2006. (Pre-trial memorandum in <u>Dougal Arts Limited v. Salander O'Reilly Galleries, LLC</u>, 05 Civ. 5299 (WHP) (SDNY), a copy of which is attached hereto as Ex. 5.)

d.    The Gallery guaranteed a purchase by Salander of a Charles Sheeler painting, titled *New Haven,* on April 1, 2005, from Saundra Lane for $9,173,261. One or both of the Defendants paid Saundra Lane $2,850,770 between April 1, 2005 and April 19, 2006. A lawsuit by Ms. Lane against the Gallery and

Salander for the remainder of the money (the "<u>Lane v. Salander</u> Action") apparently is ongoing. (Verified Complaint and attachments in <u>Saundra B. Lane v. Lawrence Salander and Salander O'Reilly Galleries, LLC</u>, 06-40178 (D. Mass.), a copy of which is attached hereto as Ex. 6.)

> e.    Defendant Salander paid a contractor $374,388.05 for renovations to his New York apartment between June 2004 and June 19, 2006, the date a complaint was filed against Salander by the contractor. (Complaint in <u>Timothy Landing, Inc. et ano v. Lawrence Salander, et ano</u>, 06/602179 (Sup. Ct. N.Y. Co.), a copy of which is attached hereto as Ex. 7.)

5.    In the <u>Lane v. Salander</u> Action, counsel for the Gallery and Lawrence Salander represented to the court that they have "a liquidity crisis," and their counsel expressed concern that their "house of cards will collapse." <u>See</u> Transcript of April 13, 2007 Proceedings, in <u>Lane v. Salander</u>, CA No. 06-40178-FDS, at pages 5 and 7 (attached hereto as Ex. 8).

6.    A recent search of Uniform Commercial Code ("UCC") financing statements revealed that in 2006 Defendants pledged at least fourteen of Plaintiff's Works as collateral to secure Defendants' own debt obligations. (<u>See</u> chart of the fourteen works and copies of the UCC #1 Financing Statements, attached hereto as Ex. 9.)

7.    The purpose of the meetings between Defendants and me in March and April of this year was to negotiate alternative methods for Defendants to make payments of at least some of the amounts Defendants owe to Plaintiff.

8.    We negotiated various terms to resolve some of the obligations, and drafted agreements reflecting those terms. After postponing signing for weeks, however,

Defendant Salander never in fact signed any of the agreements which would have addressed at least some of the claims in this action.

9.    Plaintiff will suffer substantial, immediate and irreparable injury and damages if Defendants are not (i) enjoined from continuing to sell or encumber the Works; (ii) mandated to return to Plaintiff all unsold Works; and (iii) directed to segregate in a separate bank account and deliver to Plaintiff all proceeds that Defendants already have and may receive from sales of Plaintiff's Works. Moreover, as set forth in further detail in the accompanying Memorandum of Law, Plaintiff is substantially likely to prevail on his claims against Defendants because, under Article 12 of the New York Arts and Cultural Affairs Law, Defendants hold the Works and any proceeds from the sale of such Works in trust for the benefit of Plaintiff, and Defendants have no rights to those Works or sales proceeds.

10.    Plaintiff has no adequate remedy at law.

11.    The harm that will be sustained by Plaintiff if the requested injunction is denied far outweighs the prejudice to Defendants if the requested injunction is granted.

12.    Accordingly, we respectfully request that this Court (A) award preliminary injunctive relief to Plaintiff, pending final determination of this action, by entering a judgment and order: (1) enjoining Defendants from selling or otherwise disposing of or encumbering any of Plaintiff's Works and from using any proceeds from sales of those Works for Defendants' own purposes; (2) mandating that Defendants retrieve and deliver to Plaintiff all unsold Works, and segregate in a separate bank account and deliver to Plaintiff all proceeds that Defendants already have received from sales of Plaintiff's Works; and (3) segregate in a separate bank account and deliver to Plaintiff immediately upon receipt all incoming installment payments that constitute proceeds from prior sales of Plaintiff's Works.

13.    We additionally respectfully request that this Court (A) authorize immediate service of (i) Plaintiffs' First Document Requests to Defendants; and (ii) subpoenas to the dealers and galleries to which Defendants sent Plaintiff's Works (copies of the proposed Document Requests To Defendant SOR and proposed form of Subpoena with Schedule A annexed thereto, are attached hereto as Ex. 10); and (B) authorize expedited discovery upon issuance of the preliminary injunction to further: (i) locate all of the Works and proceeds from sales of any Works; (ii) determine which of the Works have been sold and for what amount; (iii) identify all persons and entities that owe installment payments on any previously sold Works; and (iv) locate any of the Works that were improperly pledged as collateral by Defendants.

14.    Pursuant to Local Rule 6.1(d), Plaintiff states that he brought this motion by order to show cause because the very nature of the relief requested (namely, preliminary injunctive relief and expedited discovery) and the circumstances here (where the risk of irreparable harm increases significantly as time passes) necessitate that this motion be heard on an accelerated basis.

