# Exhibit H

Flemming Zulack Williamson Zauderer LLP
One Liberty Plaza
New York, New York 10006
(212) 412-9500
Dean R. Nicyper, Esq. (DRN-7757)

Attorneys for Plaintiff Earl Davis

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------- X
                                          :

EARL DAVIS,

                                         Plaintiff,

           -against-

SALANDER O'REILLY GALLERIES LLC
f/k/a SALANDER O'REILLY GALLERIES INC.,
and LAWRENCE B. SALANDER

                                     Defendants.

------------------------------------------------------------------- X

Index No. 07 Civ. 4165 (SHS) (DF)

**DECLARATION OF
DEAN R. NICYPER
IN SUPPORT OF MOTION
FOR CONTEMPT AND A
PRELIMINARY INJUNCTION**

DEAN R. NICYPER declares under the penalties of perjury as follows:

         1.       I am admitted to practice law in the State of New York and am a member

of Flemming Zulack Williamson Zauderer LLP, attorneys for plaintiff, Earl Davis ("Davis" or

"Plaintiff"), in this action. I am fully familiar with the facts set forth in this declaration in

support of the Plaintiff's Motion for Contempt and a Preliminary Injunction against Defendants

Salander O'Reilly Galleries, LLC (f/k/a Salander O'Reilly Galleries, Inc.) ("SOR" or the

"Gallery") and Lawrence B. Salander ("Salander") (SOR and Salander are referred to herein

collectively as "Defendants".) A copy of the Complaint is attached hereto as Ex. 1.

         2.       We previously filed an Order to Show Cause in this action, signed by

the Hon. Richard M. Berman on June 29, 2007, seeking a preliminary injunction and

expedited discovery. (A copy of the Order to Show Cause is attached hereto as Ex. 2.)

3.    To address the issues in the Order to Show Cause, the parties entered into a Stipulation and Order in which the parties stipulated to nearly all of the relief sought by the Order to Show Cause. The Stipulation and Order was so-ordered by this Court on July 9, 2007. (A copy of the so-ordered Stipulation and Order (the "July 2007 Order") is attached hereto as Ex. 3.) The July 2007 Order directed Defendants, *inter alia*, to (i) retrieve all unsold Works that Defendants consigned, pledged, loaned or transferred, and to deliver all unsold Works to Plaintiff; (ii) produce documents relating to any Works that Defendants pledged as collateral; and (iii) to segregate from all of Defendants' other moneys, and deliver to Plaintiff, all installments that Defendants receive as one or more payments for Works.

4.    The one aspect of relief that the Stipulation and Order did not include was the provision requiring Defendants to turn Plaintiff's trust funds over to Plaintiff. We tentatively agreed with Defendants' counsel not to include this provision on the representation, as expressly set forth in the July 2007 Order, that the parties would have until August 10, 2007, to negotiate in good faith to resolve the claims in this action. The parties have not resolved the claims. As set forth more fully below and in the Davis Declaration and the memorandum of law accompanying this motion, the actions of Defendants and Defendants' financial circumstances make it essential that Plaintiff obtain an injunction requiring Defendants to turn over to Plaintiff his trust funds. Without an injunction, it appears highly likely that Plaintiff will be precluded from obtaining all of those trust funds, and possibly will be precluded from obtaining any of them.

5.    Inventory lists Defendants provided to Plaintiff earlier this year all show that Defendants sold many of the Stuart Davis works of art which Plaintiff had delivered to Defendants (the "Works") years ago for millions of dollars in the aggregate, although

Defendants never paid Plaintiff any of the proceeds from those sales. During that same time, in contrast, Defendants paid millions of dollars to others, as is demonstrated in part in pleadings filed against Defendants in the following other actions:

      a.    To settle a claim by Compagnie de Beaux Arts Ltd. ("CBA"), the Gallery paid CBA $475,000 in the period November 30, 2005 to January 31, 2006. The Gallery owed an additional $635,000. The lawsuit by Compagnie against the Gallery, filed February 2, 2006, has since been settled and therefore all or some of that $635,000 amount appears to have been paid since January 2006. (Complaint and attachments in <u>Compagnie de Beaux Arts, Ltd v. Salander O'Reilly Galleries LLC</u>, 06/600338 (Sup. Ct. N.Y. Co.), a copy of which is attached hereto as Ex. 4.)

      b.    On March 16, 2005, the Gallery purchased an Edouard Manet painting and a sculpture from Renaud-Giquello & Associes for EUR 489,149.58, and paid EUR 146,745 on that date. A lawsuit Renaud-Giquello filed against the Gallery on February 28, 2006 for the remaining amount has now been settled, and therefore it appears that all or some of the remaining EUR 342,404.58 has been paid since the complaint was filed. (Complaint in <u>Renaud-Giquello & Associes v. Salander O'Reilly Galleries LLC</u>, 06/600661 (Sup. Ct. N.Y. Co.), a copy of which is attached hereto as Ex. 5.)

      c.    The Gallery purchased a sculpture from Dougal Arts Limited on March 1, 2004, for EUR 850,000, and Defendants paid EUR 400,000 to Dougal on March 9, 2004. A lawsuit Dougal Arts filed against the Gallery for nonpayment of the remainder has now been settled and therefore it appears that the Gallery paid all or some of the remaining EUR 450,000 to Dougal since the filing of a pre-trial

memorandum in the action on November 7, 2006. (Pre-trial memorandum in Dougal Arts Limited v. Salander O'Reilly Galleries, LLC, 05 Civ. 5299 (WHP) (SDNY), a copy of which is attached hereto as Ex. 6.)

        d.      The Gallery guaranteed a purchase by Salander of a Charles Sheeler painting, titled *New Haven,* on April 1, 2005, from Saundra Lane for $9,173,261. One or both of the Defendants paid Saundra Lane $2,850,770 between April 1, 2005 and April 19, 2006. A lawsuit by Ms. Lane against the Gallery and Salander for the remainder of the money (the "Lane v. Salander Action") apparently is ongoing. (Verified Complaint and attachments in Saundra B. Lane v. Lawrence Salander and Salander O'Reilly Galleries, LLC, 06-40178 (D. Mass.), a copy of which is attached hereto as Ex. 7.)

        e.      Defendant Salander paid a contractor $374,388.05 for renovations to his New York apartment between June 2004 and June 19, 2006, the date a complaint was filed against Salander by the contractor. (Complaint in Timothy Landing, Inc. et ano v. Lawrence Salander, et ano, 06/602179 (Sup. Ct. N.Y. Co.), a copy of which is attached hereto as Ex. 8.)

        6.      In the Lane v. Salander Action, counsel for the Gallery and Lawrence Salander represented to the court that they have "a liquidity crisis," and their counsel expressed concern that their "house of cards will collapse." See Transcript of April 13, 2007 Proceedings, in Lane v. Salander, CA No. 06-40178-FDS, at pages 5 and 7 (attached hereto as Ex. 9).

        7.      A search we conducted in the spring of this year of Uniform Commercial Code ("UCC") financing statements revealed that, in 2006, Defendants pledged

at least fourteen of Plaintiff's Works as collateral to secure Defendants' own debt obligations. (See chart of the fourteen works and copies of the UCC #1 Financing Statements, attached hereto as Ex. 10.) We recently updated that search and found an additional UCC financing statement revealing that Defendants recently pledged another of the Works belonging to Plaintiff, an oil painting titled *Punchcard Flutter*, as collateral for even further of Defendants' own debt obligations. (A copy of that UCC #1 Financing Statement is attached hereto as Ex. 11.)

        8.    Pursuant to the July 2007 Order, Defendants produced approximately 1000 pages of documents to Plaintiff on July 26, 2007 (one day after the July 2007 Order required their production). In violation of the July 2007 Order, Defendants produced no documents whatsoever explaining, or even concerning, the security interests in Plaintiff's Works that Defendants had pledged to their own creditors, as is reflected at least in part in the UCC #1s that certain creditors filed as described in the preceding paragraph 7.

        9.    In addition, the July 2007 Order expressly required Defendants to "retrieve all Works that have not yet been sold from those persons or entities to which Defendants consigned, pledged, loaned or transferred such unsold Works, and deliver such unsold Works to Plaintiff." (July 2007 Order, Ex. 3 hereto) at ¶ 2.) After Defendants produced documents, we asked Defendants' counsel whether there were any unsold works. Defendants' counsel said his client confirmed that there were no unsold Works still outstanding. Defendants' representation was false.

        10.    Specifically, after the Plaintiff learned from SOR personnel that SOR had not contacted other galleries and dealers to retrieve Plaintiffs' Works, as Plaintiff had been demanding for more than one year, we sent letters to several dealers and galleries notifying

them that Plaintiff no longer had a business relationship with SOR and that any of Plaintiff's property therefore should be returned to Plaintiff. After the July 2007 Order was issued, one gallery, known as Babcock Galleries, contacted us stating that it still had seven Stuart Davis works of art that it had received on consignment from SOR. All seven of these works were included in the 116 Works that Defendants failed to return to Plaintiff. Babcock Galleries returned those seven works to Plaintiff on July 24, 2007, and reported that no one from SOR had contacted them to see if they still had any Works on consignment. (Attached hereto as Ex. 12 is a copy of a receipt from Babcock Galleries, dated July 24, 2007, identifying the seven Works that Babcock Galleries returned to Plaintiff.) Five of these seven Works Defendants previously reported (falsely) to Plaintiff as having been sold, and Defendants falsely represented purported sale prices for those five Works. As explained below, we have recalculated the sale prices Defendants received by subtracting Defendants' reported sale prices for those five Works.

        11.    In further violation of the July 2007 Order, Defendants failed to deliver to Plaintiff any installment payments. The July 2007 Order requires Defendants to deliver all such installment payments to Plaintiff upon Defendants' receipt of them beginning on the date of the Order. Defendants' counsel represented to me that there are no installment payments owed in connection with Defendants' previous sales of any of the Works. This assertion, however, is belied by the documents Defendants produced, which reveal that Defendants entered into a installment payment plan for the 4-Paintings Sale, with 48 equal payments due and payable monthly commencing on July 2, 2006. (A copy of a January 2, 2006 invoice on SOR letterhead concerning the 4-Painting Sale is attached as Ex. 13.) The August 2, 2007 payment date has come and gone, but Plaintiff has not received that installment payment.

