Flemming Zulack Williamson Zauderer LLP
One Liberty Plaza
New York, New York 10006
(212) 412-9500
Dean R. Nicyper, Esq. (DRN-7757)

Attorneys for Plaintiff Earl Davis

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ X
EARL DAVIS,                                                   :
                                                             :    Index No. 07 Civ. 4165 (SHS) (DF)
                                       Plaintiff,            :
                                                             :
            -against-                                        :    **REPLY DECLARATION**
                                                             :    **OF DEAN R. NICYPER IN**
                                                             :    **FURTHER SUPPORT OF**
SALANDER O'REILLY GALLERIES LLC                              :    **MOTION FOR CONTEMPT**
f/k/a SALANDER O'REILLY GALLERIES INC.,                      :    **AND FOR A PRELIMINARY**
and LAWRENCE B. SALANDER                                     :    **INJUNCTION**
                                                             :
                                       Defendants.           :
------------------------------------------------------------------ X

DEAN R. NICYPER declare under penalties of perjury as follows:

        1.      I am admitted to practice law in the State of New York and am a member

of Flemming Zulack Williamson Zauderer LLP, attorneys for plaintiff, Earl Davis ("Davis" or

"Plaintiff"), in this action.  I am fully familiar with the facts set forth in this reply declaration in

further support of the Plaintiff's Motion for Contempt and a Preliminary Injunction (the

"Motion") against Defendants Salander O'Reilly Galleries, LLC (f/k/a Salander O'Reilly

Galleries, Inc.) ("SOR" or the "Gallery") and Lawrence B. Salander ("Salander") (SOR and

Salander are referred to herein collectively as "Defendants".)

        2.      The Declaration Of Edwin M. Larkin In Support Of Defendants'

Opposition To Plaintiff's Motion For Contempt And For A Preliminary Injunction ("Larkin

Dec." or "Larkin Declaration") includes sworn representations by Mr. Larkin concerning the

nature and history of the Gallery's business and operations as well as a partial resume of the

background of individual Defendant Salander. These are statements one would expect to see in a declaration of Lawrence Salander. Defendants, however, do not submit any statement, declaration or affidavit of Salander, even though he is the gallery's Managing Director, the person on behalf of Defendants who had the vast majority of communications with Plaintiff (see Declaration of Earl Davis in Support of Motion for Contempt and a Preliminary Injunction, dated August 20, 2007 (submitted with Plaintiff's moving papers) (the "Davis Dec." or "Davis Declaration")), and the person who, together with Leigh Morse ("Morse") and Andrew Kelly ("Kelly"), orchestrated the disposition of the Stuart Davis works of art owned by Plaintiff which are at issue in this action (the "Works"). (See, infra, ¶¶ 6, 19, 20, 22, 24, and 33, and Exs. D, E, F, H, and I, referring to the hundreds of pages of documents that several subpoenaed dealers and galleries produced to date showing the extensive involvement of Salander, Morse and Kelly in disposition of the Works. See also the accompanying Declaration of Simon Parkes, dated September 6, 2007 ("Parkes Declaration" or "Parkes Dec."), explaining that Salander gave him one of Plaintiff's Works in lieu of paying the fees SOR owed to Mr. Parkes).

3.      The Larkin Declaration contains several other statements with respect to which Mr. Larkin does not appear competent to testify. See e.g., ¶¶ 2, 3, and 4. For example, Mr. Larkin, who only began representing the Defendants one month ago, submits sworn statements concerning the Plaintiffs "twenty-year relationship with Defendants" and "[t]he goal of the parties' arrangement." Id. ¶ 4. Mr. Larkin does not state on what basis he is competent to provide such evidence.

4.      The Defendants Opposition does not dispute that the Defendants, as consignees of the Works, have a fiduciary obligation to provide a full accounting to Plaintiff with respect to all of his Works and all of the sales proceeds from the Works. Yet, Defendants have

concealed and, in their opposition to this motion, continue to conceal that information.

5.      Rather than provide sworn statements from the three people most knowledgeable about Defendants' disposition of Plaintiff's Works, namely Salander, Morse and Kelly, Defendants offer a Declaration of Antonette Favuzza ("Favuzza Declaration" or "Favuzza Dec."). By her own admission, she has no personal knowledge of Defendants' disposition of Plaintiff's Works. She began working for Defendants only a few months ago and apparently still learning about the business and operations of the Gallery. Nonetheless, she was delegated the task of locating and retrieving Plaintiff's Works (Favuzza Dec. ¶ 4). She, in turn, delegated the task to someone else. Id. ¶ 10.