15.    No prior request has been made for the relief sought herein.

16.    THEREFORE, for the above reasons and for all the reasons set forth in the accompanying Memorandum of Law and Declaration of Earl Davis, Plaintiff respectfully requests that the Court grant the requested preliminary injunction and expedited discovery.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed on:  June 27, 2007
New York, New York

_____
DEAN R. NICYPER

295304                                    6

# Exhibit F

Flemming Zulack Williamson Zauderer LLP
One Liberty Plaza
New York, New York 10006
(212) 412-9500
Dean R. Nicyper, Esq. (DRN-7757)

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7/9/07 (MB)
```

Attorneys for Plaintiff Earl Davis

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ X

EARL DAVIS,                                        :
                                                   :    Case No. 07-CV-4165 (SHS) (DF)
                              Plaintiff,            :
                                                   :
              -against-                            :
                                                   :
                                                   :    **STIPULATION AND ORDER**
SALANDER O'REILLY GALLERIES LLC                   :
f/k/a SALANDER O'REILLY GALLERIES INC.,           :
and LAWRENCE B. SALANDER                          :
                                                   :
                              Defendants.          :

------------------------------------------------------------------ X

WHEREAS, Plaintiff, as the son and heir of American artist Stuart Davis, owns works of art created by his father. He consigned many of those works to Defendants' art gallery for exhibition or possible sale. He alleges that the Defendants have neither returned nor paid him for all of those works of art.

WHEREAS, Plaintiff has moved by Order To Show Cause for an order granting preliminary relief, which was signed by Judge Richard M. Berman on June 29, 2007. To resolve the relief sought in the Order to Show Cause, the parties agree, and Defendants consent, to the following:

IT IS HEREBY STIPULATED, AGREED, AND ORDERED that:

1.    Defendants, and all persons acting for, on behalf of or for the account of either of said Defendants, are enjoined, restrained and prohibited during the pendency of this action, from selling, lending, leasing, consigning, encumbering, assigning or pledging as collateral, or transferring or attempting to transfer to any person or entity other than to the Plaintiff herein or as this Court may otherwise direct,

possession of or any interest in any of the works of art identified in Schedule A hereto (the "Works");

      2.     Defendants are to retrieve all Works that have not yet been sold from those persons or entities to which Defendants consigned, pledged, loaned or transferred such unsold Works, and deliver such unsold Works to Plaintiff;

      3.     Defendants are to segregate from all of Defendants' other moneys, and deliver to Plaintiff, all installments that Defendants receive, upon such receipt from this date forward, as one or more payments for Works sold prior to this date;

      5.     Defendants shall begin producing to Plaintiff as soon as practicable, and shall complete production by July 25, 2007 (unless the parties stipulate otherwise or Defendants can demonstrate upon motion good cause for a later date for production of certain documents), pre-existing documents sufficient to demonstrate with respect to each and every Work:

      (a) if it was sold, to whom it was sold (including name, address and telephone number), the sale price, sale date and all terms of the sale, including but not limited to any terms for payment over time (such as a bill of sale, payment records, deposited checks, etc.);

      (b) if it was consigned, the person or entity to which it was consigned (including its name, address and telephone number) and the consignment agreement or other written document between the consignor and consignee describing all terms of the consignment;

      (c) if it was pledged as collateral, its current location, the security agreement or other written agreement between the debtor and creditor identifying the collateral and the debt for which it was pledged and the identity of the creditor (including its name, address and telephone number) to which it was pledged; and

      (d) if it was loaned, left on approval or otherwise delivered to any person or entity, the terms of that arrangement, including the identity, address and

295716

2

telephone number of each person involved, including the person currently in possession of the Work.

      6.     If Defendants fail to deliver to Plaintiff all documents identified in the preceding paragraph 5 with respect to any individual Work or Works on or before July 25, 2007 (or other date agreed to or ordered by the Court), Plaintiff may subpoena appropriate third-parties to locate each such Work and determine its status.

      7.     The parties shall have until August 10, 2007, to negotiate in good faith to attempt to resolve the claims in this action. If the parties are unable to reach a mutually acceptable resolution on or before August 10, 2007, this Consent Order shall *[or before]* remain in effect, the parties shall confer pursuant to Fed. R. Civ. P. Rule 26(f) on August *[5th]* 11, 2007, ~~a Rule 16 conference will be held with the Court on August 15, 2007~~, and this case may proceed in full, including with respect to any additional requests for injunctive relief that may be sought. *The parties are directed to Telephone Mag. Judge Debra Freeman to whom this action has been referred for general pretrial purposes, to establish a Rule 16 conference.*

Dated: New York, New York
      July 6, 2007

FLEMMING ZULACK WILLIAMSON
    ZAUDERER LLP

By: _____
    Dean R. Nicyper (DRN-7757)
One Liberty Plaza
New York, NY 10006-1404
Tel: (212) 412-9500
Fax: (212) 964-9200
*Attorneys for Plaintiff*

WINSTON & STRAWN LLP

By: _____
    David E. Mollón (DM-5624)
200 Park Avenue
New York, NY 10166
Tel: (212) 294-6700