12.     We do not know which of the other unaccounted-for Works are still unsold or out on consignment.  Nor do we know for which of the other sales installment payments are still owing.

13.     Plaintiff already has suffered substantial harm as a result of Defendants' failure to comply with the July 2007 Order.  Plaintiff withdrew his original Order to Show Cause on the understanding that Defendants would comply with the Stipulation and Order, as so ordered by the Court, while the parties attempted to resolve the claims in this action. Instead, Defendants signed the order and then went about their lives as if it had no effect.  The result is that Plaintiff is in essentially the same place in which he started when he filed this lawsuit, except that now, he may forever be precluded from obtaining the trust funds that rightfully belong to him.

14.     Plaintiff will suffer substantial, immediate and irreparable injury and damages if Defendants are not found in contempt and compelled to comply with the July 2007 Order (i) enjoining them from continuing to sell or encumber the Works and mandating that they produce all documents relating to Works they pledged as collateral; (ii) mandating that they retrieve and return to Plaintiff all unsold Works; and (iii) requiring them to segregate in a separate bank account and deliver to Plaintiff all installment payments for Works Defendants previously sold.

15.     Because Defendants' violations of the July 2007 Order have deprived Plaintiff of critical information needed to locate his Works and trust funds, it is essential that Defendants' three principal executives appear for immediate depositions.  The three SOR executives who had the most responsibility concerning handling of Plaintiff's Works are Lawrence Salander, Leigh Morse and Andrew Kelly.  We therefore respectfully request that

this Court order each of them to appear for deposition at Flemming Zulack Williamson Zauderer LLP, respectively, on September 25, 26 and 27, 2007.

16.    Plaintiff will suffer substantial, immediate and irreparable injury and damages if Defendants also are not required to turn over all of Plaintiff's trust funds, consisting of the proceeds from the sales of any and all of the Works previously sold by Defendants. Based on the records we received from Defendants,[1] the trust funds Defendants reported to have received (which does not include any amounts for the 38 Works for which Defendants have not reported any sale prices) totals $9,382,500.00. Therefore, Defendants should be compelled to turn over to Plaintiff a minimum of $9,382,500 in trust funds.

17.    As set forth in further detail in the accompanying Memorandum of Law, Plaintiff is substantially likely to prevail on his claims against Defendants because, under Article 12 of the New York Arts and Cultural Affairs Law, Defendants hold the Works and any proceeds from the sale of such Works in trust for the benefit of Plaintiff, and Defendants have no rights to those Works or sales proceeds. Plaintiff has no adequate remedy at law and the harm that will be sustained by Plaintiff if the requested injunction is denied far outweighs the prejudice to Defendants if the requested injunction is granted.

18.    Accordingly, we respectfully request that this Court (A) compel Defendants to comply with all provision of the July 2007 Order; (B) issue a preliminary injunction directing Defendants to turn over to Plaintiff all of Plaintiff's trust fund proceeds in an amount no less than $9,382,500.00, and (C) order Defendants Lawrence Salander, and SOR senior executives, Leigh Morse and Andrew Kelly, each to appear for his or her

---

[1]    These new calculations are based on the Inventory Lists Defendants produced, supplemented by invoices Defendants produced with their July 26, 2007 document production, from which we then subtracted amounts Defendants had falsely reported as sale prices for 5 of the 7 Works that Babcock Galleries returned to Plaintiff on July 24, 2007.

deposition, to be taken at the offices of Flemming Zulack Williamson Zauderer LLP,

respectively on September 25, 26, and 27, 2007.

        19.    No prior request has been made for the relief sought herein.

    I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed on:  August 20, 2007
                New York, New York

                          DEAN R. NICYPER

# Exhibit I

Flemming Zulack Williamson Zauderer LLP
One Liberty Plaza
New York, New York 10006
(212) 412-9500
Dean R. Nicyper, Esq. (DRN-7757)

Attorneys for Plaintiff Earl Davis

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------- X
                                                                     :
EARL DAVIS,                                                          :
                                                                     :    Index No. 07 Civ. 4165 (SHS) (DF)
                                Plaintiff,                           :
                                                                     :
            -against-                                               :
                                                                     :
                                                                     :
SALANDER O'REILLY GALLERIES LLC                                     :
f/k/a SALANDER O'REILLY GALLERIES INC.,                             :
and LAWRENCE B. SALANDER                                            :
                                                                     :
                        Defendants.                                 :
------------------------------------------------------------------- X

## MEMORANDUM OF LAW IN SUPPORT OF
## MOTION FOR CONTEMPT AND
## FOR A PRELIMINARY INJUNCTION

FLEMMING ZULACK WILLIAMSON ZAUDERER LLP
One Liberty Plaza, 35th Floor
New York, New York 10006
(212) 412-9500

Dean R. Nicyper, Esq.

Attorneys for Plaintiff Earl Davis

Of Counsel:

    Jean Marie Hackett, Esq.
    Erica Fabrikant, Esq.

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES ................................................................................... iii

PRELIMINARY STATEMENT ........................................................................... 1

FACTS ...................................................................................................... 4

    A.   The Parties' Twenty-Year Trust Relationship ......................................... 4

    B.   Signs Of Trouble At The Gallery, And Plaintiff's
        Requests That Sales Cease, All Works Be Returned
        And Payment Of All Sales Proceeds Be Made ..................................... 5

    C.   Further False Reassurances ................................................................... 8

    D.   Unreported Sales Revealed By Outside Sources ................................... 9

    E.   109 Works Either Are Unaccounted For Or Were
        Sold Without Payment To Plaintiff ..................................................... 10

    F.   Defendants Admit They Owe Plaintiff The
        Sales Proceeds At Issue ..................................................................... 11

    G.   While Owing Plaintiff Millions Of Dollars Of Trust Funds,
        Defendants Paid Millions Of Dollars To Others ................................... 11

    H.   The July 9th Order And Defendants' Violations Of It ........................... 12

ARGUMENT .............................................................................................. 13

POINT I       DEFENDANTS SHOULD BE HELD IN CIVIL
                CONTEMPT FOR THEIR FAILURE TO COMPLY
                WITH THE COURT'S JULY 2007 ORDER ................................. 13

POINT II      A PRELIMINARY INJUNCTION SHOULD BE
                ORDERED COMPELLING DEFENDANTS TO PAY
                TO PLAINTIFF ALL TRUST FUNDS DEFENDANTS
                HOLD FOR THE SOLE BENEFIT OF PLAINTIFF ..................... 16

            A.   BY STATUTE, PLAINTIFF ALONE IS ENTITLED TO HIS
                 WORKS AND THE PROCEEDS FROM SALES OF HIS WORKS .... 16

# TABLE OF CONTENTS (cont'd)

| | | | PAGE |
|---|---|---|---|
| B. | | AN INJUNCTION IS NECESSARY TO PREVENT DISSIPATION OF PLAINTIFF'S TRUST FUNDS | 18 |
| | 1. | Plaintiff Will Likely Succeed On The Merits Of His Claims | 20 |
| | 2. | Plaintiff Would Suffer Irreparable Harm And Extreme Damage If The Injunction Does Not Issue | 21 |
| | 3. | The Balance Of The Hardships Decidedly Tips In Favor Of Plaintiff | 23 |
| CONCLUSION | | | 24 |

# TABLE OF AUTHORITIES

PAGE

Cases

A.V. By Versace, Inc. v. Gianni Versace S.p.A.,
  279 F. Supp. 2d 341 (S.D.N.Y. 2003) ................................................................. 13-14

B.U.S.A. Corp. v. Ecoglaves, Inc.,
  No. 05 Civ. 9988 (SCR), 2006 WL 3302841 (S.D.N.Y. Jan. 31, 2006) ..................................... 23

Bank of Credit and Commerce Intern. (Overseas) Ltd. v. Tamraz,
  No.97 Civ.4759, 2006 WL 1643202 (S.D.N.Y. June 13, 2006) ................................................. 13

Bronx Household of Faith v. Bd. of Educ. of New York,
  226 F.Supp.2d 401 (S.D.N.Y. 2002), aff'd 331 F.3d 342 (2d Cir. 2003) ........................... 18, 20

Chere Amie, Inc. v. Windstar Apparel, Corp.,
  175 F. Supp. 2d 562 (S.D.N.Y. 2001) ..................................................................... 13

Clissuras v. City Univ. of New York,
  No. 02 Civ.8130, 2005 WL 3288097 (S.D.N.Y. Dec. 2, 2005) ................................................. 13

Columbia Broad. Sys., Inc. v. Am. Soc'y Of Composers, Authors And Publishers,
  320 F. Supp. 389 (S.D.N.Y. 1970) .......................................................................... 20

Deckert v. Independence Shares Corp.,
  311 U.S. 282, 61 S.Ct. 229 (1940) ......................................................................... 22

Demolition Workers Union v. Mackroyce Contracting Corp.,
  No. 97 Civ. 4094 (LMM), 2000 WL 297244 (S.D.N.Y. March 22, 2000) .......................... 18, 23

Experience Hendrix, LLC v. Chaplin, PPX,
  No. 06 Civ.9926, 2007 WL 541620 (S.D.N.Y. Feb. 15, 2007)................................................. 13

Green Party of New York State v. New York State Bd. of Elections,
  389 F.3d 411 (2d Cir. 2004) .................................................................................. 18

Horizon Mktg. v. Kingdom Int'l Ltd.,
  244 F. Supp. 2d 131 (E.D.N.Y. 2003)........................................................... 19, 21, 22

In re Martin-Trigona,
  732 F.2d 170 (2d Cir. 1984) .................................................................................. 13