6.      It appears from Defendants' Opposition that none of the delegates regarding that task interviewed or even had access to the three people most knowledgeable about Plaintiff's Works (i.e., Salander, Morse, and Kelly). If they had, far more information would have been -- or at least should have been -- provided. This is demonstrated by documents that other galleries and dealers have now produced in response to subpoenas Plaintiff served. Those documents (discussed below) show that it has been Salander, Morse and Kelly who disposed of Plaintiff's Works. (See also the Davis Declaration). Those documents cry out for explanations from Salander, Morse and Kelly. Yet, the response of these three individuals, and consequentially the response of Defendants generally, is complete silence with respect to any such substance.

7.      For example, without information from Salander, Morse and Kelly, the Larkin Declaration inaccurately asserts that "Simon Parks (sic), a restorer that does work for the gallery, found [the Stuart Davis painting titled *(East) Gloucester Harbor*] after conducting a search pursuant to a subpoena from Plaintiffs counsel." Mr. Larkin makes these statements

3

without any personal knowledge, and, not surprisingly, they are incorrect.  Mr. Larkin's

reference would lead one to believe that Simon Parkes had the painting titled *(East) Gloucester*

*Harbor* because he was restoring it.  That impression could not be farther from the truth.  Mr.

Parkes has provided a declaration explaining the precise circumstances.  See Parkes Declaration.

As Mr. Parkes explains, at the time he received the painting, SOR owed him a significant amount

of money for restoration work he had done.  Mr. Parkes spoke to Larry Salander about the debt,

and Larry Salander transferred the *(East) Gloucester Harbor* painting to Mr. Parkes in lieu of

money to payoff SOR's debt to Mr. Parkes.  (See release from SOR to Simon Parkes dated

February 3, 2006, which Mr. Parkes provided to us (attached as Ex. A, at p. 2).)

   8. Mr. Parkes also states that he returned the painting to SOR when he

received the subpoena our firm served on him because the subpoena raised concerns in his mind

about whether the Defendants' transfer of the painting to him was appropriate.  Parkes Dec. ¶ 4.

   9. Mr. Parkes further explains that he returned the painting to the gallery on

August 15, 2007.  The Larkin Declaration asserts that the painting, however, "was not checked in

with Salander's register." (Larkin Dec. ¶ 13; see also Def. Br. p. 6.)  That statement presumably

is Defendants' attempt to justify the fact that Defendants never informed Plaintiff or Plaintiff's

counsel that Defendants had received the painting. (We, instead, had to notify defense counsel of

the return when we learned of it five days later.)  Defendants' attempted justification, however,

fails because, as documents Mr. Parkes produced show, Salander's Registrar, Bill Thibideau, did

check in the painting and, in fact, signed a receipt for it on August 15, 2007.  (See true and

correct copy of an August 15, 2007 receipt, provided by Simon Parkes, attached hereto as Ex. A

hereto at p. 3.)  The Gallery therefore was fully aware that Mr. Parkes had returned the painting

to it on August 15th, but Defendants never informed Plaintiff or voluntarily delivered the painting

to Plaintiff as the July 9th Order ("Order") required.

10.     Simon Parkes called me on August 20, 2007, and I returned his call that evening.  On the phone he told me that he had returned the *(East) Gloucester Harbor* painting to SOR on August 15, 2007.  Given that Defendants had not told us that the painting had been returned five days earlier, I was immediately concerned that Defendants would transfer the painting to another of their creditors to pay off another of their own debts.  I therefore sent a letter to defense counsel David E. Mollon, the next morning at 9:20, August 21, 2007, demanding return of the painting immediately (a copy of which is attached hereto as Ex. B).  In light of Defendants' recent practices, if we had not fortuitously learned of the return from Mr. Parkes and immediately contacted Defendants' counsel, it is highly likely that Mr. Salander would have delivered the painting to another of Defendants' creditors to payoff another of Defendants' debts.  Because of our demands, however, Defendants finally delivered the painting to our law firm.