Fax: (212) 294-4700

*Attorneys for Defendants*

7/1/08

SO ORDERED:

_____
    Sidney H. Stein, J.
    United States District Judge

3

SCHEDULE A

## OIL PAINTINGS

Y.4     **Coal Derrick**
1916 - 17, oil on canvas
24 1/8 x 30 in
Reg # 3926

Y.6     **Dogtown (Hillside with Stone Walls)**
c. 1916, oil on canvas
29 1/2 x 23 5/8 in
Reg # 3928

Y.7     **Farmer and Horse, Tioga, PA.**
c. 1919, oil on canvas
24 x 29 3/4 in
Reg # 5313

Y.8     **Airview**
c. 1916, oil on canvas
30 1/4 x 24 1/4 in
Reg # 5322

Y.10    **Mobil Oil**
1916, oil on canvas
23 x 19 in
Reg # 5334

Y.12    **(East) Gloucester-Harbor**
c. 1919, oil on canvas
19 x 23 in
Reg # 5324

Y.14    **Untitled (Rainy Day)**
c. 1918, oil on canvas
23 x 19 1/2 in
Reg # 3947

Y.17    **Summer House**
c. 1916, oil on canvas
18 3/4 x 22 3/4 in

Y.18    **Portrait of a Man**
c.1915, oil on canvas
23 1/8 x 19 1/8 in
Reg # 12760

Y.28    Bleecker Street
        1913, oil on canvas
        38 x 30 in
        Reg # 5326


Y.31    Harbor Scene
        1914, oil on canvas
        26 1/8 x 38 1/8 in
        Reg # 5343

Y.32    Woman in Landscape
        1914, oil on board
        12 x 16 in
        Reg # 14390

Y.41    Bowsprit
        1916, oil on canvas
        23 x 19 in
        Reg # 5318

Y.41A   A Cove, Gloucester Beach
        1916, oil on canvas
        30 x 24 in
        Reg # 3925

Y.45    Market and Broad Street,
        Newark, New Jersey
        1917, oil on paper
        16 x 12 1/2 in
        Reg # 3938

Y.46    Windy Night, Newark
        1917
        15 1/2 x 11 1/4 in
        Reg # 3939

Y.52    Tioga-Tobacco Fields
        1919, oil on canvas
        23 3/4 x 29 3/4 in

Y.53    Gloucester Landscape
        1919, oil on canvas
        23 7/8 x 29 3/4 in
        Reg # 5328

Y.57    Setting Sun, Tioga
        1919, oil on canvas
        24 x 30 in
        Reg # 5340A

**Y.61**     **Tree**
1921, oil on canvas
19 7/8 x 25 1/8 in
Reg # 5321

**Y.62**     **From the Shore (The Sword Plant)**
1921, oil on canvas
15 x 30 in
Reg# 11241

**Y.64**     **Tree and Urn**
1921, oil on canvas
30 x 19 in
Reg # 4809

**Y.65**     **Garden Scene**
1921, oil on canvas
20 X 40 in
Reg # 5344A

**Y.66**     **Wharf**
1921, oil on canvas
15 x 23 in
Reg # 12758

**Y68A**     **Still-Life with Dial**
1922, oil on canvas
49 3/4 x 32 in

**Y.69**     **Still Life with Egg Beater**
1922, oil on canvas
12 x 19 in
Reg # 3940

**Y69A**     **Red Still-Life**
1922, oil on canvas
50 x 32 in

**Y.70**     **Landscape with Saw**
1922, Oil on board
16 x 12 in
Reg # 2785

**Y.74**     **Still Life (Any)**
1922, oil on artist board
9 x 6 in
Reg # 10835

**Y74A**   **Brown Still-Life**
1922, oil on canvas
50 x 32 in

**Y.81**   **Interior**
c.1922, oil on canvas
20 1/8 x 16 /1/8 in
Reg # 3933

**Y.81- B**   **New Mexican Peak**
1923, oil on canvas
22 x 32 1/2 in
Reg # 5310

**Y.81-C**   **Mexican Girls**
1923, oil on canvas
20 x 16 in
Reg # 4407

**Y.81-D**   **Mexican Family**
1923, oil on board
20 1/8 x 16 1/8 in
Reg # 4406

**Y.82B**   **Indian Com**
1924, oil on board
18 3/4 x 24 1/2 in
Reg # 8456

**Y.82C**   **Roses in a Vase**
1924, oil on board
24 1/8 x 18 in
Reg # 6080

**Y.84A**   **Little Giant Still Life**
**(black and white version)**
1953, oil on canvas
32 7/8 x 43 in
Reg # 11260

**Y84B**   **Windshield Mirror**
c. 1954, tempera drawing on canvas
54 x 76 in

**Y.86**   **The Plan II**
1960, oil on canvas
8 x 12 in

**Y.88**    **Twilight in Turkey**
1961, oil on canvas
14 x 18 in
Reg # 7198

**Y.89**    **Punchcard Flutter**
1963, oil on canvas
24 x 32 in

**Y.93**    **Letter and His Ecol (Black & White)**
c. 1962-64, casein on canvas
24 x 30 in
Reg # 3956B

**Y.96**    **Theme for Eye Level**
c. 1950, oil on canvas
14 x 10 in
Reg # 3342

**Y.99**    **Abstraction**
c. 1922-23, oil on canvas
32 x 22 in
Reg # 3345

**Y.100**    **Untitled (Black and White Variation on Pochade)**
c. 1958-64, casein on canvas
45 x 56 in
Reg # 3346

## WORKS ON PAPER

**O.1**    **Suffragettes**
1910, watercolor on paper
13 3/4 x 18 3/4 in
Reg # 3951

**O.11**    **Chinese Merchant**
1912, watercolor on paper
14 1/2 x 10 1/2 in
Reg # 4784

**O.13**    **Portrait of Man with Cap**
1912, watercolor
10 1/2 x 14 5/8 in
Reg # 11711

**O.23**    **Woman with Shawl**
1918, watercolor
22 1/2 x 171/2 in

**O.23C**    **Glintenkamp on Bleeker**
1911, watercolor
17 3/4 x 23 3/4 in
Reg # 11708

**O.23K**    **The Plaza**
1918-19, watercolor on paper
18 x 24 in
Reg # 3936

**O.27**    **Untitled**
1921, watercolor on paper
23 x 17 in
Reg # 3963

**O.28**    **Greek Letter Backwards**
1921, pencil and watercolor on paper
17 1/4 x 23 in
Reg #3962

**O.30A**    **Room Interior**
1925, watercolor on paper
12 1 /8 x 9 1/2 in
Reg # 3953

**O.40**    **Study for Allee**
1955, gouache
8 x 35 in

**O.42-A**    **Section Study for Allee**
1955, gouache
8 x 11 in

**O.44**    **Hightstown Turnoff**
1960, casein
11 3/8 x 15 1/4 in

**O.47**    **On Location**
1963, casein on paper
8 3/8 x 11 5/8 in
Reg # 11264

**O.48**    **Figure with Pear**
c. 1925, watercolor and pencil on paper
15 x 18 in
Reg # 3958

**O.52**    **Untitled (Pear)**
1921, watercolor and pencil on paper
17 x 12 1/4 in
Reg # 3959

**O.55**    **Factory, Gas Pump and Boat**
c. 1930, ink and gouache on paper
10 x 15 1/2 in
Reg # 3945

**O.58**    **Study for Flying Carpet #2**
1942, gouache
5 x 7 in

**O.59**    **Study for Flying Carpet #3**
1942, gouache
5 x 7 in

**O.61**    **Untitled**
Mixed media and watercolor on paper
14 1/2 x 9 1/2 in
Reg # 3954

**O.63**    **Theater Crowd**
1911, watercolor on paper
14 x 18 1/2 in
Reg # 7161

**O.96**    **The Saint**
1943, gouache
15 x 20 in

**DRAWINGS**

**B.6**    **(Abstract Building composition)**
c. 1920's, ink on paper
16 3/4 x 22 in

**B.10**    **Composition with Paintings
and Town Square (Studio Interior with "Plaza")**
1925, ink on paper
10 x 11 in
Reg # 11683

**B.15-A**    **Drugstore Reflection**
1931, ink on paper
11 1/2 x 15 1/4 in

**B.16**      **Study for Radio City Music Hall Mural**
1932, pencil on paper
10 1/2 x 17 in
Reg # 11250

**B.16A**      **Configuration**
1932, gouache and pencil on paper
11 x 14 in
Reg # 16323