Koeniges v. Woodward,
  183 Misc.2d 347, 702 N.Y.S.2d 781 (Civ. Ct. N.Y. Co. 2000)................................................. 17

## TABLE OF AUTHORITIES (cont'd)

PAGE

Nat'l Basketball Ass'n v. Design Mgmt. Consultants, Inc.,
  289 F. Supp. 2d 373 (S.D.N.Y. 2003) .................................................................. 13, 15

Paramedics Electromedicina Comercial, Ltda v. GE Med. Sys. Info. Tech.,
  369 F .3d 645 (2d Cir.2004) ........................................................................................ 13

Quantum Corp. Funding, Ltd. v. Assist You Home Health Care Services of Va., L.L.C.,
  144 F. Supp. 2d 241 (S.D.N.Y. 2001). ............................................................... 22, 23

Wesselmann v. Int'l Images, Inc.,
  172 Misc. 2d 247, 657 N.Y.S.2d 284 (Sup. Ct. N.Y. Co. 1996) ................................. 17

Wesselmann v. Int'l Images, Inc.,
  169 Misc. 2d 476, 645 N.Y.S.2d 263 (Sup. Ct. N.Y. Co. 1996) .......................... 22, 23

Wishnatzki & Nathel, Inc. v. H.P. Island-Wide, Inc.,
  No. 00 Civ. 8051 (JSM), 2000 WL 1610790 (S.D.N.Y. Oct. 27, 2000) .................... 19-20, 22-23

Yurman Design Inc. v. Chaindom Enters. Trading Corp.,
  No. 99 Civ.9307, 2002 WL 1402305 (S.D.N.Y. June 27, 2002) ................................ 13

Zucker v. Hirschl & Adler Galleries, Inc.,
  170 Misc.2d 426, 648 N.Y.S.2d 521 (Sup. Ct. N.Y. Co. 1996) ................................. 17

Statutes

N. Y. Arts and Cultural Affairs Law, § 11.01.3 (McKinney 1984)............................... 18

N.Y. Arts and Cultural Affairs Law § 12.01.1(a) (McKinney 1984 Supp. 2007) ................ passim

Perishable Agricultural Commodities Act ("PACA") ................................................... 19

Rule 65 of the Federal Rules of Civil Procedure ........................................................ 18

Plaintiff Earl Davis ("Mr. Davis" or "Plaintiff") respectfully submits this memorandum of law in support of his motion (1) requesting that this Court hold defendants Salander O'Reilly Galleries, LLC (f/k/a Salander O'Reilly Galleries, Inc.) ("SOR" or the "Gallery") and Lawrence B. Salander ("Salander") (SOR and Salander are referred to herein collectively as "Defendants") in civil contempt for their failure to comply with the injunction agreed to by defendants in a Stipulation and Order executed by the parties on July 6, 2007, and "so ordered" by this Court on July 9, 2007 (the "July 2007 Order"); (2) ordering that Defendants fully comply with the July 2007 Order within seven days; (3) directing that Defendant Salander submit an affidavit explaining his efforts, if any, to comply with the July 2007 Order; (4) requiring defendant Lawrence Salander and two SOR senior executives, Leigh Morse and Andrew Kelly, to appear for depositions to take place at Plaintiff's counsel's offices on September 25, 26, and 27, 2007, respectively; (5) imposing sanctions upon the Defendants in the event that they do not comply with the July 2007 Order within seven days; (6) for a preliminary injunction directing Defendants to pay to Plaintiff all trust funds that Defendants statutorily are deemed to hold solely for the benefit of Plaintiff; and (7) for such other and further relief as the Court deems appropriate.

## PRELIMINARY STATEMENT

Plaintiff is the son and heir of the well-known American artist Stuart Davis and owns hundreds of works of art created by his father. Plaintiff consigned hundreds of Stuart Davis works of art (the "Works") to Defendants' art gallery. Under Article 12 of New York's Art and Cultural Affairs law ("NYACA"), Defendants, as art merchants, are statutorily deemed to hold all of the Works they received from Plaintiff as "trust property ... for the benefit of [Plaintiff]"

and hold all proceeds from sales of those works of art as "trust funds … for the benefit of [Plaintiff]."

In addition to their significant monetary value, these important works of art created by Plaintiff's father have enormous non-monetary value to Plaintiff. In December 2005 and early 2006, Plaintiff repeatedly instructed Defendants to cease all sales of his Works and demanded that Defendants return to Plaintiff all unsold Stuart Davis works of art and deliver to Plaintiff all proceeds from sales of his Works. Although Defendants said they would do so, Plaintiff learned in the past eight to ten months that Defendants sold dozens of Plaintiff's Works over the past several years and never disclosed those sales or forwarded the sales proceeds to Plaintiff. Plaintiff also learned in the past five months that Defendants pledged at least fifteen of Plaintiff's Works as collateral to cover Defendants' own debts.

Under NYACA, Plaintiff alone is entitled to the Works he delivered to Defendants and all proceeds from the sales of any of the Works. Defendants have no right, title or interest in those Works or sales proceeds from them. Defendants' only right is a contractual right for Plaintiff to pay Defendants an agreed-upon amount as a commission.[1]

One apparent reason Defendants have not returned Plaintiff's Works or paid him the statutory trust funds to which he is entitled is, as Defendants recently asserted in court in another action, Defendants have "a liquidity crisis" and are concerned that their "house of cards will collapse." To avoid the collapse of their house of cards, Defendants have been using the cash they receive to pay other creditors. A court order is needed to prevent Defendants from further dissipating Plaintiff's trust funds for Defendants' "liquidity problems".

---

[1]    The commission rates agreed to by Plaintiff and Defendants were: For each painting, 20% of up to $1 million and 10% for proceeds in excess of $1 million; for each work on paper, 30% of up to $20,000 and 20% of amounts in excess of $20,000.

On June 29, 2007, Plaintiff filed an Order To Show Cause For Preliminary Injunction And Expedited Discovery (the "Order To Show Cause"), which was signed by Judge Richard M. Berman.  On July 6, 2007, in resolution of the relief sought in the Order To Show Cause, the parties signed a Stipulation And Order, which was "so-ordered" by this Court on July 9, 2007[2] ("July 2007 Order").  The July 2007 Order (i) prohibited Defendants from disposing of any of the Works; (ii) required Defendants to retrieve all unsold Works and deliver them to Plaintiff; (iii) required Defendants to segregate all installment payments they receive from prior sales of Works and deliver them to Plaintiff; and (iv) required Plaintiffs to produce documents demonstrating the details of those Works that were sold, consigned, pledged as collateral or out on loan.

In violation of the July 2007 Order's requirements, Defendants did not retrieve and deliver to Plaintiff all unsold Works.  Instead, Defendants represented (falsely) that there were no unsold Works.  That representation proved false when a gallery that Plaintiff's counsel had contacted disclosed that it still held seven of the Works on consignment from Defendants, and none of them had sold.

Further in violation of the July 2007 Order's requirements, Plaintiff paid none of the installment payments to Plaintiff even though documents produced by Defendants reveal that at least $2.6 million dollars is in the process of being paid to Defendants in 48 monthly installments.  According to that installment payment agreement, Defendants should have received an installment on August 2, 2007, but Defendants have not forwarded those trust fund sales proceeds to Plaintiff.  Defendants further violated the July 2007 Order by failing to produce any records identifying which Works were pledged by Defendants as collateral or the

---

[2]    A copy of the so-ordered Stipulation and Order is attached to the accompanying Declaration of Dean R. Nicyper in Support of Motion for Contempt and Preliminary Injunction ("Nicyper Dec.") at Ex. 3.

terms of those security interest arrangements. UCC Financing Statements filed with the State

of New York reveal that Defendants pledged at least 15 of the Works as collateral.

Defendants, however, produced no records whatsoever concerning those security interests or

any other security interest they may have pledged.

Given Defendants' flagrant violations of the July 2007 Order and repeated disregard of

Plaintiff's rights, Plaintiff respectfully requests that this Court hold Defendants in contempt,

compel them to comply with the July 2007 Order, require the three Gallery executives with the

greatest responsibility for Plaintiff's Works, namely, Lawrence Salander, Leigh Morse and

Andrew Kelly, to appear for depositions respectively on September 25, 26 and 27, 2007, and

issue a preliminary injunction mandating that Defendants deliver to Plaintiff all trust funds that

Defendants hold, as mandated by statute, for the exclusive benefit of Plaintiff.

## FACTS

**A.    The Parties' Twenty-Year Trust Relationship**

Plaintiff is the son of the well-known American artist Stuart Davis. (See Declaration of

Earl Davis in Support of Motion for Contempt and a Preliminary Injunction, dated August 20,

2007, ("Davis Dec.") at ¶ 1.) Plaintiff's father died in 1964. (Davis Dec. ¶ 4.) For decades,

Plaintiff, as an heir of his father's estate, has actively managed the large collection of his father's

works of art that remained in the family after his father's death. (Davis Dec. ¶ 5.) These works

of art have incalculable personal and emotional significance to Plaintiff. (Davis Dec. ¶ 3.)

Defendant Salander-O'Reilly Galleries, LLC (f/k/a/ Salander-O'Reilly Galleries, Inc.)

("SOR" or the "Gallery") is a well-known art gallery located just off Fifth Avenue in Manhattan.

Individual Defendant Lawrence Salander ("Salander") is the Managing Director of SOR, and he

directs and oversees the Gallery's operations directly and through others. See Complaint, a copy of which is attached as Ex. 1 to the Nicyper Dec.

Plaintiff and Defendants have had a business and trust relationship for more than twenty years. During that relationship, Plaintiff delivered hundreds of works of art created by his father (the "Works") to the Gallery for exhibition and possible sale. (Davis Dec. ¶ 6.)

Plaintiff and Defendants agreed that Defendants would offer a work for sale only after consultation with Plaintiff and only at prices expressly authorized by Plaintiff, and that, for such sales, SOR would be entitled to commissions as follows:

For each painting:

- 20% of sales proceeds up to $1 million.
- 10% of sales proceeds in excess of $1 million.