11.     The implication in Defendants' opposition that Defendants voluntarily returned the painting therefore is grossly misleading.  Also, Defendants touting their return of a drawing titled *Cigar and Hand Held Before View Looking Northwest from Approximately Third Avenue and East 14th Street* is equally misleading, and the circumstances regarding this drawing are astounding.  Defendants did not return the drawing until one week after we served and filed this Motion – nearly seven weeks after the Order.  In their Opposition papers, they claim that they located the drawing "[a]s result of Defendants' searches and efforts."  Def. Br. at 6.  Yet, Exhibit D to the Favuzza Declaration shows that the drawing had been hanging in Leigh Morse's office at the Gallery all along.  (See Favuzza Dec., Ex. D at p. 3 of 5, 8th item from top.) Defendants do not explain why they waited until August 28th to return a drawing that had been in

Leigh Morse's office throughout that time-period.

      12.    Defendants repeatedly refer to their production of "over 1000 pages of documents," which their Opposition states was made pursuant to the Order. The Order did not require Defendants to make a production of documents pursuant to FRCP Rule 26(a)(1). Instead, it required Defendants to produce, by July 25, 2007, "documents sufficient to demonstrate with respect to each and every Work:

      (a)    if it was sold, to whom it was sold (including name, address and telephone number), the sale price, sale date and all terms of the sale, including but not limited to any terms for payment over time (such as a bill of sale, payment records, deposited checks, etc.);

      (b)    if it was consigned, the person or entity to which it was consigned (including its name, address and telephone number) and the consignment agreement or other written document between the consignor and consignee describing all terms of the consignment;

      (c)    if it was pledged as collateral, its current location, the security agreement or other written agreement between the debtor and creditor identifying the collateral and the debt for which it was pledged and the identity of the creditor (including its name, address and telephone number) to which it was pledged; and

      (d)    if it was loaned, left on approval or otherwise delivered to any person or entity, the terms of that arrangement, including the identity, address and telephone number of each person involved, including the person currently in possession of the Work.

      13.    In making their document production, however, the Defendants did not segregate and produce the above categories of documents. Instead, the vast majority of documents they produced had nothing whatsoever to do with the above categories. For example, they included numerous pages of communications between Larry Salander and Earl Davis, copies of checks concerning numerous Works not at issue, etc. Moreover, Mr. Mollon expressly told me, when we met the day after he produced the documents, that Defendants had made a general document production. This is confirmed by his cover letter accompanying the document

production.  (See cover letter from David E. Mollon, dated July 25, 2007, a copy of which is

attached hereto as Ex. C.)

14.    We reviewed the documents Defendants produced, and the only

documents they produced that were responsive to the required categories in the Order were a

collection of invoices.  But, of the 103 Works still at issue, Defendants produced invoices for

only 50 of them, i.e., fewer than half of the Works that are missing.  The following itemizes

those invoices:

| Category of Works | # of Works Still Not Returned | # of Invoices Produced | # of Works for which No Invoices were Produced |
|---|---|---|---|
| Paintings | 46 | 22 | 24 |
| Works on Paper | 20 | 19 | 1 |
| Drawings | 16 | 5 | 11 |
| Sketchbook Drawings | 21 | 4 | 17 |
| | 103 | 50 | 53 |

15.    Defendants produced no documents whatsoever constituting the "payment

records" or "deposited checks" specified in the Order.  Nor did Defendants produce any wire

transfer confirmations or bank records that would constitute payment records.  Defendants also

produced no records whatsoever under category (b) in the Order concerning consignments.  Nor

did Defendants produce any documents whatsoever under category (c) in the Order regarding

Works pledged as collateral.  Finally, Defendants produced no documents whatsoever under

category (d) in the Order pertaining to Works loaned, left on approval or otherwise delivered to

someone.

16.    The Order also provided that:

If Defendants fail to deliver to Plaintiff all documents identified in
the preceding paragraph 5 with respect to any individual Work or
Works on or before July 25, 2007 (or other date agreed to or
ordered by the Court), Plaintiff may subpoena appropriate third-
parties to locate each such Work and determine its status.

17.    Defendants assert that they "received no word from Plaintiff's counsel indicating that the production was deficient." (Def. Br. at 7.)  As the above relevant provisions from the Order demonstrate, notice of a deficiency was not contemplated by the Order.  Nor would it have served any purpose other than delay.  Defendants did not need to have Plaintiff identify whether Defendants produced documents specified in the Order.  Defendants already knew they had not.  The analysis was simple.  The Order attached a list of the Works of art at issue.  Anyone could easily compare the list to the documents produced and determine that the documents Defendants produced included invoices for only 50 of the 103 Works still at issue, included no payment records or bank records reflecting payments, and included no documents whatsoever under categories (b), (c) or (d) of the Order.