**B.18**      **Radio Tube**
1939, pencil on paper
7 1/8 x 4 3/8 in
Reg # 6001

**B.19B**      **Drawing for Report from Rockport**
1940, ink on paper
24 1/2 x 30 1/2 in
Reg # 10834

**B.20**      **Pad Series #1**
1939, pencil on paper
34 1/2 x 19 1/2 in
Reg # 11716

**B.20B**      **Drawing from Pad Series #3**
1939, pencil on paper
32 1/4 x 20 1/4 in
Reg # 4542

**B.29**      **Study for Percolator**
1927, pencil drawing
18 1/8 x 14 1/4 in

**B.50**      **Summer Landscape**
1932, pencil on paper
7 1/8 x 10 3/8 in
Reg # 11715

**B.84**      **New York Study**
undated, pencil on paper
13 1/4 x 8 3/4 in
Reg # 7143

**B.86**  **Clock and Telephone**
c. unknown, ink on paper
7 1/2 x 5 (sight) in
Reg # 12827

**B.88**  **(Untitled Drawing 1)**
ink on paper
7 3/4 x 6 3/4 in

**B.89**  **Study for Hightstown Turnoff**
1960, ink on paper
4 x 6 in
Reg # 3557

**B.102**  **Sketch for On Location**
c. 1963, ink and pencil on paper
4 x 5 7/8 in
Reg # 3558

**B.104**  **Drawing for Bois**
pencil on paper
4 11 /16 x 5 9/16 in
Reg # 4788

**B.116**  **Gloucester Study**
undated, pencil on paper
3 1/2 x 5 in
Reg # 7141

**SD-4**  **Drawing for Smiths Cove**
c. 1935, pencil on paper
15 x 20 in
Reg # 4804

**SKETCHBOOK DRAWINGS**

**1-1**  **Sketchbook 1-1**
c. 1931, pencil on paper
7 3/8 x 11 in
Reg # 11354

**1-13**    **Cigar and Hand Held Before View**
          **Looking Northwest from Approximately**
          **Third Avenue and E. 14th St.**
          1930-32, ink on paper
          7 3/8 x 7 3/8 in
          Reg # 5989

**2-13**    **6th Avenue E1 from**
          **Washington Mkt.**
          undated, pencil on paper
          9 1/2 x 11 3/4 in
          Reg # 10821

**3-3**     **Sketchbook (Gloucester 3-3)**
          c. 19301, pencil on paper
          10 3/4 x 14 1/2 in
          Reg # 11688

**7-15**    **Street Scene with Boulanger**
          c. 1928, pencil on paper
          8 x 10 1/2 in
          Reg # 4545

**9-4**     **Sketchbook #9-4 (Sailboat and Lighthouse)**
          c. 1932, pencil on paper
          6 x 7 in
          Reg # 7132

**9-14**    **Drawing for Garage Lights**
          1932, pencil on paper
          7 x 8 in
          Reg # 3586

**10-4**    **Sketchbook #10-4 (Eraldine and Phyllis)**
          pencil on paper
          7 1/2 x 9 1/3 in
          Reg # 7135

**10-7**    **Sketchbook (Gloucester)**
          c. 1930-31, pencil on paper
          8 x 10 in
          Reg # 16315

**11-6**    **Sketchbook #11-6**
          1932, ink on paper
          8 x 10 1/4 in
          Reg # 5198

**11~19**    **Sketchbook**
**(Gloucester Abstractions 11-19)**
1932, ink on paper
8 x 10 1/4 in
Reg # 11707

**11-20**    **Untitled {Sketchbook #11-20)**
1938, ink on paper
10 1/4 x 8 in
Reg # 4551

**13-1**    **Study for Max II**
ink on paper
10 x 8 in
Reg # 8458

**15-5**    **Sketchbook (Gloucester 15-5)**
1933, pencil on paper
8 x 10 in
Reg # 11692

**16-8**    **Sketchbook**
(Gloucester Dock Scenes 16-8)
1933, pencil on paper
8 x 10 in
Reg # 11702

**17-10**    **Sketchbook #17-10**
1936, ink on paper
6 x 9 in
Reg # 5200

**17-16**    **Sketchbook (Gloucester 17-16)**
1936, pencil on paper
6 x 9 in
Reg # 11689

**17-18**    **Sketchbook #17-18**
1936, ink on paper
6 x 9 in
Reg # 5197

**20-6**    **Untitled (New York)**
1938, ink on paper
7 x 9 1/2 in
Reg # 6003

**23-1**     **Drawing for Pennsylvania**
1947, pencil drawing on paper
12 x 18 in

**23-3**     **George Wettling Composition**
1947, pencil on paper
12 x 18 in
Reg # 11700

**23-4**     **Rhythm (sic)**
1947, pencil on tracing paper
12 x 18 in

**24-10**     **Detail Study from Pad Series #2**
c. 1946, pencil on paper
8 1/2 x 8 in
Reg # 4549

# Exhibit G

Flemming Zulack Williamson Zauderer LLP
One Liberty Plaza
New York, New York 10006
(212) 412-9500
Dean R. Nicyper, Esq. (DRN-7757)

Attorneys for Plaintiff Earl Davis


UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------- X

EARL DAVIS,                                              :
                                                        :     Index No. 07 Civ. 4165 (SHS) (DF)
                                    Plaintiff,           :
                                                        :
            -against-                                   :
                                                        :     **DECLARATION OF**
                                                        :     **EARL DAVIS IN SUPPORT**
SALANDER O'REILLY GALLERIES LLC                          :     **OF MOTION FOR**
f/k/a SALANDER O'REILLY GALLERIES INC.,                  :     **CONTEMPT AND A**
and LAWRENCE B. SALANDER                                 :     <u>**PRELIMINARY INJUNCTION**</u>
                                                        :
                                    Defendants.          :
-------------------------------------------------------------------- X


        EARL DAVIS declares under the penalties of perjury as follows:

        1.      I am the son and heir of American artist Stuart Davis and the plaintiff in

this action.  I am fully familiar with the facts set forth in this declaration in support of Plaintiff's

Motion for Contempt and a Preliminary Injunction.

        2.      My father is a well-known American artist.  His works of art are exhibited

in many museums around the country and throughout the world.  The works of art he created

have significant value.

        3.      Aside from their value on the art market, my father's works of art have

incalculable personal and emotional significance to me.

        4.      My father died in 1964.

297092

5.     For decades, I, as an heir of my father's estate, have actively managed the large collection of works of art that remained in the family after my father's death.

6.     For more than twenty years, I have had a business and trust relationship with Salander O'Reilly Galleries, LLC (f/k/a Salander O'Reilly Galleries, Inc.) ("SOR" or the "Gallery") and Lawrence B. Salander ("Salander") (SOR and Salander are referred to herein collectively as "Defendants").  During that relationship, I delivered hundreds of works of art created by my father (the "Works") to the Gallery for exhibition and possible sale.