For each work of art on paper:

- 30% of sales proceeds up to $20,000.
- 20% of sales proceeds in excess of $20,000.

(See letter agreement between Salander-O'Reilly Galleries and Earl Davis, attached to Davis Dec. as Ex. 1.)

## B.    Signs Of Trouble At The Gallery, And Plaintiff's Requests That Sales Cease, All Works Be Returned And Payment Of All Sales Proceeds Be Made

In early 2005 -- more than twenty years into their business relationship -- Plaintiff began to see signs that the Gallery was having what appeared to be bookkeeping problems. He therefore asked the Gallery to print an inventory of the Works, listing the current prices for each Work. (Davis Dec. ¶ 10.) Plaintiff also requested that Defendants verify the location of each of the Works. (Davis Dec. ¶ 11.) Weeks later, in response, Defendants' Registrar told Plaintiff that he personally had confirmed the location of all of the Works in the Gallery's storage

facilities and assured Plaintiff that "everything was in order." (Davis Dec. ¶ 12.) Defendants'
assurances later proved to be false.

On November 30, 2005, Defendants sold four of the most significant works remaining
in Plaintiff's collection (the "4-Paintings Sale") without informing Plaintiff of the sale and
without confirming the sale prices. When Defendant Salander finally notified Plaintiff after the
sale, Plaintiff demanded that the sale be rescinded. Salander told him it could not be. Salander
initially said that the sale price of $2,700,000.00 was to be paid in installments over three years
(Davis Dec. ¶ 14), but later represented that the installment payments were to be made over four
years in 48 monthly payments. (Id.) Defendants have now produced an invoice showing that
installment payments were to be in 48 monthly installments, beginning July 2006, on the 2nd day
of each month. (Nicyper Dec. Ex. 13.) According to Salander's statement and the invoice, more
than two years of such installment payments for the 4-Paintings Sale are yet to be paid.

After learning that he had not been consulted about a major sale, Plaintiff told the Gallery
in the first week of December 2005 to cease selling his Works. (Davis Dec. ¶ 16.) In January
2006, Plaintiff repeated this instruction, specifying that the Gallery must "clearly freeze any
further offerings of sales," and he demanded "the immediate return of all [Plaintiff's] inventory"
of Works. (Davis Dec. ¶ 17 and Ex. 2.) Salander assured Plaintiff in person that sales would
cease and the Works would be returned. (Davis Dec. ¶ 18.)

To further reassure Plaintiff, Salander represented (falsely) in an e-mail that: "I will pay
you in full whatever it is you think I owe you.... I am prepared to live without my commission
deducted or even more (within reason). I will pay in full on or before December 31, 2006."
(Davis Dec. ¶ 19 and Ex. 2.) Although Salander's promise conveyed the impression of contrition
and generosity, he in fact never paid Plaintiff a penny from the 4-Paintings Sale.

In May 2006, Salander told Plaintiff that many of the Works were out of the Gallery at framers, restorers, on consignment, or "on approval" with potential buyers. Until then, Plaintiff had not been aware that so many of the Works would be out of the Gallery. (Davis Dec. ¶ 21.) Plaintiff therefore asked the Gallery for a full inventory identifying the location of each of the Works, and instructed Defendants to arrange for all to be returned. (Davis Dec. ¶ 22.)

Rather than focus on preparing an inventory and returning the Works, Defendants arranged the sale of another Stuart Davis painting, titled *Punchcard Flutter,* for $2,250,000.00 and the sale of 12 other Stuart Davis works of art for $650,000.00 (the "Two Sale Agreements"). (Davis Dec. ¶ 23.) Defendants induced Plaintiff to accept the Two Sale Agreements by Salander's falsely representing the sale price and promising immediate payment. (Davis Dec. ¶ 24.) After concluding the sales, Salander claimed that the buyers had not paid, but he nonetheless released the works to the buyers. (Davis Dec. ¶ 25.) For months, Defendants repeatedly promised to pay Plaintiff, but never did. (Davis Dec. ¶ 26.) Recently, Defendants pledged the same *Punchcard Flutter* painting as collateral to another creditor. (Nicyper Dec. Ex. 11.)

On May 31, 2006, Plaintiff repeated his instruction to the Gallery to cease all sales: "I want Everyone involved in sales of my father's work at the gallery to be clearly and unambiguously notified that I wish to Completely Suspend any and all offerings of such works for sale until after such time that they have each been physically returned to my possession and a more reliable system of accounting and record keeping has been established at the gallery." (Davis Dec. ¶ 28 and Ex. 4 (emphasis in original).

## C.    Further False Reassurances

By mid-June, Plaintiff still had not been paid any proceeds from the 4-Paintings Sale or the Two Sale Agreements. To temporarily mollify the growing concerns Plaintiff increasingly was expressing, Salander, without any prior discussion with Plaintiff, handed Plaintiff a stack 24 post-dated checks (each in the amount of $222,083.00) on June 21, 2006. The checks were to pay over a 24-month period the debt that Defendants had disclosed to Plaintiff as of that date, namely the proceeds from: the 4-Paintings Sale; the Two Sale Agreements; and two partnership transactions Plaintiff and Defendants had entered into.[3] (Davis Dec. ¶ 29.) Surprised to be handed the checks without his agreeing to them, Plaintiff told Salander he did not want a 24-month payout. In response, Salander said the checks were merely to serve as back-up security for Plaintiff and reassurance that Defendants planned to pay. (Davis Dec. ¶ 31.) Only three of the checks eventually cleared.

In June 2006, Defendants finally began to return some of Plaintiff's Works. In nine separate deliveries to Plaintiff between June 1, 2006 and January 11, 2007, Defendants returned 102 of 218 outstanding Works. (Davis Dec. ¶ 32.) Although beginning to receive some of the Works was somewhat comforting to Plaintiff, he later learned when the returns ended in January 2007 that the returns included very few paintings and for the most part were the least significant and least valuable Works. (Id.)

After months of Plaintiff's repeated requests, Defendants finally produced an inventory listing all of Plaintiff's Works in late July 2006. (Davis Dec. ¶ 33.) (See list provided by SOR to Plaintiff in late July 2006 (the "2006 List"), attached as Ex. 6 to the Davis Dec.) The 2006

---

[3]    The two partnership deals were entered into in 2003. Pursuant to those deals, Plaintiff and Defendants jointly purchased a Courbet painting and a pair of bronze sculptures. (Davis Dec. ¶ 30, and Ex. 5.) In accordance with their agreement, Defendants were to have paid Plaintiff $400,000.00 in June 2004 and $560,000.00 in August 2004. Id.

List identified 124 Works which, at that time, had not been returned to Plaintiff. In the 2006

List, Defendants represented to Plaintiff that 103 of the 124 Works listed were out on

consignment with other galleries or dealers, eight others were either on consignment or on

approval with various private collectors or museums, nine purportedly were in SOR's

possession, and four were missing. The 2006 List did not disclose that any of the 124 listed

Works had been sold. To the contrary, Gallery officer Andrew Kelly handwrote on the 2006 List

the last agreed-upon prices at which the Gallery would offer each of the listed Works and the

years in which those prices had been agreed to. (Davis Dec. ¶ 34.)

**D.    Unreported Sales Revealed By Outside Sources**

In mid-September through October 2006, however, Plaintiff discovered from people not

associated with Defendants that several of the Works designated in the 2006 List as out on

consignment in fact had been sold without any of the proceeds being forwarded to Plaintiff.

Specifically, a Gallery client, Joseph Carroll, told Plaintiff that he owned 10 of the Works.

(Davis Dec. ¶¶ 36, 37.) In addition, a show at the Whitney Museum included two of the Works

listing their owners as someone other than Plaintiff. (Davis Dec. ¶ 37.) Finally, another art

gallery was selling five of the Works. (Id.) When Plaintiff confronted Salander with these

previously undisclosed, apparent sales, and demanded payment, Salander feigned surprise and

stated that he would look into it. (Davis Dec. ¶¶ 38, 39.)

In November 2006, after the checks Salander handed to Plaintiff in June cleared for the

first three months, the Gallery's accountant suggested that Plaintiff not deposit any more checks

because they were unlikely to clear. (Davis Dec. ¶ 41.)[4] In addition, in mid-December 2006, a

high-level Gallery employee informed Plaintiff that the Gallery had not sent letters for return of

---

[4]    The checks that did clear were only sufficient to cover the Defendants' debt for the two partnership deals they had entered into in 2003. The cleared checks did not compensate Plaintiff for any of the Works at issue in this action.

Plaintiff's Works except to only four of the numerous people and entities that the 2006 List described as consignees of the Works. When Plaintiff reiterated to Salander that the letters must be sent, Salander threatened to go on the attack against Plaintiff if he made any statements to anyone that Salander might consider to be damaging to his reputation. (Davis Dec. ¶ 42.)

**E.    109 Works Either Are Unaccounted For
       Or Were Sold Without Payment To Plaintiff**

The Gallery continued to return Works until January 11, 2007. When the returns ceased, 99 Works were not accounted for. (Davis Dec. ¶ 43.) An updated inventory list Defendants delivered to Plaintiff, dated January 4, 2007 (the "January 4, 2007 List") provided a horrifying explanation. In stark contrast to the 2006 List, which had identified 124 of the Works and their purported locations, the January 4, 2007 List identified only 73 of the Works and now reported that *all 73 had been sold*. (Davis Dec. ¶ 43 and Ex. 8.) For those 73 Works, the January 4, 2007 List provided dollar amounts that purportedly represented the prices for which the 73 Works were sold. The January 4, 2007 List reported that Defendants had received a total of $9,378,875.00 in sales proceeds for those 73 Works.

When Plaintiff inquired as to the location of his other Works, Defendants provided several revised lists, culminating in a revised list dated February 2, 2007 (the "February 2, 2007 List"). (Davis Dec. ¶ 44 and Ex. 9.) The February 2, 2007 List identified 116 works, comprised of the 99 Works that were not returned, plus the Works in the 4-Paintings Sale and the 12 Works Sale, plus *Punchcard Flutter*. The list included sales information for the same 73 Works listed as sold in the January 4, 2007 List, but gave no information on the status of the other 43 Works.