18.    Realizing that the documents Defendants produced contained little information concerning Plaintiff's Works, Plaintiff has been serving subpoenas, pursuant to the express provisions of the Order, on non-parties who are likely to have relevant information.  To date, we have received documents in response to several of the subpoenas and have been informed by representatives for other subpoenaed parties that many more documents will be produced.

19.    To date, we have received nearly 1,000 pages of relevant documents in response to five of the subpoenas.  The information they contain is alarming.

20.    For example, Joseph Carroll and Joseph P. Carroll Ltd. (jointly "Carroll") produced documents showing that Defendants transferred more than one dozen of Plaintiff's Works to Carroll in 2006 (see true and correct copies of selected documents from the more than 400 pages of documents Carroll produced, attached hereto as Ex. D).  The Carroll documents reflect transactions in 2006 that purport to be the pledging of security interests, sales, and

exchange transactions to resolving existing debts. (See Ex. D.) All are dated long after Plaintiff had expressly instructed Defendants -- specifically including Salander, Morse, and Kelly (see Davis Dec. ¶¶ 16, 17, 27 and 28) -- to cease selling all of his Works and to return all to him.   In addition, many of the Carroll documents are communications with, and documents signed by, Larry Salander, but Defendants did not produce any of those documents. Id.

21.    The Carroll documents also include numerous pages of communications among Carroll, his counsel, Defendants, Defendants' company counsel (McLaughlin & Stern) and First Republic Bank, concerning Carroll's claimed security interests in numerous Stuart Davis Works. These documents expressly reference those purported security interests and UCC financing statements regarding them. (See Ex. D.) Carroll also produced agreements pertaining to such claimed security interests, which are signed by First Republic, Carroll and Larry Salander. Id. Nearly all of these documents no doubt are in the possession of Defendants, their bank (First Republic Bank) and their corporate counsel, but Defendants produced none of them in this action. Moreover, despite Defendants' obligations under NYACA and their fiduciary obligations to Plaintiff, Defendants never disclosed any of these transactions to Plaintiff. Continued non-disclosure of these transaction apparently was Defendants' reason for withholding these documents.

22.    Documents produced by Owings Dewey Fine Arts ("ODFA") in response to Plaintiff's subpoena are equally alarming. The ODFA documents show extensive communications between ODFA and Salander, Morse and Kelly. (See Ex. E hereto, containing true and correct copies of some of the more than 400 pages of documents produced by ODFA.) The documents also show that Defendants' Registrar, Bill Thibideau, often was the person at SOR responsible for releasing works of art. Id. None of the ODFA documents, except for a few

9

invoices, have been produced by Defendants in this action.

23.    The ODFA documents show that many of Plaintiff's Works were transferred to ODFA in what purport to be consignments, sales and payoffs of existing debts. They include transfers of several of the Works in 2006 and 2007, long after Plaintiff instructed Defendants to cease selling all Works, retrieve all Works from third parties and return all Works to Plaintiff.

24.    In one communication, dated August 15, 2007, Nat Owings of ODFA asks Leigh Morse at SOR for information concerning five earlier transactions (so that he can produce a full set of documents in response to the subpoena Plaintiff served on ODFA). The e-mail chain shows that Leigh Morse forwarded the request to Antonette Favuzza (who submits a declaration in opposition to this Motion). (See e-mail chain at Ex. F.) She, in turn, delegated the task to Matthew Richter. Id. Despite the fact that this request from ODFA to SOR provided a good opportunity for Defendants to make inquiries of ODFA regarding its documents related to Plaintiff's Works -- and contrary to the representation by Antonette Favuzza that Defendants have been diligently trying to track down Plaintiff's Works -- neither Ms. Favuzza nor anyone else at SOR made any inquiries of ODFA pursuant to the Order until August 30, 2007, nine days after this Motion was served. (See id.)

25.    In her declaration, Ms. Favuzza asserts that when Defendants finally did contact ODFA on August 30, 2007, ODFA complained. But, the ODFA complaint (see Favuzza Dec. Ex. E) explains that ODFA was complaining because it had already sent some documents to Defendants. Defendants do not produce those documents now, and do not even represent to this Court that they were included in the Defendants' document production on July 25, 2007. Defendants' failure to produce the documents that the ODFA e-mail shows are in Defendants'

possession is yet another violation of the Order by Defendants.