7.     Because of the non-monetary significance of the Works to me, I made clear to Defendants that, although I delivered the Works to SOR for exhibition and possible sale, I did not want all of the Works to be sold.  To the contrary, I expressly informed SOR that, depending upon which of the Works might first become in demand, I would want to keep at least some of the other remaining Works in my family collection.

8.     Defendants and I have had a long-standing practice of regularly reassessing the asking prices for the Works I delivered to the Gallery.  In recent years, I informed Defendants that I was to be notified prior to any of the Works being offered for sale to discuss whether to offer the individual work and, if so, the price at which it would be offered.

9.     Defendants and I accordingly agreed that the Defendants would offer a work for sale only after consultation with me and only at prices expressly authorized by me, and that, for such sales, SOR would be entitled to commissions as follows:

For each painting:

- 20% of sales proceeds up to $1 million.
- 10% of sales proceeds in excess of $1 million.

For each work of art on paper:

- 30% of sales proceeds up to $20,000.

- 20% of sales proceeds in excess of $20,000.

(See letter agreement between Salander-O'Reilly Galleries and me, attached hereto as Ex. 1.)

10.     For more than twenty years, by all appearances from all information I was aware of, I had a successful and close-working business relationship with the Gallery and its director, Larry Salander.  In early 2005 -- more than twenty years into our business relationship -- I began to see signs that the Gallery was having what appeared to be bookkeeping problems.  I therefore asked the Gallery to print an inventory of the Works, listing the last agreed prices for each Work so that they all could be updated coherently.  Each time I made the request, I was told that the Gallery would look into it.

11.     I also requested that the Gallery employees verify the location of each of the Works.

12.     In response, several weeks after my last request, the Gallery's Registrar, Bill Thibodaux, told me that he personally had confirmed the location of all of the Works in the Gallery's storage facilities, and he expressly told me that he had accounted for everything and that "everything was in order."  I was reassured by this representation.

13.     Neither he nor anyone else informed me at that time that any of my Works were anywhere other than at the Gallery's New York location or New York warehouse.

14.     On November 30, 2005, the Gallery sold four of the most significant works remaining in my collection (the "4-Paintings Sale").  It sold those paintings without informing me and without first seeking my approval of the highly discounted sale prices.  When Larry Salander did inform me of the sale after it had been concluded, I demanded that the sale be rescinded.  Larry Salander told me, however, that it could not be rescinded.  Instead, he told me that the sale price of $2,700,000 was to be paid in installments over three years.  He later

represented to me, however, that the installment payments were to be made over four years in 48 monthly payments.

15.    From time to time Defendants sold other Works on a similar installment payment basis.  I do not have information identifying which of my Works recently were sold on an installment basis or what installment payments are still outstanding.

16.    After learning that Defendants had concluded the 4-Paintings Sale without consulting me, and in light of recent record auction prices for my father's art, I told the Gallery in the first week of December 2005 to cease selling my Works pending a full price review and revision.

17.    In January 2006, I repeated this instruction, specifying that the Gallery must "clearly freeze any further offerings of sales," and I further demanded "the immediate return of all my inventory" of Works.  (See January 27, 2006 e-mail from me to Larry Salander included in e-mail correspondence between me and Larry Salander, dated January 27, 2006 and February 7-8, 2006, attached hereto as Ex. 2.)

18.    Larry Salander assured me in person that any further sales would cease and that the Works would be returned.

19.    To further assuage my concern about the 4-Paintings Sale, Larry Salander emphasized our successful 20-year business relationship and promised: "I will pay you in full whatever it is you think I owe you.…  I am prepared to live without my commission deducted or even more (within reason).  I will pay in full on or before December 31, 2006."  (See February 8, 2006 e-mail from Larry Salander to me included in e-mail correspondence between me and Larry Salander, dated January 27, 2006 and February 7-8, 2006, attached hereto as Ex. 2.)

20.    Surmising from the recent events that the Gallery may be having either recordkeeping or liquidity problems, I told Larry Salander at a meeting with him on March 14, 2006, that the Gallery must not mix my sales proceeds with the Gallery's "general pool" of money and that my sales proceeds should instead be kept in a "trust-like account" for me.

21.    After many repeated attempts to set up appointments with the Gallery's registrar for the return of my entire collection of my father's Works at the Gallery, in May 2006, Larry Salander told me that many of my Works were out of the Gallery at framers, restorers, on consignment, or "on approval" with potential buyers.  Until then, I had not been aware that such a large quantity of the Works would be out of the Gallery without my being informed.

22.    I therefore demanded that the Gallery provide a full inventory identifying the actual present location of each of the Works and that the Gallery arrange for all of them to be returned immediately.

23.    Also in May 2006, Larry Salander persuaded me to sell a Stuart Davis painting, titled *Punchcard Flutter,* in one sale for $2,250,000 – significantly less than the amount I told him I felt it was worth in light of recent auction records -- and to sell 12 other Stuart Davis works of art for $650,000 in another sale (the "Two Sale Agreements").