Not only did Defendants sell Plaintiff's Works without consulting him and without paying him, but Defendants also used Plaintiff's Works as collateral for Defendants' own debts. A search of Uniform Commercial Code ("UCC") financing statements last spring revealed that

in 2006 Defendants pledged at least fourteen of Plaintiff's Works as collateral to secure Defendants' own debt obligations. (See Ex. 10 to the Nicyper Dec.) A more recent search of UCC financing statements revealed that, contrary to Defendants' representation that *Punchcard Flutter* had been sold, Defendants apparently pledged the work as collateral in April this year to secure another of Defendants' own debt obligations. (See Ex. 11 to the Nicyper Dec.)

**F.    Defendants Admit They Owe Plaintiff The Sales Proceeds At Issue**

Defendants have repeatedly acknowledged to Plaintiff that Defendants owe him all sales proceeds for all Works sold. For example, in a December 13, 2006 e-mail to Plaintiff, Salander stated: "The only thing that could stand in the way of paying you would be my death…. The fact is your trust was, is and will be well placed with me. You will get paid every cent you are owed." (Davis Dec. ¶ 48, and Ex. 10 thereto.)

In a March 12, 2007 e-mail to Plaintiff, Salander further stated: "So it comes down to money, and a lot of it. I have already promised you I will pay you every cent I owe you and as quickly as I possibly can…. You have the right to say, 'Yeah, but it's my money' – and that it is." (Davis Dec. ¶ 49, and Ex. 11 thereto.)

**G.    While Owing Plaintiff Millions Of Dollars Of Trust
       Funds, Defendants Paid Millions Of Dollars To Others**

The Defendants' inventory lists show that Defendants sold many of the Works years ago for millions of dollars in the aggregate, but none of those sales proceeds/statutory trust funds were paid to Plaintiff despite Plaintiff's repeated demands for payment. (Davis Dec. ¶ 46.) During that same time, Defendants went on a buying spree, acquiring art with a price tag of more than $11 million. Court filings in cases brought by sellers against the Gallery for its failure to pay in full for that artwork show that Defendants paid between $4,436,443.10 and $6,138,550.60, or more, to others over the last couple of years, while Defendants withheld from

Plaintiff more than $9 million of Plaintiff's trust funds. Defendants' buying spree ultimately led them to declare in one lawsuit that they have a "liquidity crisis" and are concerned that their "house of cards will collapse." (Nicyper Dec. ¶ 6 and Ex. 9.) As the threat of additional lawsuits against Defendants grows by the week, there is no telling what Defendants will do with whatever remains of Plaintiff's trust funds. (Nicyper Dec. ¶¶ 5, 6, 12, 13.)

## H.    The July 9th Order And Defendants' Violations Of It

On June 29, 2007, Plaintiff filed an Order to Show Cause for a Preliminary Injunction and Expedited Discovery ("Order to Show Cause"). On July 6, 2007, in resolution of the Order to Show Cause, the parties signed a Stipulation and Order, which was so-ordered by this Court on July 9, 2007 (the "July 2007 Order"). Among other things the July 2007 Order required Defendants to retrieve any Works still out on consignment and return them to Plaintiff. Defendants did not do that and instead represented to Plaintiff's counsel that there were not works still on consignment. In response to a letter from Plaintiff's counsel, however, a gallery informed Plaintiff's counsel after the July 2007 Order was issued that the gallery still had seven of the Works on consignment from SOR.[5] In further violation of the July 2007 Order's requirements, Defendants have paid no installment payments to Plaintiff, even though Defendants produced a document showing that installment payments are still being made for the 4-Painting Sale. In further violation of the July 2007 Order, Defendants produced no documents relating to their pledging many of the Works as collateral for their own debts as is evidenced by many UCC filings.

---

[5]    Deducting the "sales proceeds" which Defendants falsely reported they had received for five of those seven Works, the total aggregate amount Defendants report to have received for the 70 reportedly sold Works of the 103 Works that have not been returned is $9,382,500 (Davis Dec. ¶ 55).

## ARGUMENT

## POINT I

## DEFENDANTS SHOULD BE HELD IN CIVIL CONTEMPT
## FOR THEIR FAILURE TO COMPLY WITH THE COURT'S JULY 2007 ORDER

It is well-settled that "[c]ourts possess the 'inherent power to enforce compliance with their lawful orders through civil contempt.'" Bank of Credit and Commerce Intern. (Overseas) Ltd. v. Tamraz, No.97 Civ.4759, 2006 WL 1643202, at *2, *5 (S.D.N.Y. June 13, 2006) (finding defendant in further civil contempt "for having failed to comply with this Court's [order] in all respects.") (quoting In re Martin-Trigona, 732 F.2d 170, 173 (2d Cir. 1984)); see Nat'l Basketball Ass'n v. Design Mgmt. Consultants, Inc., 289 F. Supp. 2d 373, 376 (S.D.N.Y. 2003) (holding that violations of court order, in making sales of merchandise after issuance of the injunction and in failing to provide an accounting and supporting documentation, warranted a finding that defendants committed contempt).[6]

"'A party may be held in civil contempt for failure to comply with a court order if '(1) the order the contemnor failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the contemnor has not diligently attempted to comply in a reasonable manner.'" Id. (quoting Paramedics Electromedicina Comercial, Ltda v. GE Med. Sys. Info. Tech., 369 F.3d 645, 655 (2d Cir. 2004)). "It need not be established that the violation be willful." Paramedics, 369 F.3d at 655 (citation omitted). Further, it is "[t]he

---

[6]     See also Experience Hendrix, LLC v. Chaplin, PPX, No. 06 Civ.9926, 2007 WL 541620, at *2 (S.D.N.Y. Feb. 15, 2007) (holding defendants in civil contempt for violating temporary restraining order and preliminary injunction by transferring funds in violation thereof); Clissuras v. City Univ. of New York, No. 02 Civ.8130, 2005 WL 3288097, at *2-3 (S.D.N.Y. Dec. 2, 2005) (holding plaintiffs in contempt and ordering reimbursement of attorneys' fees for violating permanent injunction); Paramedics Electromedicina Comercial, Ltda v. GE Med. Sys. Info. Tech., 369 F.3d 645, 655 (2d Cir. 2004) (holding that district court did not abuse its discretion in holding distributor in civil contempt for failure to comply with injunction and court directive); Yurman Design Inc. v. Chaindom Enters. Trading Corp., No. 99 Civ.9307, 2002 WL 1402305, at *1-2 (S.D.N.Y. June 27, 2002) (finding defendant in contempt of injunction order for continuing to manufacture enjoined products and failing to send recall letters to customers); Chere Amie, Inc. v. Windstar Apparel, Corp., 175 F. Supp. 2d 562, 566, 568 (S.D.N.Y. 2001) (finding defendant in civil contempt for failure to comply with injunction directing it to recall and deliver to plaintiffs all of its infringing products).

contemnor [who] bears the burden of producing evidence of his inability to comply", a burden

that "is not easily met . . . ." A.V. By Versace, Inc. v. Gianni Versace S.p.A., 279 F. Supp. 2d

341, 346 (S.D.N.Y. 2003) (citations omitted).

Here, Defendants should be held in contempt for failing to comply with the Order for the

following reasons:

- The defendants signed the July 2007 Order as a Stipulation and Order, which they took part in negotiating, in which they explicitly agreed to the terms of the injunction issued against them;

- The Order is clear and unambiguous in requiring defendants, *inter alia*, to (i) retrieve all unsold Works which Defendants consigned, pledged, loaned or transferred, and deliver such Works to Plaintiff; (ii) produce documents relating to any Works that Defendants pledged as collateral; and (iii) to deliver to Plaintiff all installment payments that Defendants receive, as one or more payments for sales of any Works; and

- Defendants have not complied – or satisfied their obligation to make a diligent attempt to comply – with any of these three directives.

First, Defendants failed to comply with the July 2007 Order because they did not produce

any documents concerning Works pledged as collateral. A search of UCC financing statements

revealed that in 2006 Defendants pledged at least fourteen of Plaintiff's Works as collateral to

secure their own debt obligations. See Nicyper Dec. ¶ 7, and Ex. 10. Further, Plaintiff recently

discovered that several months ago Defendants pledged yet another of Plaintiff's Works as

collateral for their own debts. See Nicyper Dec. ¶ 7, and Ex. 11. Plaintiff learned this, not

through information produced by Defendants -- as required by this Court's Order -- but through

his own efforts in searching UCC filings. Indeed, of the 1089 pages produced by Defendants,

not a single piece of paper concerns Works pledged as collateral. See Nicyper Dec. ¶ 8.

Second, Defendants failed to comply with the July 2007 Order's directive that they

retrieve any unsold Works which Defendants consigned, pledged, loaned or transferred, and

deliver such Works to Plaintiff. Despite the Court's Order, Defendants did not even pick up the phone or send a letter. Instead, Defendants falsely represented to Plaintiff's counsel that there were no unsold Works still outstanding. See Nicyper Dec. ¶ 9. This assertion is belied by a gallery in New York recently informing Plaintiff in response to that Plaintiff's counsel communication to it that the gallery was still holding seven Works that it had received on consignment from Defendant SOR. See Nicyper Dec. ¶ 10, and Ex. 12.

Finally, Defendants failed to deliver to Plaintiff installment payments that Defendants receive. The July 2007 Order requires Defendants to deliver all such installment payments to Plaintiff upon Defendants' receipt from the date of the Order forward. Defendants' counsel has represented that there are no installment payments owed for the sales of any Works. See Nicyper Dec. ¶ 11. This assertion is belied by the documents they produced, which reveal that Defendants entered into a installment payment plan for the sale of the 4-Paintings, with 48 equal payments due and payable monthly commencing on July 2, 2006. See Nicyper Dec. ¶ 11, and Ex. 13. The August 2, 2007 payment date has come and gone, but Defendants did not forward this installment payment to Plaintiff.