26.    The hundreds of pages of documents produced by subpoenaed galleries and dealers and the return of eight Works of art to Plaintiff as a result of his own efforts demonstrate just how valuable Plaintiff's efforts have been.  They also demonstrate, in contrast, the gross inadequacy of Defendants' purported efforts in response to the Order.  Defendants could have undertaken the same efforts Plaintiff undertook months ago, with the same results, but they did not.

27.    Aware of their failure to act, Defendants make broad, generalized accusations that Plaintiff's contacting other galleries (which yielded eight Works and nearly one thousand pages of relevant documents to date) had the "effect of undermining Defendants' efforts in contacting third parties" and "resulted in confusion about the location of various Works."  These statements are wholly unfounded.  As the documents attached to the Favuzza Declaration demonstrate, Defendants made little or no efforts "in contacting third parties" until August 30, 2007, long after this motion was filed.  That Defendants made little or no efforts is confirmed by counsel for several dealers who transacted Stuart Davis artwork business with SOR.  Specifically, counsel for The Peters Gallery, Joseph Carroll and Joseph P. Carroll Ltd., and Owings Dewey Fine Arts have all confirmed that SOR did not contact them between July 1, 2007 and August 24, 2007.  (See copies of e-mails attached hereto at Ex. G.)

28.    In addition, Defendants 'claim that Plaintiff's undertaking the efforts that Defendants failed to undertake "resulted in confusion" is equally unfounded.  Defendants repeat that phrase throughout their opposition papers, but nowhere do they identify any "confusion" that purportedly resulted.

29.    The Larkin Declaration also tries to criticize Plaintiff's success in

obtaining seven Works from Babcock Gallery, asserting that "[a]t no time did Plaintiffs counsel reveal, even during the course of settlement negotiations, that it was aware of Babcock's possession of these Works." Id. at ¶ 12. This statement is absolutely false. Mr. Larkin, who was not present at a meeting I had with Mr. Larkin's partner, David E. Mollon, on July 26, 2007, apparently has not spoken to Mr. Mollon about that meeting. At the meeting, Mr. Mollon and I discussed several issues, many of which focused on whether we could reach a settlement. We also, however, discussed certain of the points now raised in this Motion. Specifically, in connection with the Order's requirements, I asked Mr. Mollon whether Defendants still had any unsold Works out on consignment. Mr. Mollon responded that his client had informed him that none were still out on consignment. I replied that his client gave him false information because Babcock Gallery had just returned seven Works to Plaintiff. The statement in the Larkin Declaration that we did not inform defense counsel of the Works Babcock returned, therefore, is absolutely false – we had done so within two days after the Works were returned.

30.    Defendants claim that they undertook diligent efforts to comply with the Order. Yet, Defendants' Managing Director and individual Defendant, Larry Salander, merely delegated the task of complying with the Order to the new employee, Antonette Favuzza, who, in turn, delegated the task to Diane Buckley. (Favuzza Dec. ¶ ¶ 4, 10.) Ms. Favuzza asserts in her declaration that Ms. Buckley made calls in July and August, 2007. Yet, Ms. Favuzza concedes she has no personal knowledge of any such efforts and her statements in that respect appear to be pure conjecture based upon documents she says she found after Ms. Buckley resigned. The documents Ms. Favuzza attaches to her declaration do not indicate in any way that Defendants were making any efforts in July or August to locate Plaintiff's Works. Ms. Buckley had been working on trying to locate Works as early as mid-December 2006, as Mr. Davis described in his

Declaration accompanying Plaintiff's moving papers. (Davis Dec. ¶ 42.) The Defendants submit no evidence that efforts made took place after the initial efforts in late 2006, and the documents attached to Ms. Favuzza's declaration do not include dates that would indicate any later efforts.

31.    In her declaration, Ms. Favuzza makes several statements regarding installment payments that illustrate her lack of knowledge of relevant facts and of Defendants' operations. Her statements on this issue are very carefully guarded by the repeated phrase "to my knowledge." There is no evidence, however, that Ms. Favuzza has any knowledge concerning installment payments. The 4-Painting Sale referred to in the Davis Declaration was negotiated by Larry Salander, and he represented to Earl Davis that the sale involved installment payments over 48 months. (See Davis Dec. ¶ 56.) Defendants also produced an invoice showing installment payments for those 4-Paintings over 48 months. (See Nicyper Moving Dec., Ex. 13.) Ms. Favuzza's Declaration does not state that she spoke to Larry Salander about this installment payment arrangement or any other installment payment arrangement. There therefore is no apparent basis for her to know whether any payments Defendants received are installment payments or even initial payments related to a Stuart Davis Work. With the complete silence of Defendant Salander on the installment payment issue, the guarded representations or Ms. Favuzza have no substantive value whatsoever.