24.    Larry Salander used my anxiety about the general status of my art and funds held in trust by the Gallery to induce me to agree to the Two Sale Agreements by his making representations (which I later learned were false) regarding the sale price for the works, and by stating that the first sale would be paid within the week, that the buyers of the second sale already had "cash on the table," and that the Gallery, in turn, would pay me immediately.

25.    Larry Salander later revealed to me that *Punchcard Flutter* was sold for $2,125,000, not $2,250,000, and that, although he and the Gallery had released it and the other 12 works to the two buyers, he claimed that the buyers had not yet paid for the Works. Larry Salander again sought to erase my concerns about the Gallery's recent practices by reminding me of our 20-year successful relationship and by repeatedly promising to pay me more than the actual sale prices for works sold, plus interest.

26.    Defendants, however, to this day have not paid me any of the $2,900,000 proceeds from the Two Sales Agreements or the additional $2,700,000 for the 4-Paintings Sale, despite my repeated demands for payment.

27.    By May 31, 2006, the Gallery and Larry Salander had not returned any of the Works to me despite my repeated demands for them.  I therefore reminded one of the Gallery's senior art professionals, Leigh Morse (who previously had handled sales of several of my father's works of art) that I had been demanding that "my entire inventory of works by my father [be] returned immediately ...."  (See May 31, 2006 e-mail from me to Leigh Morse, attached hereto as Ex. 3)

28.    I repeated to another senior officer at the Gallery, Andrew Kelly: "I want Everyone involved in sales of my father's work at the gallery to be clearly and unambiguously notified that I wish to Completely Suspend any and all offerings of such works for sale until after such time that they have each been physically returned to my possession and a more reliable system of accounting and record keeping has been established at the gallery." (See June 12, 2006 e-mail from me to Andrew Kelly, attached hereto as Ex. 4 (emphasis in original).)

29.     To mollify my growing concerns as were reflected in my e-mails to Leigh Morse and Andrew Kelly, Larry Salander again reminded me about our good long-standing relationship and that he would do whatever it took to pay me in full. Then, at a meeting with his accountant on June 21, 2006, without any prior discussion with me, he handed me a stack 24 post-dated checks (each in the amount of $222,083). The checks were to pay over 24 months the Gallery's debt to me -- at least to the extent that he and the Gallery had disclosed their debt to me as of that date. The checks therefore were purportedly to cover the 4-Paintings Sale, the Two Sale Agreements, and two earlier partnership transactions Defendants and I had entered into.

30.     The two partnership transactions were deals the Gallery and I had entered into in 2003. Pursuant to those deals, Defendants and I jointly purchased a Courbet painting and a pair of bronze sculptures. (See copies of a January 4, 2005 letter agreement confirming the 2003 agreement regarding the Courbet painting and a January 4, 2005 letter agreement confirming the 2003 agreement regarding the pair of bronze sculptures, attached hereto as Ex. 5.) The checks Larry Salander handed to me on June 21, 2006 resolved the Gallery's debt for the two partnership transactions, and those transactions are not at issue in this lawsuit. (As is explained below, only three of the checks ultimately cleared and therefore only the debt for the two partnership transactions was paid.)

31.     I was surprised to be handed the 24 post-dated checks without agreeing to them. I told Larry Salander that I did not want a 24-month payout. In response, he said the checks were merely to serve as back-up security for me and reassurance that he and the Gallery planned to pay me in full.

32.     In June 2006, Defendants began to return some of the Works to me.  In nine separate deliveries between June 1, 2006 and January 11, 2007, Defendants returned 102 Works to me.  The fact that works were being returned to me significantly reduced my concerns about the Gallery's bookkeeping, although I was later to learn when the returns ended in January 2007 that the returns included few paintings and for the most part were the least significant and least valuable works I had delivered to the Gallery.

33.     After my repeated demands for an inventory listing all of my Works and their locations, the Gallery finally produced a list to me in late July 2006.  (See list provided by SOR's Andrew Kelly to me in late July 2006 (the "2006 List"), attached hereto as Ex. 6.)

34.     The 2006 List identified 124 Stuart Davis works of art that I had delivered to the Gallery which, at that time in August, had not yet been returned to me.  In the 2006 List, the Gallery represented to me that 103 of the 124 Works listed were out on consignment with other galleries or dealers, eight others were either on consignment or on approval with various private collectors or museums, nine purportedly were in SOR's possession, and four were missing.  The 2006 List did not disclose that any of the 124 listed Works had been sold.  To the contrary, Gallery employee Andrew Kelly handwrote on the 2006 List the last agreed-upon prices at which the Gallery would offer each of the listed Works and the years in which the Gallery and I had agreed to those prices.

35.     Learning for the first time from the 2006 List that all but nine of my Works were outside the Gallery, I reiterated to Larry Salander: "I want to be clear that the WORKS OUT really have all actually been called in for immediately return."  (See July 27, 2006 email from me to Larry Salander and Andrew Kelly, attached hereto as Ex. 7) (emphasis in original).)