After the July 2007 Order was so-ordered by this Court, Defendants went about their lives as if the Order did not exist.

Such disdain for the Court's Order violated Defendants' obligation to be "reasonably diligent and energetic in attempting to comply." See Nat'l Basketball Ass'n, 289 F. Supp. 2d at 376-377 (finding that defendants had not employed reasonable diligence and energy where defendants failed to avoid sales of merchandise after the court had enjoined such sales, and failed to present evidence that an "effective or specific set of instructions was issued to those persons directed to remove [the merchandise] from sale"). Defendants' refusal to take the injunction

seriously -- indeed, they have all but ignored it -- is yet another denial and delay tactic in a long

series of such tactics employed by the Defendants leading up to Plaintiff's filing of this lawsuit.

Accordingly, Defendants should be held in civil contempt for their failure to comply with the

directives of this Court.

Mr. Davis respectfully requests that this Court enter an Order (1) holding defendants in

civil contempt for failure to comply with the July 2007 Order; (2) ordering that Defendants fully

comply with the July 2007 Order within seven days; (3) directing that Defendant Salander

submit an affidavit explaining his efforts, if any, to comply with the July 2007 Order; (4)

requiring defendant Lawrence Salander and two SOR senior executives, Leigh Morse and

Andrew Kelly, to appear for depositions to take place at Plaintiff's counsel's offices on

September 25, 26, and 27, 2007, respectively; and (5) imposing sanctions upon the defendants in

the event that they do not comply with the July 2007 Order within seven days.

## POINT II

### A PRELIMINARY INJUNCTION SHOULD BE ORDERED COMPELLING DEFENDANTS TO PAY TO PLAINTIFF ALL TRUST FUNDS DEFENDANTS HOLD FOR THE SOLE BENEFIT OF PLAINTIFF

A.    BY STATUTE, PLAINTIFF ALONE IS ENTITLED TO HIS
      WORKS AND THE PROCEEDS FROM SALES OF HIS WORKS

Article 12 of the New York Arts and Cultural Affairs Law provides in pertinent part:

(a)    Whenever an artist or craftsperson, his heirs or personal representatives,
       delivers or causes to be delivered a work of fine art, craft or print of his own
       creation to an art merchant for the purpose of exhibition and/or sale on a
       commission, fee or other basis of compensation, the delivery to and
       acceptance thereof by the art merchant establishes a consignor/consignee
       relationship as between such artist or craftsperson and such art merchant
       with respect to the said work, and:

       (i)    such consignee shall thereafter be deemed to be the agent of such
              consignor with respect to the said work;

(ii)   such work is trust property in the hands of the consignee for the benefit of the consignor;

(iii)  *any proceeds from the sale of such work are trust funds in the hands of the consignee for the benefit of the consignor;*

(iv)   such work shall remain trust property notwithstanding its purchase by the consignee for his own account until the price is paid in full to the consignor; . . . and

(v)    no such trust property or trust funds shall be subject or subordinate to any claims, liens or security interest of any kind or nature whatsoever.

N. Y. Arts and Cultural Affairs Law ("NYACA"), § 12.01.1(a) (McKinney 1984 Supp. 2007) (emphasis added).

The scope and strength of NYACA's trust fund provisions protecting artists and their heirs cannot be overstated. For example, in Zucker v. Hirschl & Adler Galleries, Inc., 170 Misc.2d 426, 648 N.Y.S.2d 521 (Sup. Ct. N.Y. Co. 1996), a gallery sought to hold a number of an artist's original works of art as collateral for loans made by the gallery to the artist. The artist did not dispute that he had received monetary advances from the gallery or that he owed money to the gallery. The court nevertheless denied the gallery's petition to hold the artist's works because "the statute expressly precludes any such security interest." Id. at 433, 526. The court instead ruled that "the Gallery shall return to plaintiff all such artwork in its custody, control or possession." Id. at 435, 527. See also Koeniges v. Woodward, 183 Misc.2d 347, 349, 702 N.Y.S.2d 781, 783 (Civ. Ct. N.Y. Co. 2000) (referring to prior summary judgment in the case ordering art gallery to return photographs to photographer under NYACA); Wesselmann v. Int'l Images, Inc., 172 Misc.2d 247, 253, 657 N.Y.S.2d 284, 288 (Sup. Ct. N.Y. Co. 1996) ("Wesselmann I") (artist "Tom Wesselmann is entitled to the return from defendants of all art works created by him that are in defendants' possession, custody or control.... Such art works and *the proceeds from sales of such artworks are trust funds in the hands of defendants for the benefit of Tom Wesselmann.*") (emphasis added).

Here, Plaintiff is the heir of the well-known artist, Stuart Davis. (Davis Dec. ¶ 1.) As such, he owns hundreds of his fathers works of art and consigned hundreds of Works to Defendants. (Davis Dec. ¶¶ 5, 6.) Defendants are art merchants, as that term is defined in NYACA. See NYACA, § 11.01.3. As such, Defendants are required to hold all of the Works they received from Plaintiff as "trust property . . . for the benefit of [Plaintiff]" and all of the proceeds from sales of the Works as "trust funds . . . for the benefit of [Plaintiff]." Id. at § 12.01.1(a).

Under NYACA, therefore, Plaintiff alone has title in and all rights to the Works as well as to all proceeds from sales of those Works. Only Plaintiff is entitled to possession of those Works and those sales proceeds. Defendants have no rights in the Works or the sales proceeds. Defendants only have a contractual right for Plaintiff to pay to the Gallery an agreed-upon commission. Defendants have absolutely no right to use the sales proceeds for their own operations or working capital, as they appear to have done.

B.    AN INJUNCTION IS NECESSARY TO PREVENT
       DISSIPATION OF PLAINTIFF'S TRUST FUNDS

A preliminary injunction should be issued under Rule 65 of the Federal Rules of Civil Procedure where the moving party demonstrates: (1) irreparable injury if the injunction is not issued; and (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits and a balance of hardships decidedly tipped in the movant's favor. Green Party of New York State v. New York State Bd. of Elections, 389 F.3d 411, 418 (2d Cir. 2004); Bronx Household of Faith v. Bd. of Educ. of New York, 226 F. Supp. 2d 401, 411 (S.D.N.Y. 2002), aff'd, 331 F.3d 342 (2d Cir. 2003); Demolition Workers Union v. Mackroyce Contracting Corp., No. 97 Civ. 4094 (LMM), 2000 WL 297244 (S.D.N.Y. Mar. 22, 2000) (granting injunction requiring payment of funds).

Preliminary injunctive relief is particularly appropriate to enforce the rights of a beneficiary of a statutory trust. See, e.g., Horizon Mktg. v. Kingdom Int'l Ltd., 244 F. Supp. 2d 131, 135 (E.D.N.Y. 2003) (granting preliminary injunction restraining produce buyers from dissipating assets that were part of statutory trust established for the benefit of produce sellers under the Perishable Agricultural Commodities Act ("PACA"), finding that the statutory trust was "meant to ensure that sellers are paid in full from the proceeds derived from the re-sale of produce."). In Horizon -- a case involving a statutory trust under a statute parallel to the NYACA statute at issue here -- the court held that irreparable harm was "the risk that a produce buyer will have dissipated the PACA trust without paying the produce seller, thus leaving the produce seller out of luck and out of money." 244 F. Supp. 2d at 140. Likewise, irreparable harm under NYACA "is the risk that [an art merchant] will have dissipated the [NYACA] trust without paying the [artist or his heir], thus leaving the [artist or his heir] out of luck and out of money." The court in Horizon additionally found that the likelihood of success on the merits prong likewise is addressed easily in such statutory trust contexts where a plaintiff delivers goods to defendants but is not paid for those goods. Id. ("that plaintiffs are entitled to payment is not in dispute").

Similarly, in Wishnatzki & Nathel, Inc. v. H.P. Island-Wide, Inc., No. 00 Civ. 8051 (JSM), 2000 WL 1610790 (S.D.N.Y. Oct. 27, 2000), plaintiff sought a temporary restraining order and preliminary injunction to prevent defendants from dissipating funds that plaintiff claimed to own pursuant to a PACA trust. The court found that plaintiff had properly demonstrated an imminent danger of dissipation by defendants and accordingly granted the temporary restraining order pending the hearing on the preliminary injunction. In so holding, the court observed that "where the particular funds sought to be frozen are also the funds at issue in

the suit, a preliminary injunction is proper." Id. at *1. As in Wishnatzki, the particular funds

sought to be the subject of preliminary injunctive relief here are the same funds ultimately at

issue in this suit; therefore, a preliminary injunction is proper.

Under a standard that differs somewhat from the standard for a restrictive injunction, a

mandatory injunction is properly ordered where the moving party demonstrates "a clear or

substantial likelihood of success on the merits, or that it will suffer extreme or very serious

damage if denied preliminary relief." Bronx Household, 226 F. Supp. 2d at 411 (citations

omitted). Preliminary mandatory injunctions requiring the payment of money pending trial are

appropriate where warranted by "the circumstances and equities of the case." See, e.g.,

Columbia Broad. Sys., Inc. v. Am. Soc'y of Composers, Authors And Publishers, 320 F. Supp.

389, 392 (S.D.N.Y. 1970) ("the circumstances and equities of the case do render appropriate the

granting of an injunction ordering monetary payments pendente lite").

As demonstrated below, the preliminary injunction standards are met in this case, and we

respectfully submit that this Court should issue the injunction Plaintiff seeks.

### 1.    **Plaintiff Will Likely Succeed On The Merits Of His Claims**

As heir to the estate of well-known artist Stuart Davis, Plaintiff delivered the Works at

issue to the Gallery. Under NYACA, the Defendants hold "any proceeds from the sale of such

[W]ork[s] [as] trust funds ... for the benefit of [Plaintiff]." NYACA, § 12.01.1(a). Since

December 2005, Plaintiff repeatedly demanded that Defendants deliver all sales proceeds to

Plaintiff. (Davis Dec. ¶¶ 26, 39, 46.) Plaintiff alone has all rights to possession of and title to

such proceeds from the sales of his Works.