32.    Defendants assert that their counsel contacted me to have "the parties work[] together to locate the Works." (Def. Mem. at 9.) This assertion is misleading at best. Mr. Larkin did contact me on August 28, 2007 -- one week after Plaintiff filed this Motion -- but not to have the parties "work together to locate the Works." He instead asked if Plaintiff would withdraw his motion for contempt, or "hold it in abeyance," because Defendants were now

working on trying to track down the Works.  Mr. Larkin also told me that Defendants were working on a protocol to locate the Works.  He asked if we wanted to have input in preparing the "protocol."

33.     I was amazed that, at that late date -- 50 days after the Order was issued -- Defendants were only beginning to prepare a purported protocol to locate the Works.  Not only was the extraordinarily late start to such a project startling, but also the entire concept of preparing a protocol appeared absurd in these circumstances.  There are three principal people at SOR who over the years handled sales, consignments, and -- as we now have learned -- improper dispositions of the Stuart Davis Works.  They are Salander, Morse and Kelly.  (See Davis Dec. at ¶ 59; documents produced by subpoenaed dealers at Exs. D, E, F, H, and I.)  In addition, Bill Thibideau, who commonly handled artwork transfers from an operational standpoint, also would have knowledge.  Davis Dec. at ¶ 12.

34.     Those four people collectively would know where every Work of art is.  Mr. Larkin's representation on August 28th that Defendants were merely beginning some over-formalized, drawn out, protocol process, rather than merely have the four most knowledgeable people provide information, itself demonstrated to me that Defendants still were not making a good faith effort to comply with the Order.  In fact, it demonstrated the contrary -- that Defendants were now disingenuously miring themselves in bureaucracy and trying to shift the onus to Plaintiff.

35.     Moreover, Mr. Larkin's suggestion that our firm or the Plaintiff could contribute to preparing a protocol made no sense.  Plaintiff does not know where the Works are.  Salander, Morse, Kelly and Thibideau do.  Plaintiff does not know the identities or contact information of the creditors of SOR.  Salander, Morse, Kelly and Thibideau do.  Plaintiff does

not know to which of Defendants' creditors Defendants may have delivered the Works (as

Salander, we recently learned, did when he transferred *(East) Gloucester Harbor* to Simon

Parkes).  Salander, Morse, Kelly and Thibideau do know.  Plaintiff does not even know the

identities of dealers, collectors or anyone else to whom Defendants sold, transferred or loaned

Works, or may have sold, transferred or loaned Works.  But, Salander, Morse, Kelly and

Thibideau do know that information.

36.     The call from Mr. Larkin to me therefore was a transparent ruse.  It was

merely an attempt to induce Plaintiff to withdraw or "hold in abeyance" the contempt motion so

that Defendants could further delay satisfying their obligations to Plaintiff.  Moreover, upon

reading Defendants' brief, it is apparent that Mr. Larkin called me as part of an attempt to

manufacture an argument that Defendants' non-compliance with the Order was the result of what

Defendants now contend was a "refusal to cooperate."  Def. Br. at 13, *citing* Tap Pub'ns. Inc. v.

Chinese Yellow Pages, Inc., No. 95 Civ. 5043, 1996 WL 509718 (SDNY 1996).

37.     Mr. Larkin's call to me while he was preparing Defendants' opposition

papers to this Motion, however, failed to establish facts that might be even remotely similar to

those in the Tap Pub'ns. Inc. case Defendants cite, because, here, only the Defendants know the

facts and procedures regarding their disposition of the Works and their business practices.  Here,

there was nothing Plaintiff could meaningfully contribute to the purported "protocol" Defendants

belatedly were beginning to prepare on August 28, 2007.

38.     Tellingly, Defendants do not attach to their opposition papers the

"protocol" or even a working draft of it.  One would think they would have submitted it as

evidence of their claimed effort to comply with the Order.  It appears that they never prepared

one, and very likely never even intended to.

39.    The purpose of the parties' entering into the Stipulation that resulted in the Order was to have Plaintiff's Works returned to him before the Works disappeared or moved out of reach, and, for those Works not returned, to have documents produced identifying where all Works are and their status as well as to locate the funds Defendants obtained from any sales of those Works. The Order itself, therefore, was the "protocol," and Defendants have violated it.