36.     In mid-September through October 2006, however, I learned from people not associated with the Gallery that several of the Works designated in the 2006 List as having been on consignment in fact had been sold. I had not been informed about the sales and none of the sales proceeds have been forwarded to me.

37.     Specifically, a Gallery client, Joseph Carroll, told me that he owned 10 of my Works, contrary to the Gallery's representation to me that all the Works merely were out on consignment. In addition, a show at the Whitney Museum included two of the Works and identified them as being owned by someone other than me. Finally, another art gallery, the Babcock Gallery, was selling five of the Works, contrary to Larry Salander's assurances that he would arrange the return of all outstanding Works.

38.     I also learned from a lawyer who had represented the person who bought *Punchcard Flutter* (see, supra, ¶ 25) that the buyer had paid an intermediary dealer in full for the painting on June 1, 2006 and that the dealer said he had paid the Gallery in full for the painting on June 2, 2006. This information contradicted Larry Salander's repeated representations to me that the Gallery was never paid for *Punchcard Flutter*.

39.     When I confronted Larry Salander with all of these previously undisclosed, apparent, sales and issues, and demanded payment, he claimed he was surprised and said that he would look into them.

40.     I again repeated to him my demand that the Gallery send a notice to every consignee on the 2006 List informing each that my Works were no longer for sale and must be returned. He again confirmed to me that he and the Gallery would do this.

41.     For the first three months after Larry Salander handed me 24-post-dated checks, the checks cleared, but in November 2006, the Gallery's accountant suggested that I

not deposit any more checks because they were unlikely to clear.  The checks that did clear,

therefore, were only sufficient to cover the Gallery's debt for the two partnership deals I had

entered into with Larry Salander and the Gallery in 2003 (which are not at issue in this

action).  The checks that cleared were for amounts insufficient to cover any of the proceeds

from sales of any of the Works at issue in this action.

42.     In mid-December 2006, a high-level Gallery employee, Diane Buckley,

informed me that the Gallery had sent letters for return of my Works to only four of the

numerous people and entities that the 2006 List described as consignees of my Works.  When I

raised this issue with Larry Salander, he threatened me saying he would go on the attack

against me if I told anyone anything that he might consider to be damaging to his reputation.  I

therefore became concerned about contacting the other galleries and dealers myself and

refrained from doing so.

43.     I continued my requests for return of my Works and for a more accurate

list identifying the status of my Works.  The Gallery continued to return Works, but the returns

slowed and then ceased after January 11, 2007, leaving at least 99 Works unaccounted for.  On

January 5, 2007, the Gallery provided an updated list to me dated January 4, 2007 (the "January

4, 2007 List").  In stark contrast to the 2006 List, which had identified 124 of the Works and

their locations, the January 4, 2007 List identified 73 of the Works and for the first time reported

that they *all had been sold*.  (See List dated January 4, 2007 (the "January 4, 2007 List") attached

hereto as Ex. 8.)

44.     This was worse than anything I could have dared to imagine, and I asked

for clarification of information in the January 4, 2007 List and the location of my other Works.

In response, the Gallery provided several revised lists, culminating in a revised list dated

February 2, 2007 (the "February 2, 2007 List"). (See February, 2, 2007 List attached hereto as Ex. 9.) The February 2, 2007 List identifies 116 works. To my surprise, the revised lists all represented that many of the previously undisclosed sales of my Works had actually occurred several years ago.

45.    With respect to all of the 73 Works that, according to the new lists, purportedly had been sold by the Gallery, neither Larry Salander nor anyone else at the Gallery had consulted me regarding the sale prices for the works, and they never gave me a chance to keep some of the Works for my family collection.

46.    The sales information in the lists the Gallery provided to me this past spring report that the Gallery sold 73 of my Works for a total of $9,378,875. The Gallery never paid me any of that $9,378,875.00 in sales proceeds. Since hearing of these sales, I have made repeated demands of Defendants for payment, but I have received nothing.

47.    In addition to not disclosing to me that they had sold dozens of my Works and in addition to not paying me any of the proceeds from those sales, Larry Salander and the Gallery sold all or nearly all of the 73 Works at prices well below the prices I would have assigned had I been consulted. Indeed, they sold many of the Works at prices well below the prices that I had discussed with them years earlier, even though the Works had significantly appreciated in value since that time. For example, Andrew Kelly states in the 2006 List, with respect to Work number Y.65, that the Gallery and I had agreed in 1999 (see the 2006 List) that it would be sold for $450,000, and then agreed in 2003 that the price would be $850,000 (see the 2006 List), but the February 2, 2007 List shows that Defendants sold it in 2005 for only $290,000. As another example, with respect to Work number Y.88, the Gallery and I had agreed in 1999 to sell it for $475,000 (see 2006 List), but the February 2,

2007 List shows that Defendants sold it for only $375,000.  As another example, with respect to Work number Y.84A, the Gallery and I had agreed in 2005 (see 2006 List) that this work would be sold for $850,000, but the February 2, 2007 List shows that Defendants sold it for only $500,000.