In the inventory lists they prepared, Defendants reported that they sold 73 of those Works

for a total of $9,378,875.00. (Davis Dec. ¶ 46 and Ex. 9 thereto.) Supplementing those amounts

with sale prices in invoices Defendants produced on July 25, 2007, and subtracting falsely

reported sales proceeds for five Works that a gallery recently returned at Plaintiff's counsel's

request, Defendants' reported sales proceeds total $9,382,500. (Nicyper Dec. ¶15 and footnote

1.) None of those sales proceeds have been delivered to Plaintiff despite his numerous demands.

(Davis Dec. ¶ 46.) The Gallery's Managing Director, Defendant Salander, admits that

Defendants owe the sales proceeds to Plaintiff: "So it comes down to money, and a lot of it. I

have already promised you I will pay you every cent I owe you and as quickly as I possibly

can…. You have the right to say, 'Yeah, but it's my money' – and that it is." (Davis Dec. ¶ 49,

and Ex. 11 thereto.)

Because Plaintiff alone is entitled to the $9,382,500 in proceeds from sales of those

Works, and because Defendants have failed deliver to Plaintiff the $9,382,500 in sales proceeds,

there is a substantial likelihood that Plaintiff will succeed on his NYACA and replevin claims

(the only claims at issue in this motion). See, e.g., Horizon Mktg. v. Kingdom Int'l Ltd., 244 F.

Supp. 2d 131 (E.D.N.Y. 2003) (finding likelihood of success on the merits prong satisfied where

plaintiff delivered goods to defendant but was not paid, in violation of defendants' statutory trust

obligations).

### 2. Plaintiff Would Suffer Irreparable Harm And Extreme Damage If The Injunction Does Not Issue

Plaintiff already has been irreparably harmed by Defendants' dissipation of the sales

proceeds constituting funds Defendants hold in trust for Plaintiff. While their obligation to pay

the $9,382,500 in trust funds remains outstanding, Defendants have spent millions of dollars to

acquire other works of art and relieve Defendants of their debts to others (Nicyper Dec. ¶ 5). In

light of Defendants' admission that they have "a liquidity crisis" and are concerned that their

"house of cards will collapse" (Nicyper Dec. ¶ 6 at Ex. 9), and the growing number of lawsuits

being instituted against Defendants, there is an enormous risk that, absent an injunction, the sales

proceeds will continue to be dissipated by Defendants. See Wesselmann v. Int'l Images, Inc.,

169 Misc.2d 476, 482, 645 N.Y.S.2d 263, 267 (Sup. Ct. N.Y. Co. 1996) ("Wesselmann II")

(mandatory injunction granted under similar New York standard where plaintiff artist

demonstrated it was likely that art works in question were plaintiff's trust property under

NYACA, and defendant was selling those art works and keeping proceeds).

     "Preliminary injunctions are appropriate to thwart a defendant from making a judgment

uncollectible." Quantum Corp. Funding, Ltd. v. Assist You Home Health Care Services of Va.,

L.L.C., 144 F. Supp. 2d 241, 248 (S.D.N.Y. 2001) (finding irreparable harm where "actual and

imminent threat" that defendant's company, wrought with accounting and payroll problems,

would cease to exist, thereby making judgment uncollectible; placement of money in Court's

interest-bearing account as opposed to leaving sum in hands of defendant was "most prudent

course"). Given Defendants' practice of not delivering sales proceeds to Plaintiff and given

Defendants' "liquidity crises," Plaintiff may never recover his trust fund sales proceeds. See

Deckert v. Independence Shares Corp., 311 U.S. 282, 288-89, 61 S.Ct. 229, 233 (1940)

(affirming order enjoining defendants from transferring or disposing of trust assets during

pendency of suit where allegations that "[defendant] is insolvent, that its business is practically

halted, that it is threatened with many lawsuits, that its assets are endangered . . . it [may] be

extremely difficult to obtain satisfaction of any claim"); Horizon, 244 F. Supp. 2d at 140

(irreparable harm existed where there was risk that trustee would continue to dissipate trust funds

without paying entity for which funds were held in trust, potentially "leaving the [trust

beneficiary] out of luck and out of money"); Wishnatzki, 2000 WL 1610790, at *1 (order

freezing assets pending payment for goods sold where plaintiffs properly demonstrated

"imminent danger of dissipation"); Demolition Workers Union v. Mackroyce Contracting Corp.,
2000 WL 297244, at *9 (defendant's "apparently precarious financial condition" and substantial
danger that disputed funds may not be collectable were basis, in part, for finding irreparable
harm). See also Wesselmann II, 169 Misc.2d at 482, 645 N.Y.S.2d at 267 (granting a
preliminary injunction because "[i]f [defendant] continues [selling the art] it would render
ineffectual the judgment compelling the return of the [a]rt. It also appears that [defendants] may
be unable to pay a judgment in plaintiffs' favor.").

### 3. The Balance Of The Hardships Decidedly Tips In Favor Of Plaintiff

Even if Plaintiff could not demonstrate a likelihood of success on the merits -- which he
has -- an injunction nonetheless should issue because, at the very least, sufficiently serious
questions exist and the balance of hardships decidedly tips in favor of Plaintiff. As demonstrated
above, Defendants have no legitimate right, title or interest in the Works or their sales proceeds.
Indeed, Defendants have repeatedly admitted to Plaintiff that Defendants owe him all sales
proceeds for all Works sold. See Davis Dec. ¶¶ 48-49, and Exs. 10-11 thereto. See also
Quantum, 144 F. Supp. 2d at 249 (balance of hardships tipped in plaintiff's favor where, *inter
alia*, defendant demonstrated pattern of bad-faith in evading creditor claims and defendants
admitted they owed money to plaintiff). Defendants will not suffer any hardship should they be
prevented from using Plaintiff's trust fund sales proceeds for their own purposes. See B.U.S.A.
Corp. v. Ecogloves, Inc., No. 05 Civ. 9988 (SCR), 2006 WL 3302841, at *7 (S.D.N.Y. Jan. 31,
2006) (finding that balance of hardships favored plaintiff since injunction would prevent
defendants from engaging in conduct "which they cannot do regardless of the injunction"). In
contrast, if the preliminary injunction is not issued, Plaintiff will lose his trust funds, comprised

of proceeds from sales of his unique, irreplaceable works of art. The hardships at issue here therefore are entirely one-sided tipping the balance in favor of a preliminary injunction.

*    *    *

Accordingly, Plaintiff respectfully submits that this Court should issue a preliminary injunction mandating that Defendants deliver to Plaintiff all trust funds consisting of proceeds that Defendants received from sales of Plaintiff's Works.

## CONCLUSION

For all of the forgoing reasons, Plaintiff respectfully submits that this Court should hold Defendants in contempt; order them to comply with the July 2007 Order within seven days; direct that Defendant Salander shall submit an affidavit explaining his efforts, if any, to comply with the July 2007 Order; require Defendants to appear for immediate deposition; impose sanctions upon the defendants in the event that they do not comply with the July 2007 Order within seven days; and issue a preliminary injunction mandating that Defendants deliver to Plaintiff all trust funds that Defendants are statutorily deemed to hold for the exclusive benefit of Plaintiff.

Dated:   New York, New York
         August 20, 2007

Flemming Zulack Williamson Zauderer LLP

By: _____

Dean R. Nicyper (DN-7757)
One Liberty Plaza
New York, New York 10006
(212) 412-9500
Attorneys for Plaintiff Earl Davis

# Exhibit J

FLEMMIN, ZULACK WILLIAMSON ZAUDER, LLP

LAW OFFICES
ONE LIBERTY PLAZA
NEW YORK, NEW YORK
10006-1404
(212) 412-9500
FAX (212) 964-9200

June 4, 2007

REDACTED

Dean R. Nicyper

Owings Dewey Fine Art
76 East San Francisco Street
Santa Fe, New Mexico 87501

Re:    **Stuart Davis Paintings, Drawings and Works on Paper**

Dear Sirs and Madams:

Our client, Earl Davis, manages all works of art from the estate of his father, American artist Stuart Davis. Earl Davis worked with the Salander-O'Reilly Galleries for several years, but no longer is working with that gallery and has sought to have all of the Stuart Davis works returned to him. If you currently hold any unsold Stuart Davis works of art that came directly or indirectly from Mr. Davis or Salander-O'Reilly Galleries, please contact our office to arrange for the works of art to be returned to the estate. Also, if you are aware of any Stuart Davis works for which full or partial payment is still outstanding, please contact us.

If you have any questions, please feel free to call me at the telephone number identified above.

Sincerely,

Dean R. Nicyper

WRITER'S DIRECT DIAL
(212) 412-9504
dnicyper@fzwz.com

DRN/ac

294233/24243

ED000286

FLEMMING ZULACK WILLIAMSON ZAUDERE. LLP

LAW OFFICES
ONE LIBERTY PLAZA
NEW YORK, NEW YORK
10006-1404
(212) 412-9500
FAX (212) 964-9200

June 4, 2007

Dean R. Nicyper

Carol Craven Gallery
PO Box 593
West Tisbury, MA 02575

Re:     **Stuart Davis Paintings, Drawings and Works on Paper**

Dear Sirs and Madams:

Our client, Earl Davis, manages all works of art from the estate of his father, American artist Stuart Davis. Earl Davis worked with the Salander-O'Reilly Galleries for several years, but no longer is working with that gallery and has sought to have all of the Stuart Davis works returned to him. If you currently hold any unsold Stuart Davis works of art that came directly or indirectly from Mr. Davis or Salander-O'Reilly Galleries, please contact our office to arrange for the works of art to be returned to the estate. Also, if you are aware of any Stuart Davis works for which full or partial payment is still outstanding, please contact us.