40.    Defendants argue that Plaintiff is not entitled to a preliminary injunction because although Plaintiff originally requested such relief in his motion on June 27, 2007, such relief was absent from the Order. Defendants fail to advise the Court that the omission of such relief from the Order was a direct result of the representations of Defendants' counsel, David E. Mollon, during the negotiation of the stipulation. At that time, he represented to me: (1) that Defendants did not have enough money in their bank accounts and therefore could not and would not stipulate to such relief; and (2) that Defendants, in exchange for Plaintiff's holding the trust fund injunction provision in abeyance, would negotiate in good faith for a complete resolution of this dispute. Defendants' entire settlement effort consisted of attending one meeting prior to August 10th deadline. Because of this, and because of escalating news of Defendants' demise and the extensive documentary evidence from non-parties showing Defendants' gross violations of Plaintiff's rights and illegal use of his property, the preliminary injunctive relief sought here has become critical.

41.    Defendants argue that Plaintiff's moving papers take out of context the Defendants' lawyer's representation to the US District Court in Massachusetts that Defendants "house of cards will collapse." Defendants do not dispute that Defendants made this statement just a few months ago. Nor do they take issue with the additional statement by Defendants' counsel at that hearing that Defendants have "a liquidity crisis." (See Nicyper Moving Dec. at

Ex. 9, p. 5.)  Defendants, instead, try to rephrase the "house of cards will collapse" statement, arguing that it meant that an injunction "would put Defendants out of business."  (Def. Br. at 23.) Defendants' Massachusetts counsel, however, made clear that he was not referring to a healthy gallery going out of business, but instead that the Defendants' precarious "house of cards" with a current "liquidity crisis" would collapse if any further burden was placed upon it.

42.    Defendants do not submit any sworn statements to dispute that they have a "liquidity crisis" or that their business is a teetering "house of cards."  The declaration of their new CFO, who may be competent to provide such testimony, does not contest either of these points.

43.    Defendants' precarious financial condition is evident also from the fact that Defendants gave Mr. Parkes one of Plaintiff's paintings in lieu of payment because Defendants could not afford pay Mr. Parkes' bill for services.  (See Parkes Dec. ¶ 2.)

44.    Defendants' liquidity crisis also is evident from the increasing number of lawsuits filed against them.  At least six lawsuits other than this action have been filed against Defendants this year.  One was filed by the only other member of SOR's limited liability company, alleging that it is owed millions of dollars and that "Salander's shell game" has been concealed from it.  (See Complaint in Curtis Galleries, Inc., et ano v. Salander-O'Reilly Galleries LLC, et ano, No. 602676/07 (Sup. Ct. N.Y. Co.), a copy of which is attached hereto at Ex. J.)

45.    In another recent case, Monty Diamond, et ano v. Salander O'Reilly Galleries LLC, et ano, No. 602284/07 (Sup. Ct. N.Y. Co.) (a copy of the summons and complaint are attached hereto at Ex. K.), two plaintiffs sought an attachment on their contract claim against Defendants.  Mr. Davis recently sought to intervene in that case to protect his statutory trust funds.  At the preliminary relief hearing on September 6, 2007, Justice Friedman issued her

ruling on the record, denying the attachment because the plaintiff had not established fraud as is required under the New York attachment statute. The case demonstrates, however, how Defendants' precarious financial condition has placed Plaintiff's rights to his trust funds in serious jeopardy.

46.     Without support, the Larkin Declaration contends that, at my meeting with defense counsel on July 26, 2007, defense counsel asked me to provide documents supporting Plaintiff's valuation of the Works at issue. Mr. Larkin further contends that Plaintiff never produced valuation documents. (Larkin Dec. ¶¶ 22-24.) These contentions are absolutely false. At that meeting with Mr. Larkin's partner, David Mollon, on July 26th, Mr. Mollon asked us to produce all of Plaintiff's Rule 26(a)(1) documents, asserting that production of such documents by us was appropriate because he had just produced what was, according to him, the equivalent of Defendants' Rule 26(a)(1) documents. July 26th was the first time Defendants had asked for documents from Plaintiff. Whereas Defendants had been required to produce documents pursuant to the Order -- an order they negotiated and agreed to in exchange for our withdrawing our original motion for a preliminary injunction and expedited discovery -- Plaintiff, in contrast, had no obligation whatsoever to produce any documents to Defendants at that time. Nonetheless, in less time than it took Defendants to produce documents pursuant to the Order, Plaintiff produced 1,112 pages of documents to Defendants on August 17, 2007, in the spirit of cooperation.