48.    Defendants have repeatedly acknowledged to me that they owe to me all sales proceeds for all Works sold.  For example, in a December 13, 2006 e-mail to me, the Gallery's Managing Director, individual Defendant Larry Salander, stated: "The only thing that could stand in the way of paying you would be my death.... The fact is your trust was, is and will be well placed with me.  You will get paid every cent you are owed."  (Ex. 10 hereto.)

49.    As another example, in a March 12, 2007 e-mail to me, Larry Salander stated: "So it comes down to money, and a lot of it.  I have already promised you I will pay you every cent I owe you and as quickly as I possibly can.... You have the right to say, 'Yeah, but it's my money' – and that it is."  (Ex. 11 hereto.)

50.    When the Gallery ceased returning Works to me in mid-January (revealing that 99 Works were not accounted for) and produced lists in January and February showing 73 Works sold (consisting of 56 of the 99 Works that had not been returned plus the 4-Paintings, the 12 Works and *Punchcard Flutter*) and 43 Works still unaccounted for, I lost faith in the trust I had relied on in my more than 20-year relationship with Larry Salander and the Gallery.  I therefore retained a law firm to assist me.  We tried to avoid litigation by attempting to negotiate a binding resolution with the Gallery.  We were unsuccessful and therefore initiated this lawsuit.

51.    Mr. Carroll contacted me again recently. During our discussion he told me that the Gallery did generate and provide invoices to him for the Stuart Davis works of art he had purchased from the Gallery. He also told me that he had filed several UCC financial statements. Our search of the UCC filings uncovered many instances in which the Gallery had pledged my Works as collateral for its own debts. At no time did I authorize the Gallery to pledge my Works as collateral.

52.    The Defendants' sales of my Works without consulting me already has caused me irreparable damage. The Works I delivered to the Gallery were the only Works of my father's art remaining in my family's possession. I had specifically agreed with the Gallery that they would contact me prior to any sales so that I could determine whether I wanted to sell a particular work and, if so, at what price. We established this procedure to enable me to determine which of my father's works I would keep upon learning which works people were interested in buying.

53.    The Defendants' sales of dozens of the most important of my Works has deprived me of the opportunity to retain significant Works created by my father as well as the ability to mount future exhibitions to promote his work.

54.    Any further sales of my Works will cause me further irreparable damage. Defendants claim that 73 Works have been sold. They have not explained what happened to the 43 other Works. My instructions to Defendants to cease selling my father's Works and return them to me have been disregarded.

55.    Defendants also disregarded the Stipulation and Order that was so-ordered by this Court on July 9, 2007 (the "July 2007 Order"). For example, that Order required Defendants to retrieve and return any and all unsold Works to me. Defendants

apparently made no effort to do that. Instead, my counsel contacted a few galleries and one, Babcock Galleries, returned seven of the Works to me. Because Defendants falsely reported to me that five of those Works had been sold, we have deducted the sale prices Defendants falsely reported for those five items. The aggregate sale proceeds, according to Defendants' representations, for the remaining 70 "sold" Works is $9,382,500. (See accompanying Declaration of Dean R. Nicyper in Support of Motion for Contempt and for a Preliminary Injunction ("Nicyper Dec.", ¶ 15 and footnote 1.) Defendants have not explained what happened to the other 38 Works.

56.    Defendants also did not comply with July 2007 Order's directive to immediately forward all installment payments to me. Defendants produced an invoice showing that 48 monthly installments were to be paid for the 4-Painting Sale, beginning July 2, 2006. Pursuant to the July 2007 Order, the August 2, 2007, payment for the 4-Painting Sale should have been forwarded to me, but I did not receive it.

57.    Also in violation of the July 2007 Order, Defendants did not produce any documents related to the security interests in my Works that they wrongfully pledged to others.

58.    Given these circumstances, I respectfully request that this Court compel the Defendants to comply with the July 2007 Order, specifically to: cease selling or encumbering any of my Works; retrieve any that are unsold or which have been pledged as collateral; return all unsold Works to me; pay all installment payments to me; and produce all documents providing the details of the arrangements under which Defendants wrongfully pledged certain of my Works as collateral for their own debt obligations.

59.    It is also essential that the personnel at the Gallery with primary responsibility for my Works, Lawrence Salander, Leigh Morse and Andrew Kelly, appear to give testimony under oath as soon as possible to explain the status of my Works and of my trust funds consisting of the proceeds from sales of many of the Works.  I therefore respectfully request that this Court order such depositions to take place as soon as possible.

60.    Defendants have declared that they have a liquidity crisis.  (See Nicyper Dec. ¶ 6.)  The Defendants' declaration is confirmed by Defendants' repeated failed promises to pay me all money they owe.  The proceeds from sales of my Works, however, are mine alone.  Defendants have no right to those funds.  Given Defendants' liquidity crisis, the longer Defendants withhold payment of my sales proceeds trust funds, the greater the likelihood that Defendants will never deliver those trust finds to me.  I therefore additionally respectfully request that this Court order Defendants to deliver to me all proceeds from all sales of my Works, which, under the New York Art and Cultural Affairs Law, Defendants are deemed to hold for my exclusive benefit as trust funds.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on:  August 20, 2007
              New York, New York


_____
            EARL DAVIS