If you have any questions, please feel free to call me at the telephone number identified above.

Sincerely,

Dean R. Nicyper

WRITER'S DIRECT DIAL
(212) 412-9504
dnicyper@fzwz.com

DRN/ac

294233/24243

FLEMMING ZULACK WILLIAMSON ZAUDERER LLP

LAW OFFICES
ONE LIBERTY PLAZA
NEW YORK, NEW YORK
10006-1404
(212) 412-9500
FAX (212) 964-9200

June 4, 2007

Dean R. Nicyper

Gerald Peters Gallery
1011 Paseo de Peralta
Santa Fe, NM 87501

Re:    **Stuart Davis Paintings, Drawings and Works on Paper**

Dear Sirs and Madams:

Our client, Earl Davis, manages all works of art from the estate of his father, American artist Stuart Davis. Earl Davis worked with the Salander-O'Reilly Galleries for several years, but no longer is working with that gallery and has sought to have all of the Stuart Davis works returned to him. If you currently hold any unsold Stuart Davis works of art that came directly or indirectly from Mr. Davis or Salander-O'Reilly Galleries, please contact our office to arrange for the works of art to be returned to the estate. Also, if you are aware of any Stuart Davis works for which full or partial payment is still outstanding, please contact us.

If you have any questions, please feel free to call me at the telephone number identified above.

Sincerely,

Dean R. Nicyper

WRITER'S DIRECT DIAL
(212) 412-9504
dnicyper@fzwz.com

DRN/ac

294233/24243

ED000288

# THE PETERS GP CORPORATION

REDACTED

4056 CERRILLOS ROAD, SUITE F-1, SANTA FE, NM 87507
P.O. BOX 908, SANTA FE, NM 87504-0908
TEL 505 424-9081  FAX 505 424-1890

July 6, 2007

Dean R. Nicyper, Esq.
Flemming Zulack
Williamson Zauderer LLP
One Liberty Plaza
New York, New York 10006-1404

RE:    *Stuart Davis Paintings, Drawings and Works on Paper*

Dear Dean:

Catherine Whitney, Director of 20th Century American Art, Gerald Peters Gallery, has recently discussed with me your June 4, 2007, letter addressed to the Gallery concerning the referenced matter.

We are in the process of obtaining information concerning the Gallery's inventory of Stuart Davis works of art. I will be able to discuss this with you after August 1, when I return from vacation.

Meanwhile, thank you for your patience.

Very truly yours,

George F. Bingham
General Counsel

GFB/sd
cc:    Ms. Catherine Whitney

ED000293

FLEMMING ZULACK WILLIAMSON ZAUDERER LLP

LAW OFFICES
ONE LIBERTY PLAZA
NEW YORK, NEW YORK
10006-1404
(212) 412-9500
FAX (212) 964-9200

June 4, 2007

Dean R. Nicyper

D.C. Moore Gallery
724 Fifth Avenue
New York, New York 10019

Re:    **Stuart Davis Paintings, Drawings and Works on Paper**

Dear Sirs and Madams:

Our client, Earl Davis, manages all works of art from the estate of his
father, American artist Stuart Davis. Earl Davis worked with the Salander-
O'Reilly Galleries for several years, but no longer is working with that gallery
and has sought to have all of the Stuart Davis works returned to him. If you
currently hold any unsold Stuart Davis works of art that came directly or
indirectly from Mr. Davis or Salander-O'Reilly Galleries, please contact our
office to arrange for the works of art to be returned to the estate. Also, if you are
aware of any Stuart Davis works for which full or partial payment is still
outstanding, please contact us.

If you have any questions, please feel free to call me at the telephone
number identified above.

Sincerely,

Dean R. Nicyper

WRITER'S DIRECT DIAL
(212) 412-9504
dnicyper@fzwz.com

DRN/ac

294233/24243

ED000290

FLEMMING ZULACK WILLIAMSON ZAUDERER LLP

LAW OFFICES
ONE LIBERTY PLAZA
NEW YORK, NEW YORK
10006-1404
(212) 412-9500
FAX (212) 964-9200

June 4, 2007

Dean R. Nicyper

Simon Parkes Art Conservation
502 East 74th Street
New York, NY 10021-3402

Re:   **Stuart Davis Paintings, Drawings and Works on Paper**

Dear Sirs and Madams:

        Our client, Earl Davis, manages all works of art from the estate of his
father, American artist Stuart Davis.  Earl Davis worked with the Salander-
O'Reilly Galleries for several years, but no longer is working with that gallery
and has sought to have all of the Stuart Davis works returned to him.  If you
currently hold any unsold Stuart Davis works of art that came directly or
indirectly from Mr. Davis or Salander-O'Reilly Galleries, please contact our
office to arrange for the works of art to be returned to the estate.  Also, if you are
aware of any Stuart Davis works for which full or partial payment is still
outstanding, please contact us.

        If you have any questions, please feel free to call me at the telephone
number identified above.

                                        Sincerely,

                                        Dean R. Nicyper

WRITER'S DIRECT DIAL
(212) 412-9504
dnicyper@fzwz.com

DRN/ac

294233/24243

ED000291

FLEMMING ZULACK WILLIAMSON ZAUDERER LLP

LAW OFFICES
ONE LIBERTY PLAZA
NEW YORK, NEW YORK
10006-1404
(212) 412-9500
FAX (212) 964-9200

June 4, 2007

Dean R. Nicyper

Bernard Goldberg Fine Arts, LLC
667 Madison Avenue, 24th Floor
New York, New York 10021

Re:    Stuart Davis Paintings, Drawings and Works on Paper

Dear Sirs and Madams:

Our client, Earl Davis, manages all works of art from the estate of his father, American artist Stuart Davis. Earl Davis worked with the Salander-O'Reilly Galleries for several years, but no longer is working with that gallery and has sought to have all of the Stuart Davis works returned to him. If you currently hold any unsold Stuart Davis works of art that came directly or indirectly from Mr. Davis or Salander-O'Reilly Galleries, please contact our office to arrange for the works of art to be returned to the estate. Also, if you are aware of any Stuart Davis works for which full or partial payment is still outstanding, please contact us.

If you have any questions, please feel free to call me at the telephone number identified above.

Sincerely,

Dean R. Nicyper

WRITER'S DIRECT DIAL
(212) 412-9504
dnicyper@fzwz.com

DRN/ac

294233/24243

ED000292

# Exhibit K

**REDACTED**



Mr. Dean R. Nicyper                                                      July 10, 2007
Flemming Zulack Williamson Zauderer LLP
Law Offices
One Liberty Plaza
New York, NY 10006-1404

Re:   **Your June 4, 2007 Letter, Stuart Davis**

Dear Mr. Nicyper,

Attached is a list of seven works on paper by Stuart Davis that we have in our possession on consignment from Salander-O'Reilly Galleries, LLC. This list represents each and all works by Stuart Davis that we have from Salander-O'Reilly. Please convey to Mr. Earl Davis our interest in retaining these works on consignment from him under the current terms, or under such terms as would be acceptable to him. Furthermore, as the nation's oldest American Art gallery that for 155 years consignors and clients have found to be completely reliable, and as the gallery that has perhaps the most in-depth owned inventory of works by Stuart Davis, we would like to offer our services in working with Mr. Davis on the marketing of the remaining works in his father's estate.

Sincerely,

BABCOCK GALLERIES

John P. Driscoll, Ph.D.
Owner

JPD: ts

Enc.

BABCOCK GALLERIES

John P. Driscoll, Ph.D.  *Owner*

724 Fifth Avenue  New York, NY 10019   212 767 1852  *fax* 212 767 1857  *email* info@babcockgalleries.com

**Works consigned by SALANDER O'REILLY GALLERIES, LLC, 22 East 71st Street, New York, NY 10021 to BABCOCK GALLERIES, 724 Fifth Avenue, New York, NY 10019:**

| | |
|---|---|
| Artist: | Stuart Davis (1892-1964) |
| Title: | CONFIGURATION, 1932 |
| Medium: | Gouache and pencil on paper |
| Size: | 11 x 14 inches |
| Net Price: | $40,000.00 |

| | |
|---|---|
| Artist: | Stuart Davis (1892-1964) |
| Title: | SKETCHBOOK (GLOUCESTER), c. 1930 |
| Medium: | Pencil on paper |
| Size: | 8 x 10 inches |
| Net Price: | $20,000.00 |

| | |
|---|---|
| Artist: | Stuart Davis (1892-1964) |
| Title: | SKETCHBOOK #17-10, 1936 |
| Medium: | Ink on paper |
| Size: | 6 x 9 inches |
| Net Price: | $10,000.00 |

| | |
|---|---|
| Artist: | Stuart Davis (1892-1964) |
| Title: | CHINESE MERCHANT, 1912 |
| Medium: | Watercolor on paper |
| Size: | 14 1/2 x 10 1/2 inches |
| Net Price: | $45,000.00 |

| | |
|---|---|
| Artist: | Stuart Davis (1892-1964) |
| Title: | SUFFRAGETTES, 1910 |
| Medium: | Watercolor on paper |
| Size: | 13 3/4 x 18 3/4 inches |
| Net Price: | $40,000.00 |

| | |
|---|---|
| Artist: | Stuart Davis (1892-1964) |
| Title: | DRAWING FOR SMITHS COVE, c. 1935 |
| Medium: | Pencil on paper |
| Size: | 15 x 20 inches |
| Net Price: | $70,000.00 |

| | |
|---|---|
| Artist: | Stuart Davis (1892-1964) |
| Title: | STUDY FOR PERCOLATER, 1927 |
| Medium: | Pencil on paper |
| Size: | 20 1/4 x 14 1/2 inches |
| Net Price: | $140,000.00 |

ED001099

 

159
8621 $ 00.41° JUL 10 07
0442 MAILED FROM NEW YORK NY 10019

Mr. Dean R. Nicyper
Flemming Zulack Williamson Zauderer LLP
Law Offices
One Liberty Plaza
New York, NY 10006-1404

10006+1459

ED001100