47.     As the Larkin Declaration correctly states, one of the topics Mr. Mollon and I discussed during the meeting on July 26, 2007 was settlement. Mr. Larkin's Declaration, however, improperly describes portions of those settlement discussions (Larkin Dec. ¶ 22), even though Mr. Mollon and I had expressly agreed that our settlement discussions would be

confidential.  Mr. Larkin has improperly opened the door on that issue.  Given that the Larkin

Declaration falsely characterizes what occurred, I will respond solely to correct its false

statements without opening that door further.  In connection with settlement, I verbally provided

to Mr. Mollon at the meeting the Plaintiff's valuations regarding the Works at issue.  I also told

Mr. Mollon I would provide documents further detailing those valuations for each Work.  Mr.

Mollon did not ask for the written valuations – I offered to provide them.  (Mr. Mollon, in

contrast, has never identified any positions whatsoever that Defendants are taking in this

litigation regarding valuations.)  As I said I would, I sent a chart and accompanying

memorandum to Mr. Mollon by e-mail five days later -- on August 1, 2007.  That chart and

memorandum specified valuations for each Work and also described several categories of

valuations.  Because the chart and memorandum were expressly part of our confidential

settlement discussions, I have not attached copies to this Declaration.  Mr. Larkin has no

personal knowledge of these events, and his statement that Plaintiff never produced "documents

relating to the valuation of the Works" (see Larkin Dec. ¶ 24) is absolutely false.

   48. Mr. Larkin argues in his declaration that Plaintiff made an error

concerning the UCC financing statements that reflect Defendants' improperly pledging several

of Plaintiff's Works as collateral for their own debts.  Defendants do not dispute that financing

statements from 2006 show that Defendants improperly pledged fourteen of Plaintiff's Works to

secure Defendants' own debts to Joseph Carroll.  (See Nicyper Moving Dec. at ¶ 7and Ex.10

thereto.)  Mr. Larkin instead asserts that Mr. Carroll very recently amended the UCC financing

statements he filed, and asserts that Mr. Carroll still purportedly has a security interest in one of

the Works at issue.  Larkin Dec. at ¶ 25.

   49. Mr. Larkin's point is unclear.  What is clear, however, is the fact that all of

these UCC financing statements demonstrate that Defendants improperly pledged Plaintiff's

Works as collateral to Defendants' own creditors to cover Defendants' personal debts, yet

Defendants have not produced a single document pertaining to, or in any way explaining, any of

their pledges of collateral.  Their failure to produce these documents is a violation of the Order's

provision 5(c).

        50.    As demonstrated earlier, documents produced by Carroll demonstrate that

Defendants, their bank, and their counsel withheld the documents concerning Defendants'

granting a purported security interest in Plaintiff's Works to Carroll.  (See Ex. D hereto.)

Carroll's documents include agreements signed by Salander and Defendants' bank, First

Republic Bank, as well as extensive communications among Defendants, First Republic Bank

and Defendants' counsel concerning Carroll's purportedly having a security interest in Plaintiff's

Works.  Defendants produced none of them.

        51.    Moreover, Defendants still have not explained the UCC financing

statement recently filed (referred to in Plaintiff's moving papers) which shows that Defendants

recently pledged the Stuart Davis oil painting, *Punchcard Flutter*, to one of their creditors.  Nor

do Defendants submit any affidavit whatsoever from Mr. Salander explaining how he could have

pledged that painting as collateral this year when he represented to Plaintiff in May 2006 that he

sold that painting in May 2006 (and never sent any of the sales proceeds to Plaintiff).  (See Davis

Dec. ¶ 23.)  If Defendants still have that important Work – itself worth more than $2.5 million –

they must return it immediately.  Mr. Salander no doubt is fully familiar with all circumstances

concerning that Work, but he submits no sworn statement in connection with this Motion

explaining the circumstances concerning this important Work.  His silence is deafening.

        52.    We respectfully submit that a court-ordered deposition of Salander,

Morse, Kelly and other SOR employees with actual knowledge is essential, as is production of Defendants' bank records, so that as much information as possible with respect to all missing Works and funds can be obtained before the Works and funds are transferred far out of reach.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed on September 11, 2007

DEAN R. NICYPER