Exhibit J

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| CURTIS GALLERIES, INC. and CURTIS SQUIRE, INC., Plaintiffs, – against – SALANDER-O'REILLY GALLERIES LLC and LAWRENCE SALANDER Defendants. | COMPLAINT<br>Index No. 07602676 |

Plaintiffs Curtis Galleries, Inc. ("CGI") and Curtis Squire, Inc. ("CSI"), by and through their attorneys, as and for their Complaint against Defendants Salander-O'Reilly Galleries LLC ("SOR"), and Lawrence Salander ("Salander"), allege on personal knowledge as to themselves and their own acts and on information and belief as to all other matters as follows:

## NATURE OF THE ACTION

1. Plaintiffs are passive investors in Defendant SOR, a limited liability company which since its formation has been managed and run by Defendant Salander as Member, Manager and fiduciary. SOR operates a prominent art gallery on East 71st Street in Manhattan (the "SOR Gallery").

2. As passive investors, Plaintiffs have had no role in the management or business affairs of SOR or the Gallery. Plaintiffs invested in SOR and reposed their money, their valuable artwork, and their trust and confidence in Salander and SOR. In return, they have been victimized. Millions of dollars owed them have gone unpaid. Lawsuits against SOR for Salander's misconduct have been hidden from them. Basic financial and operating information of SOR has not been provided since September of 2006. CSI's membership in SOR has cost it

millions of dollars in taxes which CGI has paid for distributions that SOR has refused to make. Plaintiffs' trust and confidence in Salander has been betrayed.

3. Plaintiffs were shocked to learn through a recent trade publication — and a subsequent investigation of court filings around the country — of several lawsuits against SOR and the issuance of injunctions against SOR and its operations, all premised on gross mismanagement and misconduct occurring at SOR at Salander's direction. Salander's acts of gross mismanagement and breaches of fiduciary duty have caused SOR to fall into disrepute and have significantly diminished Plaintiffs' investment in SOR.

4. Plaintiffs have been the direct victims of Salander's shell game in at least three ways. *First*, on August 1, 2006, SOR exercised an option to purchase an important work from CGI by Georgia O'Keeffe titled *Shelton Hotel* for $7 million. Under the terms of the March 21, 2006 Option Agreement for this painting (the "Option Agreement"), SOR was obligated to pay CGI monthly installments in the amount of $500,000 until the balance was paid in full, and CGI retained title to the painting until such time as the entire purchase price had been paid. At Salander's direction, SOR made certain initial payments, then stopped paying altogether in September 2006, thereby defaulting on SOR's obligations under the Option Agreement and breaching that contract. Salander sold the *Shelton Hotel* and did not remit the proceeds of the sale to CGI. Plaintiffs have repeatedly requested payment of the balance due to CGI under the Option Agreement, but payment has not been forthcoming. The balance due for the painting is approximately $3.5 million, plus prejudgment interest of 9% per annum under New York law.

5. *Second*, CGI has lent millions of dollars to SOR pursuant to a series of promissory notes (the "Promissory Notes"). The balance under these Promissory Notes as of

June 2007 (principal and interest) is in excess of $3.8 million. CGI has demanded payment, but payment has not been made.

6. *Third*, CSI's investment in SOR was, by contract, supposed to result in a distribution to CSI of 50% of the profits of SOR, in accordance with a formula set forth in the SOR Operating Agreement (the "Operating Agreement"). CSI's membership interest in SOR has resulted in enormous tax obligations for millions of dollars that CSI has never received. CSI has incurred huge tax payments for notional SOR "profits" with no offsetting distributions to cover them. Despite repeated requests and demands for financial information, Salander has kept CSI in the dark as to the current financial state of SOR.

7. For an extended period of time, Plaintiffs attempted to resolve these disputes amicably, but it was futile. On April 2[illegible], 2007, CSI notified Salander in writing of CSI's withdrawal as a Member of SOR. Under Article 4.3 of the SOR Operating Agreement, the withdrawal takes effect six months from the date of the notice, as of October 25, 2007.

8. Following CSI's notice of withdrawal, Plaintiffs continued to harbor the hope that Salander would honor his fiduciary duties and SOR's commitments. Despite repeated requests, no payments have been forthcoming. Lawsuits have been hidden, and not even the current financial information they have requested has been provided.

9. The revelations in the August 2007 press account, Plaintiffs' subsequent discovery of court papers filed against Salander and SOR, and Salander's gross mismanagement and repeated breaches of fiduciary duty have forced Plaintiffs to sever all ties with Salander. In this action, Plaintiffs seek, *inter alia*: (1) a judgment for the full balance due for breach of the Option Agreement for the *Shelton Hotel* in the sum of approximately $3.5 million, with the precise amount to be determined at trial, plus prejudgment interest of 9% per annum pursuant to

New York law; (2) a declaration that the full amount of principal and interest is immediately due and owing under the Promissory Notes, together with prejudgment interest of 9% per annum since the date payment was demanded, pursuant to New York law; (3) a judgment for the full amount of all profits and distributions due CSI under the Operating Agreement, plus prejudgment interest of 9% per annum pursuant to New York law; (4) an accounting; (5) a declaration of this Court that CSI's withdrawal as a Member of SOR takes effect as of October 25, 2007, as of which date CSI is entitled to full payment of all further amounts due and owing pursuant to Article 3.4 of the Operating Agreement; and (6) damages, in an amount to be determined at trial, for Salander's breaches of fiduciary duty to CSI.

THE PARTIES

10. CSI is a Minnesota corporation with its principal place of business in Minneapolis, Minnesota. CSI is a passive Member of SOR, holding a 50% interest in it. On April 25, 2007, CSI served formal notice of its intention to withdraw as a member of SOR. Pursuant to the SOR Operating Agreement and CSI's notice, CSI's withdrawal is effective six months from the date of the notice, on October 25, 2007.

11. CGI is a wholly-owned subsidiary of CSI. CGI is a Minnesota corporation with its principal place of business in Minneapolis, Minnesota.

12. SOR is a New York limited liability company with offices at 22 East 71st Street, New York, New York.

13. Salander is the Manager and a Member of SOR, owning the remaining 50% of SOR, and at all relevant times has run SOR's operations.

JURISDICTION AND VENUE

14. This Court has personal jurisdiction over the Defendants pursuant to CPLR §§ 301, 308, 311 and Article III of the New York Limited Liability Company Law. SOR

has an office in the State of New York, is physically present here, is and has engaged in a continuous course of business activities in New York, and is subject to personal jurisdiction in this Court. At all relevant times, Salander was the Manager and a Member of SOR and transacted business out its offices in New York, New York, including the acts complained of. The claims asserted against Salander arise out of and relate to actions in the State of New York and subject him to personal jurisdiction in this Court.

15. Venue is proper in this Court pursuant to CPLR § 503.

## FACTUAL BACKGROUND

### A. Membership in, and Management of, SOR

16. SOR was formed pursuant to an Operating Agreement dated February 28, 1995, a true and correct copy of which is attached as Exhibit A.

17. SOR has two Members, Salander and CSI, each Member having a 50% interest in SOR.

18. Salander is, and since SOR's formation has been, the Manger of SOR (*see* Article 11 of the Operating Agreement (Exhibit A)).

19. As Manager of SOR, Salander is, and since SOR's formation has been, solely responsible for managing the affairs of SOR.

20. CSI is, and at all relevant times has been, a passive investor in SOR. CSI has had no responsibilities or active role in the management of SOR or any of its affairs.

21. Salander owes, and since SOR's formation has owed, fiduciary duties to CSI.

22. Under § 409 of the New York Limited Liability Company Law, Salander, as Manager of SOR, was required to perform his duties as Manager "in good faith and with that

degree of care that an ordinarily prudent person in a like position would use under similar circumstances." He did not.

B. Salander's Breaches of Fiduciary Duty

23. Salander has grossly mismanaged SOR and the Gallery and has violated both his statutory and fiduciary obligations to CSI. The following allegations are illustrative:

24. In August 2007, the *Maine Antique Digest*, a well-known trade publication, published a feature story entitled "Lawsuits and Charges of Unpaid Consignment Sales Trouble Salander-O'Reilly Galleries" (the "August 2007 Article"), a true and correct copy of which is annexed as Exhibit B. The August 2007 Article details allegations of misconduct on the part of Salander in the management of SOR — described as "problems…that do not shine a favorable light on his business practices" — that Salander had concealed from Plaintiffs.

25. On learning of these allegations, Plaintiffs retrieved public files relating to the lawsuits described in the August 2007 Article: *Davis v. Salander-O'Reilly Galleries LLC*, No. 07-CV-4165 (SHS) (S.D.N.Y.), *Dougall Arts Limited v. Salander-O'Reilly Galleries LLC*, No. 05-CV-05299 (WHP) (S.D.N.Y.), and *Lane v. Salander et al.*, Civil Action No. 4:06-CV-40178 (D. Mass.). These lawsuits reveal egregious mismanagement of SOR and the Gallery by Salander and have resulted in the entry of at least two injunctions against Salander and SOR.

26. A public records search of filings in New York State Supreme Court has revealed four additional lawsuits filed against Salander and/or SOR during 2007 alone.

27. None of these state or federal lawsuits was disclosed to Plaintiffs. Prior to the publication of the August 2007 Article and the subsequent public records searches undertaken by Plaintiffs, neither CSI nor CGI had any knowledge of either the lawsuits or the conduct prompting them.

28. Salander's misconduct, his gross mismanagement, and his repeated breaches of fiduciary duty have caused SOR and the Gallery to fall into disrepute and have caused significant damage to the value of CSI's membership interest in SOR and Plaintiffs' ability to obtain full payment of the moneys owed by SOR.

29. Plaintiffs themselves have been the victims of a course of conduct strikingly similar to that detailed in the lawsuits against Salander and SOR.

C. <u>Georgia O'Keefe's *Shelton Hotel*</u>

30. On March 21, 2006, SOR and CGI entered into an Option Agreement for the purchase of an important Georgia O'Keefe painting entitled *Shelton Hotel*. A true and correct copy of the Option Agreement is attached as Exhibit C.

31. Under the terms of the Option Agreement, CGI granted an option to SOR to purchase the *Shelton Hotel* for $7 million, to be paid in equal monthly installments of $500,000.

32. SOR was given the right under the Option Agreement to exercise the option at any time between July 16, 2006 and August 10, 2006.

33. Under the express terms of the Option Agreement, CGI retained title to the *Shelton Hotel* until the receipt of full payment for the painting. Paragraph 7 of the Option Agreement provides: "If [SOR] exercises its option, [CGI] shall retain title to the painting until such time as [SOR] has paid the entire purchase price, at which time title will pass to [SOR]."

34. SOR exercised the option on August 1, 2006. A true and correct copy of the option exercise is attached as Exhibit D.

35. The Option Agreement (Exhibit C) required that SOR pay the entire $7 million exercise price to CGI by April 10, 2007. SOR made the first few payments

(untimely), then began to make partial payments. By September 2006, SOR stopped making payments entirely, in breach of the Option Agreement.

36. At Salander's direction, SOR sold *Shelton Hotel*, received funds for the sale, but has not remitted full payment to CGI.

37. SOR is liable to CGI for the full remaining balance under the Option Agreement in the amount of approximately $3.5 million, plus prejudgment interest at the rate of 9% per annum, pursuant to New York law.

38. Plaintiffs have repeatedly demanded full payment for the *Shelton Hotel*. Salander and SOR have acknowledged that this money is owed, and have promised to pay it, but have not paid it.

D. Promissory Notes

39. SOR also owes CGI more than $3.8 million in principal and interest pursuant to a series of loans made to SOR at the urging of Salander.

40. CGI holds the following Promissory Notes in connection with these loans:

A. Promissory Note dated March 10, 1995 in the principal amount of $65,092.62, plus interest at the rate of 1% per annum over the prime or base rate announced by Citibank, N.A. in effect from time to time, with interest adjusting simultaneously with each adjustment of such base or prime rate.

B. Promissory Note dated October 30, 1995 in the principal amount of $50,000.00, plus interest at the rate of 1% per annum over the prime or base rate announced by Citibank, N.A. in effect from time to time, with interest adjusting simultaneously with each adjustment of such base or prime rate.

C. Promissory Note dated March 7, 1996 in the principal amount of $225,000.00, plus interest at the rate of 1% per annum over the prime or base rate announced by Citibank, N.A. in effect from time to time, with interest adjusting simultaneously with each adjustment of such base or prime rate.

D.  Promissory Note dated May 1, 1996 in the principal amount of $100,000.00, plus interest at the rate of 1% per annum over the prime or base rate announced by Citibank, N.A. in effect from time to time, with interest adjusting simultaneously with each adjustment of such base or prime rate.

E.  Promissory Note dated August 6, 1996 in the principal amount of $125,000.00, plus interest at the rate of 1% per annum over the prime or base rate announced by Citibank, N.A. in effect from time to time, with interest adjusting simultaneously with each adjustment of such base or prime rate.

F.  Promissory Note dated August 30, 1996 in the principal amount of $50,000.00, plus interest at the rate of 1% per annum over the prime or base rate announced by Citibank, N.A. in effect from time to time, with interest adjusting simultaneously with each adjustment of such base or prime rate.

G.  Promissory Note dated April 24, 1997 in the principal amount of $150,000.00, plus interest at the rate of 1% per annum over the prime or base rate announced by Citibank, N.A. in effect from time to time, with interest adjusting simultaneously with each adjustment of such base or prime rate.

H.  Promissory Note dated August 25, 1998 in the principal amount of $200,000.00, plus interest at the rate of 1% per annum over the prime or base rate announced by Citibank, N.A. in effect from time to time, with interest adjusting simultaneously with each adjustment of such base or prime rate.

I.  Promissory Note dated January 8, 1999 in the principal amount of $250,000.00, plus interest at the rate of 1% per annum over the prime or base rate announced by Citibank, N.A. in effect from time to time, with interest adjusting simultaneously with each adjustment of such base or prime rate.

J.  Promissory Note dated February 9, 1999 in the principal amount of $150,000.00, plus interest at the rate of 1% per annum over the prime or base rate announced by Citibank, N.A. in effect from time to time, with interest adjusting simultaneously with each adjustment of such base or prime rate.

K.  Promissory Note dated April 6, 1999 in the principal amount of $175,000.00, plus interest at the rate of 1% per annum over the prime or base rate announced by Citibank, N.A. in effect from time

to time, with interest adjusting simultaneously with each adjustment of such base or prime rate.

L. Promissory Note dated April 28, 1999 in the principal amount of $175,000.00, plus interest at the rate of 1% per annum over the prime or base rate announced by Citibank, N.A. in effect from time to time, with interest adjusting simultaneously with each adjustment of such base or prime rate.

M. Promissory Note dated August 30, 1999 in the principal amount of $200,000.00, plus interest at the rate of 1% per annum over the prime or base rate announced by Citibank, N.A. in effect from time to time, with interest adjusting simultaneously with each adjustment of such base or prime rate.

N. Promissory Note dated March 26, 2002 in the principal amount of $300,000.00, plus interest at the rate of 1% per annum over the prime or base rate announced by Citibank, N.A. in effect from time to time, with interest adjusting simultaneously with each adjustment of such base or prime rate.

41. Each of the Promissory Notes is, by its terms, payable "ON DEMAND." Under each Promissory Note, SOR expressly waived presentment, demand, protest and notice of dishonor.

42. CGI has demanded payment in full of all principal and interest under the Promissory Notes. No payment has been made. The amount due under the Promissory Notes exceeds $3.8 million.

43. Each Promissory Note contains an express provision requiring SOR to pay "all expenses incurred by [CGI], including reasonable attorney's fees, in seeking to collect any amounts payable hereunder which are not paid when due." CGI is, therefore, entitled to its expenses and attorneys' fees in connection with its claim for payment on the Promissory Notes and all other collection efforts it may undertake on the Promissory Notes.

E. SOR's Failure to Make Distributions

44. Since the formation of SOR, CSI has been entitled to a 50% share of the net profits of SOR, to be distributed in accordance with a formula set forth in Article 3.3 of the Operating Agreement (Exhibit A).

45. Since the formation of SOR, CSI has not received the full distributions to which it is entitled under the Operating Agreement. CSI has paid millions in taxes on undistributed income of SOR and has repeatedly demanded financial information from Salander and SOR to enable it to compute the precise amount of the distributions to which it is entitled. Defendants have not provided that information, despite CSI's requests and demands.

46. As a result, CSI has incurred significant tax obligations with no offsetting benefits in terms of actual distributions from SOR.

F. CSI's Withdrawal as a Member of SOR

47. Article 4.3 of the Operating Agreement (Exhibit A) provides that: "A Member may withdraw as a Member of the Company [SOR] upon not less than six months' prior written notice to the Company...."

48. On April 25, 2007, CSI notified SOR in writng of its withdrawal. A true and correct copy of the notice of withdrawal is annexed as Exhibit E.

49. Pursuant to Article 4.3 of the Operating Agreement, CSI's withdrawal is effective as of October 25, 2007.

50. Article 3.4 of the Operating Agreement provides:

> Upon the withdrawal of a Member as a Member of the Company, such Member shall be entitled to receive (i) any distribution to which such Member is entitled hereunder and, within a reasonable time after withdrawal, (ii) the fair value of the membership interest of such Member in the Company as of the date of withdrawal,

based upon such Member's right to share in distributions from the Company.

51. Upon withdrawal as of October 25, 2007, CSI shall be entitled to all amounts due pursuant to Article 3.4, including all distributions due and owing pursuant to the Operating Agreement that are not received prior to that date and the fair value of its membership interest in SOR.

<u>Count One: Breach of Contract</u>
(By CGI Against SOR)

52. Plaintiffs incorporate by reference the allegations of all preceding paragraphs as if fully set forth herein.

53. CGI and SOR are parties to the Option Agreement.

54. The Option Agreement is a fully-executed, valid, binding and enforceable contract.

55. CGI fully performed its obligations under the Option Agreement.

56. SOR breached the Option Agreement by, *inter alia,* exercising the option to purchase *Shelton Hotel* and failing and refusing to make all payments due CGI under the Agreement.

57. As a direct result of SOR's breach of the Option Agreement, CGI has suffered damages in an amount to be established at trial but in no event less than approximately $3.5 million, plus prejudgment interest of 9% per annum pursuant to New York law.

<u>Count Two: Declaratory Judgment and Attorneys' Fees — Promissory Notes</u>
(By CGI Against SOR)

58. Plaintiffs incorporate by reference the allegations of all preceding paragraphs as if fully set forth herein.

59. CGI is the holder of the Promissory Notes.

60. Pursuant to each Promissory Note, SOR promised to pay the holder on demand the sums set forth in that Promissory Note.

61. Under the terms of each Promissory Note, SOR waived presentment, demand, protest and notice of dishonor.

62. On August 2, 2007, CGI demanded payment of the full amount of principal and interest under the Promissory Notes.

63. SOR has not paid the sums due CGI, to CGI's damage in an amount to be determined but in no event less than $3.8 million, plus prejudgment interest of 9% per annum pursuant to New York law.

64. An actual and ripe controversy exists concerning the parties' rights and obligations under the Promissory Notes.

65. CGI is entitled to a declaration that the full amount of principal and interest is immediately by SOR under the Promissory Notes, plus prejudgment interest at the rate of 9% per annum since the date of demand.

66. CGI is further entitled to an award of expenses and attorneys' fees in pursuing this claim and with respect to all other collection efforts it may undertake, pursuant to the express provisions of each Promissory Note.

<u>Count Three: Amounts Due under Operating Agreement</u>
(By CSI Against SOR and Salander)

67. Plaintiffs incorporate by reference the allegations of all preceding paragraphs as if fully set forth herein.

68. CSI is a Member of SOR. As such, CSI is entitled to full distributions in accordance with Articles 3.2 and 3.3 of the Operating Agreement.

69. Salander is a signatory to the Operating Agreement, a Member and the Manager of SOR.

70. CSI has not received the distributions to which it is entitled under the Operating Agreement in breach thereof.

71. CSI has incurred multimillion dollar tax obligations without offsetting distributions to cover those obligations. CSI has lost the use of funds with which it paid taxes in respect of distributions that it should have received but did not receive from Salander and SOR.

72. As a direct result of Salander's breaches of the Operating Agreement, CSI has suffered damages in an amount to be established at trial, and SOR holds in constructive trust for CSI the amounts due CSI under the Operating Agreement.

<u>Count Four: Accounting</u>
(By CSI Against SOR and Salander)

73. Plaintiffs incorporate by reference the allegations of all preceding paragraphs as if fully set forth herein.

74. Salander, as Manager of SOR, owes fiduciary duties to CSI.

75. As a Member of SOR, CSI has entrusted its money and property to Salander and SOR.

76. CSI has a right to an accounting of SOR's books and records, including financial information.

77. CSI has demanded a full and complete accounting of the books and records of SOR, including financial information.

78. Defendants have not acceded to CSI's demand for an accounting.

79. CSI has no adequate remedy at law.

Count Five: Declaratory Judgment — Withdrawal as Member & Distributions Due
(By CSI Against SOR and Salander)

80. Plaintiffs incorporate by reference the allegations of all preceding paragraphs as if fully set forth herein.

81. On April 25, 2007, CSI served formal notice of withdrawal pursuant to Article 4.3 of the Operating Agreement.

82. Under Article 4.3 of the Operating Agreement, CSI's withdrawal as a Member of SOR is effective upon the expiration of six months from the date of the notice.

83. An actual and ripe controversy exists concerning the parties' rights and obligations under the Operating Agreement.

84. CSI is entitled to a declaration that its withdrawal as a Member of SOR is effective as of October 25, 2007.

85. CSI is entitled to a declaration that all amounts due CSI pursuant to Article 3.4 of the Operating Agreement, including all distributions due and owing pursuant to the Operating Agreement that are not received by CSI prior to the date of withdrawal and the fair value of its membership interest in SOR.

Count Five: Mismanagement and Breach of Fiduciary Duty
(By CSI Against Salander)

86. Plaintiffs incorporate by reference the allegations of all preceding paragraphs as if fully set forth herein.

87. As Manager of SOR, Salander owes statutory and fiduciary duties to CSI.

88. Salander has breached those duties by virtue of his misconduct and gross mismanagement, described above.

89. CSI has suffered damages as a direct result of Salander's conduct and breaches of his statutory and fiduciary duties in an amount to be determined at trial.

**Prayer for Relief**

WHEREFORE, Plaintiffs hereby prays that this Court:

a. Enter judgment in Plaintiffs' favor and against Defendants;

b. Award damages in an amount to be determined at trial, together with pre-judgment interest at the statutory rate of 9% per annum;

c. Award the declaratory and other relief requested herein;

d. Award Plaintiffs their costs and attorneys fees; and

e. Grant such other, further and different relief as the Court deems just and proper.

Dated: New York, New York
August 7, 2007

Gregory P. Joseph
Douglas J. Pepe
GREGORY P. JOSEPH LAW OFFICES LLC
485 Lexington Avenue, 30th Floor
New York, New York 10017
Phone: (212) 407-1200
Fax: (212) 407-1280

*Attorneys for Plaintiffs*

OPERATING AGREEMENT

OF

SALANDER-O'REILLY GALLERIES LLC

(A New York Limited Liability Company)

ARTICLE I

DEFINITIONS

1.1. Defined Terms. Capitalized terms used in this Agreement shall have the meanings provided below. Except as so provided, terms used herein shall have the meanings given to such terms in the New York Limited Liability Company Law.

This "Agreement" means this Operating Agreement, as amended to the date in question.

"Articles" means the Articles of Organization of the Company, on file with the Secretary of State of the State of New York, as amended to the date in question.

"Company" means Salander-O'Reilly Galleries LLC, a New York limited liability company.

The "interest" of a Member in the Company means the percentage interest of such Member in the profits of the Company, as set forth on Schedule I.

"LLC Law" means the New York Limited Liability Company Law.

"Majority in interest" shall mean those Members whose interests in the Company aggregate in excess of 50%.

"Manager" means Larry Salander.

"Members" means the Members of the Company from time to time, as set forth on Schedule I.

"Schedule I" means Schedule I to this Agreement, setting forth the names and interests of Members, as such Schedule may be amended from time to time in accordance with the provisions hereof.

ARTICLE II

MANAGEMENT

2.1. Management. The management of Company shall be vested in the Manager for so long as the Manager continues to be a Member and has not resigned or been disqualified or removed as such Manager. The Manager shall manage the Company in accordance herewith. In the event of the resignation, disqualification or removal of the Manager, a majority in interest shall determine whether the Company shall continue to be managed by one or more managers (and if not, shall cause the Articles to be amended to reflect such determination), and if the Members so determine, the Members shall elect a substitute manager or managers pursuant to the provisions of the LLC Law.

2.2. Authority of Manager. The Manager shall have sole power and authority to execute instruments on behalf of the Company and to otherwise bind the Company. No person dealing with the Company shall be required to investigate the authority of the Manager or to secure the approval of or confirmation by the Members of any act of the Manager in connection with the business or affairs of the Company. No Member, other than the Manager, shall take any action of any kind as a Member or otherwise to bind the Company in any way whatsoever.

2.3. Salary of Manager. The Manager shall be entitled to an annual salary of $500,000, together with employee benefits commensurate with those he currently receives from Salander-O'Reilly Galleries, Inc. To the extent that funds for any portion of or all the aforesaid salary are not available in any year, any portion thereof which is not paid in the year when due shall be carried forward to, and paid as soon as possible in, subsequent years before the profits of the Company are determined.

2.4. Meetings of Members. The Company shall hold an annual meeting of Members at such time and place, either within or outside the State of New York, as may be fixed by the Manager. Regular meetings of Members may be held at such times as the Manager may from time to time determine. Special meetings of Members may be called by a majority in interest or by the Manager. Members may participate in any meeting thereof by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting are able to hear each other. Such participation shall constitute the presence of such Member in person at the meeting.

2.5. Quorum of Members. A majority in interest shall constitute a quorum at a meeting of Members for the transaction of any business. When a quorum is once present to organize a meeting, it is not broken by the subsequent withdrawal of any Members. The

Members present may adjourn the meeting despite the absence of a quorum.

2.6. Notice of meetings. Written notice shall be given of any meeting of Members, stating the place, date and hour of the meeting, indicating that it is being issued by or at the direction of the person or persons calling the meeting and, in the case of a special meeting, stating the purpose or purposes for which the meeting is called. A copy of the notice of any regular meeting shall be given, personally or by first-class mail, or by telephone, telecopier or telegraph confirmed in writing before or after the meeting, not less than ten or more than 60 days before the date of an annual or regular meeting, and not less than 24 hours before the date of a special meeting, to each Member entitled to vote at such meeting. If mailed, notice of an annual or regular meeting is given when deposited in the United States mail, with postage thereon prepaid, directed to the Member at his or her address as it appears in the records of the limited liability company. Notice of a special meeting is given when given to a Member by telephone or telecopier or otherwise when received by such Member. An affidavit of a manager, if any, or other person giving the notice that the notice required by this section has been given shall, in the absence of fraud, be prima facie evidence of the facts therein stated.

2.7. Waiver of notice. Notice of meeting need not be given to any Member who submits a signed waiver of notice, in person or by proxy, whether before or after the meeting. The attendance of any Member at a meeting, in person or by proxy, without protesting prior to the conclusion of the meeting the lack of notice of such meeting, shall constitute a waiver of notice by such Member.

2.8. Adjourned Meetings. A majority in interest of the Members present at a meeting, whether or not a quorum, may adjourn the meeting to another time or place. Notice of the adjourned meeting need not be given if the time and place to which the meeting is adjourned are announced at the meeting at which the adjournment is taken. At the adjourned meeting any business may be transacted that might have been transacted at the original date of the meeting.

2.9. Action without a meeting. Whenever Members are required or permitted to take any action by vote, such action may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by the Members who hold the voting interests having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all of the Members entitled to vote therein were present and voted. Such consents shall be delivered to the employee or agent of the Company having custody of the records of the Company and

Jan-14-05 12:12 From-McLAUGHLIN&STERN LLP +212-448-0066 T-170 P.021/028 F-047

shall be retained with such records. Every written consent shall bear the date of signing by each Member who signs the consent. No written consent shall be effective to take the action referred to therein unless, within 60 days following the earliest date on any consent required to take the action in question, written consents are signed and delivered to the Company, as above provided, by a sufficient number of Members to authorize or approve the action to be taken. Prompt notice of the taking of the action without a meeting by less than unanimous written consent shall be given to those Members who have not consented thereto in writing but who would have been entitled to vote thereon had such action been taken at a meeting. If any action requiring the filing of articles or a certificate under any limited liability company law is authorized or approved by written consent, such articles or certificate so filed shall so state, in lieu of any statement otherwise required concerning any vote of Members.

2.10. Voting rights. Whenever a vote of Members is required on any matter, each Member shall vote in proportion to such Member's interest in the Company. Any Member may vote in person or by proxy at a meeting of Members. Action may be taken by Members holding a majority of the interests represented at a meeting at which a quorum is present, provided that, notwithstanding any other provision hereof, the vote of a majority in interest shall be required to:

(a) approve the incurrence of indebtedness by the Company other than in the ordinary course of business; or

(b) adopt, amend, restate or revoke the articles of organization or this Agreement, subject to Section 6.1 hereof and any other applicable provisions of law;

(c) approve the dissolution of the Company in accordance with Section 701 of the LLC Law;

(d) approve the sale, exchange, lease, mortgage, pledge or other transfer of all or substantially all of the assets of the Company; or

(e) approve a merger or consolidation of the Company with or into another limited liability company or foreign limited liability company; and

the unanimous vote of all Members shall be required to:

(a) admit a person as a Member and issue such person a membership interest in the Company; or

(b) provide for the continuation of the Company following an event causing its dissolution, as provided in Section 5.2.

Jan-14-05 12:13 From-McLAUGHLIN&STERN LLP +212-448-0066 T-170 P.022/028 F-047

ARTICLE III

PROFITS AND LOSSES, DISTRIBUTIONS

3.1. Assumption of Liability. The Company shall be obligated to pay principal and interest on the $3,500,000 credit facility as to which Salander-O'Reilly Galleries, Inc., is currently the obligor, before any determination of funds available for the salary of the Manager or of profits available for distribution.

3.2. Sharing of profits and losses. The profits and losses of the Company shall be allocated among the Members in proportion to their respective interests in the Company, as set forth in Section 3.3 hereof, or as amended and set forth in Schedule I hereto.

3.3. Sharing of distributions. Net profits (after payment of the salary to the Manager pursuant to Section 2.3 hereof) shall be divided equally between the Members. However, the Manager shall be entitled to receive 99% of net profits in any year before net profits in excess of 1% thereof are paid to the other Member, until the Manager has received $250,000 of net profits for such year, which right of the Manager to 99% of annual net profits until he has received $250,000 of net profits for each such year shall be on a cumulative basis without interest, beginning with 1995. Therefore, to the extent that the Manager shall not have received the full $250,000 of net profits for each such year, only 1% of net profits (and related items of income, gain, loss, deduction and credit) shall be distributed to the other Member. After the Manager has received his cumulative annual net profits of $250,000 as aforesaid, the other Member shall receive any balance of the net profits until he has received, on a cumulative basis without interest, beginning with 1995, net profits equal to those so paid to the Manager. Thereafter, the Members shall divide the profits equally.

3.4. Distribution upon withdrawal. Upon the withdrawal of a Member as a Member of the Company, such Member shall be entitled to receive (i) any distribution to which such Member is entitled hereunder and, within a reasonable time after withdrawal, (ii) the fair value of the membership interest of such Member in the Company as of the date of withdrawal, based upon such Member's right to share in distributions from the Company.

ARTICLE IV

MEMBERS AND MEMBERSHIP

4.1. Admission of Members. A person may become a Member of the Company with the approval of each existing Member as of the date established at the time of such approval and, in the case of the assignment of a membership interest, satisfaction of any conditions to the effectiveness of such assignment.

4.2. Assignment of Membership interest. Unless the assignee of a membership interest in the Company shall become a Member of the Company as provided herein, the only effect of an assignment of such membership interest is to entitle the assignee to receive, to the extent assigned, the distributions and allocations of profits and losses to which the assignor would otherwise be entitled. An assignee of a membership interest in the Company who becomes a Member shall have, to the extent assigned, the rights, powers, preferences and limitations and be subject to the restrictions and liabilities, of a Member under the Articles and this Agreement.

4.3. Withdrawal of a Member. A Member may withdraw as a Member of the Company upon not less than six months' prior written notice to the Company or with the approval of a majority in interest.

ARTICLE V

DISSOLUTION

5.1. Dissolution. The Company may be dissolved by the vote of a majority in interest.

5.2. Continuation of Company. Notwithstanding the dissolution of the Company because of the bankruptcy, death, dissolution, expulsion, incapacity or withdrawal of any Member or the occurrence of any other event that terminates the continued membership in the Company of any Member, the Company shall continue as a limited liability company in the event that, within the 90-day period following the event causing such dissolution, each Member shall consent in writing to such continuation.

5.3. Distribution of assets. Upon the winding up of the Company and satisfaction of liabilities of the Company to creditors, including Members who are creditors, whether by payment or by establishment of adequate reserves, the assets of the Company shall be distributed to Members first for the return of their contributions, to the extent not previously returned, and second respecting their interests in the Company, in the proportions in which the Members share in distributions as provided in this Agreement.

ARTICLE VI

AMENDMENTS

6.1. Amendments. Either the Articles or this Agreement may be amended from time to time with the approval of a majority in interest; provided, however, that neither the Articles nor this Agreement may be amended, without the written consent of each Member adversely affected thereby, (i) to increase the obligations of any Member to make contributions, (ii) to alter the allocation for tax purposes of any items of income, gain, loss, deduction or credit, (iii) to alter the manner of computing the distributions of any Member, or (iv) to allow the obligation of a Member to make a contribution to be compromised by consent of less than all the Members.

IN WITNESS WHEREOF, the undersigned individual Member has hereunto set his hand and the undersigned corporate party has hereunto caused this Agreement to be executed in its name and under its corporate seal by its officer thereunto duly authorized, as of this 28th day of February, 1995, to acknowledge the adoption of the foregoing Operating Agreement.

MEMBERS

Larry Salander

Curtis Squire, Inc.

By Chair/CEO

1492B

# Lawsuits and Charges of Unpaid Consignment Sales Trouble Salander-O'Reilly Galleries

by David Hewett

The art world buzz over the Berry-Hill Galleries bankruptcy has quieted now that it's been almost a full year and a half since the initial Chapter 11 filing. All of the necessary loans to pay off creditors have been granted, and the legal and accounting firms representing the varied groups involved in shepherding the reorganized Berry-Hill through the requisite stages have posted their final bills to the bankruptcy court. (Those bills amount to over $6.5 million, by the way, in case you were wondering what it costs for a major New York City art gallery to go through a Chapter 11 proceeding.)

During that time, when the matter was fresh in everyone's mind, when revelations of questionable bidding at auction and stories about paintings left for evaluation that turned into consignments without the knowledge of their owners were prevalent, it was not that pleasant to be a gallery owner in the Big Apple. One of those individuals, during a phone conversation, summed up the matter succinctly: "Nobody wants to leave their stuff with a gallery without getting a UCC filing first. It's made painting owners very nervous and distrustful about all of us."

There's a new art gallery-related story making the rounds in Gotham now, according to a Los Angeles collector, and it's raising more than a few eyebrows of normally jaded art-world aficionados. "Everybody knows about it," said Los Angeles attorney and art collector Maurice Katz. "After thirty years of happy relations with him, it's over. And he still owes me over thirty-two thousand!"

The "him" is Lawrence Salander of Salander-O'Reilly Galleries, one of the more improbable figures to be involved in problematic art dealings. To quote the introduction given him at the first annual Hedge Funds vs. Malaria leadership conference in September 2005, "Lawrence Salander is President of Salander-O'Reilly Galleries in New York, named best gallery in the world by the 2003 Robb Report. He has been a member of the prestigious Art Dealers Association of America for over twenty years, as well as the Art and Antique Dealers League of America (CINOA), and the Appraisers Association of America. Salander is the first private art dealer to sit on the Board of the National Indemnity Project of the National Endowment for the Humanities. His writing has appeared in *The New Republic*, *The New Criterion*, and *Arts Magazine*, and has been the subject of nine solo and ten group exhibitions. Salander is the quintessential New Yorker, an artist-art dealer/art collector and critic. The coauthor of *Exploring Late Turner* (1999) and author of *Walt Kuhn (1877-1949): The Landscapes* (1987), Salander is also a talented artist; his 96" x 42" oil on canvas from 1992, *Crucifixion*, is in the Smithsonian's collection, a gift from Charles Simon."

He has devoted time to various charities; the 2005 conference cited above fought malaria in Africa. Unlike some fair-weather friends, Salander has actually gone there and also written and spoken about the problem of worldwide hunger. He was born in New York City in 1949 and still lives there, with his wife, Julie. He is the father of seven children. His Salander-O'Reilly Galleries is among the top-ranked art galleries in New York, which gives it an international standing, and it is very active at that level.

In July 2002, Salander-O'Reilly senior vice-president Andrew Butterfield cast the winning bid on an armless 32" high terra-cotta figure of a muscular Moor at a Sotheby's sale in London. The figure, attributed to Gian Lorenzo Bernini, had been estimated at $250,000, but Butterfield paid $3.24 million to get it for the firm, bidding against an international cast of art firms (see *M.A.D.*, February 2003, p. 20-B).

They went abroad for stock again. In 2006, as *SalvoNews* of November 2, 2006, noted: "Christie's auction of the stock of Mike Roberts' Architectural Emporium in Kent, England, in September 2004 raised an unexpectedly large total, buoyed up by enthusiastic bidding from abroad. It now seems that much of it has ended up at the world's newest plush salvage and antique architectural and garden ornament showroom, the newly created Salander Decorative Arts in New York. Lawrence Salander, fourth generation dealer, is a significant figure in the top end of the trade. Salander O'Reilly sells antique and modern flat art and sculpture, representing living artists, estates, and sponsoring museum-quality exhibitions and books."

When *Art + Auction* published its list of the most influential people in the 2005 art world in its December 2005 issue, Lawrence Salander was on it and described as "the non-conformist." The reasoning for that observation came from Salander's devotion to Gothic, Baroque, and Renaissance works of art, in contrast to the tastes of other galleries for newer styles. Salander assembled around 200 examples of his preferences in the newly refurbished Beaux Arts mansion on East 71st Street that opened in September 2005 (see *Art + Auction*, December 2005).

But for all the positive publicity, he is facing several problems at present, problems that do not shine a favorable light on his business practices. Lawrence Salander has been named as defendant in three individual lawsuits (not counting the unpleasantness with attorney Maurice Katz). In April he was slapped with a preliminary injunction limiting his purchases to only the barest necessities. He could not make any new art acquisitions without the permission of a former client and had to deposit all sales funds in a specified bank account. (Katz is not one of those currently suing Salander. When asked about going to the courts to collect what he says is due him, he had this to say: "Sue Larry [Salander]? Not me!—I'm a lawyer, remember?")

Maurice Katz and his wife are art collectors and have published a catalog of their holdings. In May 2006, Katz consigned a circa 1920 oil by artist Alfred Maurer, *Landscape*, to the Salander-O'Reilly Galleries. As he stated in a letter to Salander associate Steven Harvey, the instructions were to "sell it on our behalf, with a minimum net to us of $125,000." Steven Harvey acknowledged the consignment and terms on May 5, 2006.

Nothing appears to have happened until early in February 2007, when Katz said he got a phone call from someone who was offered the Maurer and asked if he (Katz) had sold it. Lawrence Salander, responding to Katz's questions about where the Maurer painting was, answered via e-mail: "I have the painting out at a client's home and will have an answer for you by the end of next week. I love the picture and would be happy to extend a credit to you of equal value should it not sell."

Katz e-mailed Salander back and thanked him for the offer, but noted, "The only reason we are selling the Maurer painting is that we have no place to hang it, and it has been in storage in a closet. Accordingly, we do not need to acquire another painting at this time."

When Katz went to New York and tried to pick up the painting, he said he was told by Salander-O'Reilly personnel, "We don't know where it is." He returned to Los Angeles and demanded a check for the $125,000, by the end of Monday, February 19, in a demand sent via Federal Express Special Handling.

Katz threatened to serve Salander with a lawsuit and notify the New York City police, the Art Dealers Association of America, and the New York State Attorney General if he were not paid. On February 20, Salander acknowledged the sale in a fax. "As you know the Maurer was sold. We expect the first payment the first week in March of $62,500 and the balance to be paid within thirty days thereafter."

Katz was having none of that. He wrote back to Salander, "I made certain telephonic inquiries and have officially ascertained that you transferred possession of our Maurer oil painting over three weeks ago (probably during the last week of January 2007) to a third party, whose name is known to me. I have also ascertained that this person paid you the sum of $120,000, in cash, and is not obligated to pay you any further monies for this transaction."

Katz admits he was very angry at that point. He demanded the minimum net of $125,000 to the consignor that the consignment agreement specified. Payment could be in the form of a cashier's check or wire transfer. The next day, February 21, Salander faxed Katz back. "Pay you $62,500 in two payments. This is a complicated business."

A check for $62,500 did eventually arrive, dated March 5, and "even though there were non-sufficient funds in the account," Katz wrote in a March 8 letter to Antoinette Saufavuzza, CFO of Salander-O'Reilly Gallery, "First Republic Bank negotiated the Galleries' check for $62,500."

No other payments were forthcoming until May 24, when Katz got a check for $10,000. "I received a painting by Ralston Crawford, of a supposed value of $20,000, for a total payment of $92,500. Salander still owes me $32,500," Maurice Katz stated in a letter dated June 14.

—The Dougall Arts Suit

Why was a large art firm with the reputation of Salander-O'Reilly stressed for funds during the first half of 2007? Were there other more pressing problems for the company in this period?

Salander-O'Reilly Galleries was indeed facing one very big demand on May 9, 2007, when Judge William H. Pauley III of the U.S. District Court for the Southern District of New York entered a judgment that Dougall Arts Ltd. could recover €497,144.31 (approximately $665,860 in U.S. funds) from Salander-O'Reilly. And this matter, like the business with Maurice Katz, involved missed payments on material that was already sold.

Dougall Arts Ltd. is a United Kingdom arts firm with principal offices in London. On March 1, 2004, Salander-O'Reilly bought a large terra-cotta sculpture of St. Jerome from Dougall Arts for an agreed upon price of €850,000, to be paid in three installments.

The sculpture was attributed to 16th-century Italian sculptor Girolamo Campagna by art consultant and historian Dr. Charles Avery. (Somewhat complicating the issue is that the sculpture had previously been attributed to another sculptor, and after the sale it was reattributed by Salander to yet another artist.)

The first payment of €400,000 was executed by wire transfer to the London office. No further payments were made, despite all efforts by Dougall to force Salander-O'Reilly to make the payments. Follow-up letters were sent in August, September, and October 2004 to Lawrence Salander from Dougall Arts attorney Jorge Loaiza after the second installment was missed. Those letters went unanswered.

At the Maastricht art fair in March 2004, Salander had asked $4,000,000 for the sculpture, Dougall Arts alleges. Salander was also alleged to have rejected an offer of $2,000,000 at the 2004 fair and another offer of $1,250,000 made in September 2004.

On June 3, 2005, Dougall Arts Ltd. entered its suit against Salander-O'Reilly Galleries. Attorneys for Dougall stated that according to an invoice to Mr. Murray Frum, a Canadian businessman well known for collecting African art, Salander had sold the sculpture to him for $850,000 on January 3, 2005.

Attorneys for Salander argued that the person offering the sculpture when Salander first saw it at an art fair falsely stated it was fresh to the market and supplied an incorrect provenance and attribution, thus the Dougall contract was invalid.

The judgment delivered by Judge William H. Pauley III on May 9 found that the amount due to Dougall Arts Ltd. was €497,144.34. Since both parties had entered into a stipulated settlement providing monthly payments to Dougall before a verdict could be delivered, the case was discontinued, but the court did rule that if Salander-O'Reilly defaulted on any monthly payment before the next one was due, then the entire remaining payments plus interest would become due.

—The Davis Suit

The newest suit in the works was filed only on May 29, 2007. Plaintiff Earl Davis filed suit against Lawrence Salander and Salander-O'Reilly Galleries for "not less than millions of dollars" each for five claims, and asked for an accounting and the return of various art properties. Earl Davis is the son of noted American artist Stuart Davis (1894-1964).

When Stuart Davis died in 1964 there were hundreds of works of art remaining in his estate. Son Earl Davis and Lawrence Salander "have had a business and trust relationship for many years," Davis stated in his complaint. Earl Davis gave Salander-O'Reilly many works of art "for evaluation and possible sale." According to his suit, he did not give Salander open-ended authority to sell whatever he brought him.

Earl Davis said the works "have an incalculable personal and emotional significance to [him]", and he "made it clear to the Defendants that, although he delivered to SOR [Salander-O'Reilly] for sale consideration hundreds of the works of art that had been created by his father, he did not want all of the works of art to be sold."

Earl Davis maintained he also wanted to be involved in any discussions about potential prices for his father's work. Davis said they agreed on the commissions to be earned by Salander-O'Reilly. For paintings, 20% of sales proceeds up to $1 million and 10% for sales proceeds in excess of $1 million. For works of art on paper, 30% of sales proceeds up to $20,000 and 20% of sales proceeds in excess of $20,000.

Earl Davis said that he asked for a full accounting and inventory in 2005. "After many months, Defendants eventually provided a list of the items of Property and the purported locations of each," the suit claims. Two years later, Davis subsequently learned, he states, that "solely as a result of his own initiatives, that dozens of items of Property had been sold without Defendants informing or consulting Plaintiff and without any payment being made to Plaintiff, and also learned that, according to Defendants, other

items of Property may be lost.'"

In December 2005 and during the spring of 2006, Earl Davis said he told Salander to cease selling his property, return it to him, and pay for the material sold. Salander-O'Reilly failed to do that, Davis states.

Earl Davis also claims that in 2006 he was "induced" by Salander to enter into two sales arrangements of 13 paintings for a total $2,900,000. He claims he has never been paid any of that amount.

Davis is suing Salander under the New York Art and Cultural Affairs Law, claiming breach of contract, fraudulent inducement to contract, breach of fiduciary duty, and conversion, and seeking an accounting and recovery of chattels.

On July 3, attorneys for Earl Davis filed a flurry of papers in the Court. They claim that Lawrence Salander has "withheld from Plaintiff at least $9,378,875 of Plaintiff's trust funds" and that 43 paintings are unaccounted for.

Salander-O'Reilly has yet to answer any of these charges as of the date of this report. We spoke with Lawrence Salander on June 26. He called the charges just "a meaningless squabble" and said that Earl Davis "is one of my closest friends."

—The Lane Suit

The last suit against the Salander-O'Reilly Galleries and Lawrence Salander involves a very large sum. The suit was filed in U.S. District Court, Central Division of Massachusetts, by collector Saundra B. Lane. It involves an oil on canvas painting by Charles Sheeler titled *Newhaven* that Lane sold Lawrence Salander for $9,173,261.

Lane is a collector of vintage photography and a generous collector too. Her gifts to various institutions have included Ansel Adams's works to the Museum of Fine Arts, Boston and, in 2005, "The Master Sets," a total of 1465 gelatin silver prints by the influential American New Topographics movement photographer Robert Adams (b. 1937, no relation to Ansel Adams) given to the Yale University Art Gallery.

On April 1, 2005, Lawrence Salander signed a quite simple one-page five-item bill of sale as buyer. He also signed a not-quite-so-simple four-page promissory note on the same date, agreeing to 5% interest per year on the unpaid balance of the $9,173,261 note.

He also agreed to an 11-payment schedule beginning on June 30, 2005, and ending on January 31, 2007, with ten payments ranging between $250,770 and $672,310, with the final January 2007 payment ballooning to $4,884,900. Altogether Salander was to pay a total of $9,807,980 for a $9,173,261 painting, if the schedule was kept.

Salander could prepay down the note and agreed, if late with payments, to pay a late charge. As collateral, he pledged five items: the Sheeler *Newhaven* painting; a Michelangelo Buonarroti bronze sculpture, *River God*; a Benvenuto Cellini brown ink on paper, *Motto Study*; an oil on canvas by Albert Pinkham Ryder, *Windmill*; and a pair of oils on panel by James Abbott McNeill Whistler, *Seascape, Dieppe*.

Saundra Lane employed very efficient attorneys who drew up explicit promissory note conditions, guaranty details, and security agreement terms. Defaulting on the note meant the entire unpaid principal and all charges were due immediately. The UCC security agreement was filed with Massachusetts authorities. Upon default, Lane was authorized to enter any premises where the collateral was kept and remove it. A public sale of the collateral could then be conducted upon 15 days' notice to Salander. It appears Lane's lawyers were meticulous in drawing up the portfolio of terms and conditions of sale.

On February 28, 2006, the list of collateral was amended to consist of the Sheeler *Newhaven*, the Ryder *Windmill*, and the pair of Whistler oils on panel, but the Buonarroti bronze and the Cellini ink on paper were removed. In their place were substituted Théodore Géricault's *The Flemish Farrier*, a Ryder oil on leather, *Toilers of the Sea*, and another Ryder, an oil on canvas, *Witch's Mountain*.

On August 22, Saundra B. Lane signed a verified complaint, and it was filed in U.S. District Court, District of Massachusetts, on the next day. Lane's verified complaint is quite explicit in describing the reasons for filing the charges.

"Salander failed timely to make the installment payment due March 31, 2006 in the amount of $672,310" (he subsequently paid $600,000 of that payment, though). "Salander has also failed to make the installment payments due June 30, 2006 and July 31, 2006...Salander has acknowledged his obligations under the Promissory Note and promised to make the overdue payment, but has failed to do so."

"On that day, August 23, her attorneys filed a motion for a preliminary injunction. It asked the court to order Lawrence Salander to deliver or make available to Lane the Sheeler and the six other works of art.

Evidently both parties decided that there was room for compromise, and on December 12, 2006, Salander and Lane jointly asked the court to continue the scheduling for further actions to January 4, 2007, because "the parties have been engaged in settlement discussion for some time and believe that they are close to resolving this matter by agreement."

They may have believed that at that date, but by March 28, 2007, they were further apart than ever. On that date, attorneys for Saundra Lane asked Judge F. Dennis Saylor IV to issue a temporary restraining order and renewed their motion for a preliminary injunction. What had changed?

Lane had agreed to an amendment and allonge to the promissory note that had set a new schedule for payments (an allonge is an attachment to a promissory note when the original has no room for additional information). Unfortunately, her attorneys alleged, "Salander and the gallery failed to make full and timely payments under the Amendment and Allonge." Moreover, Salander and the gallery "have also failed to make available all the Collateral for appraisal. Lane retained O'Toole-Ewald Art Associates, Inc., to appraise the Collateral. To date, Defendants have produced for appraisal only two of the seven works encumbered by the Security Agreement—Albert Pinkham Ryder's *Witch's Mountain* and *Toilers of the Sea*."

On March 28, 2007, Dr. Elin Lake Ewald described in her affidavit what happened when she went to examine the paintings.

"On the morning set for inspection, none of the six paintings could be located at the Gallery...." Lawrence Salander then told her that two of the Ryders were at his personal residence. "After a search with Salander-O'Reilly staff members, [we] were able to locate, examine, and photograph the two works.

"I requested Certificates of Authenticity for these two paintings viewed at the Salander residence from Ms. Elizabeth Broun, Director of the Smithsonian American Art Museum and the leading expert on the artist. Ms. Broun declined to provide such Certificates, rendering the sale of the paintings difficult, if not impossible, to achieve on the open market.

"At this time, I must consider the paintings as only 'attributed' to Ryder, not having been authenticated as being by the hand of the artist," Dr. Ewald wrote.

In her March 28 memorandum stating why a temporary restraining order and preliminary injunction on Salander were necessary, Saundra Lane noted that Salander "could not make the first payment timely, bounced a check for another payment, requested further concessions in the payment schedule, and then simply failed to make the February 28, 2007 payment. Moreover, the Defendants were able to produce for appraisal only two of Lane's seven pieces of Collateral. As to those pieces, it appears they have little or no value, not the $3,500,000 value that Salander claimed they had just a few weeks ago."

On April 13, Judge Saylor ordered a preliminary injunction served on Lawrence Salander and the Salander-O'Reilly Galleries, ordering them to deposit all sales proceeds and/or other revenues into their regular business bank accounts. They could not remove any funds from that account without "express written permission of plaintiff Sandra [sic] B. Lane or her counsel," except for normal and ordinary business debts and expenses, rent, taxes, or payment of preexisting written obligations.

The defendants "are hereby ordered to make available to Plaintiff Sandra [sic] B. Lane within three days of the Court's order...the collateral described in the security agreement...as amended February 26, 2006...."

Lawrence Salander and his attorneys petitioned the court on May 24 to modify the injunction, because, they stated, "a dispute has arisen between the parties as to the interpretation and scope of paragraph 2 of the Preliminary Injunction."

It seems that when Lane, her appraisers, and possibly also her attorneys came to Salander's office to examine the collateral, Salander's attorney requested that she arrange for insured storage of it and that no further action be taken without their agreement or court order.

As Salander's attorneys stated in their motion to modify on May 24, Saundra Lane "apparently contends that there has been an Event of Default, as defined in the Security Agreement and the underlying Promissory Note...as amended by the Amendment and Allonge...then she may proceed without further action against the collateral." In other words, Lane intended to do just what the agreement allowed after a default—take the collateral and sell it.

Salander's attorneys asked the court to modify the injunction by adding the following sentence: "The plaintiff shall not take action against the collateral, whether by sale or otherwise, absent agreement of the parties or Court order."

Lane's attorneys began their opposition to the motion to modify with a compelling sentence in the argument section: "Litigants do not get to pick and choose the orders with which they will comply."

They argued that Salander had admitted he has defaulted; in the October 3, 2006, allonge, they quoted his (or his attorney's) phrase "certain *Events of Default have occurred* [our emphasis] under Section 6 (b) of the Note." They state that under the Massachusetts law concerning UCC filing, "Lane Need Not Seek Court Approval" to take action against the collateral.

On Friday, June 22, Judge F. Dennis Saylor IV denied Salander's motion to modify and ruled that Saundra Lane "may take possession of the collateral...." Judge Saylor offered no opinion on what conditions "must be satisfied before plaintiff may dispose of the collateral...."

It looks as if the $9 million painting is headed back to its owner. When we asked Lawrence Salander about the decision, he passed it off with a simple, "Ms. Lane will do whatever she does; she's a fine person."

On June 25, Heather Repicky, one of the attorneys with the Boston firm Nutter McClennen & Fish, representing Saundra Lane, noted that because the case was ongoing, she could not comment on it. Asked about the last ruling, she did add, "We do not physically have the paintings in our hands at this date, but we are pleased with the judge's order and are hoping for a quick resolution of the matter."

And last, asked about whether he was having a cash flow problem, Lawrence Salander had a word of warning: "You have to be careful when you say things like that." We told him we were doing just that by asking him the question directly. He said, "The answer is no."

Jerome Thompson
Amer. (1814-1886)
"Indian Maiden"
Oil on Canvas
21 x 17-1/2 Inches
Circa 1870

Post Road Gallery
19th Cent. Paintings, Sculpture and Decorative Arts · 2128 Boston Post Road Larchmont, NY 10538
Tel: (914) 834-7568 Fax: (914) 834-9745
www.postroadgallery.com

268

OPTION AGREEMENT

This Option Agreement is entered into as of the 21 day of March, 2006, by and between Curtis Galleries, Inc. ("Curtis") and Salander-O'Reilly Galleries, LLC ("Salander").

RECITALS

A. Curtis is the owner of a painting by Georgia O'Keefe entitled *Shelton Hotel*, 32 1/8 inches by 17 1/8 inches.

B. Curtis desires to grant to Salander an option to purchase the painting on the following terms and conditions and Salander desires to accept the option on said terms and conditions.

NOW, THEREFORE, the parties agree as follows:

AGREEMENT

1. Grant of Option. Curtis hereby grants an option to Salander to purchase the painting on the following terms and conditions.

2. Purchase Price. The purchase price for the painting, should Salander exercise this option, shall be seven million dollars ($7,000,000).

3. Option Payments. Commencing March 10, 2006, Salander shall pay five hundred thousand dollars ($500,000) to Curtis and shall make payments in said amount on the 10th day of each month through July, 2006.

4. Exercise of Option. This option may not be exercised prior to July 15, 2006, and shall be exercised, if at all, between July 16, 2006, and August 10, 2006. Exercise of the option shall be by written notice from Salander to Curtis mailed or sent by overnight courier to Curtis at the following address:

Curtis Galleries, Inc.
7201 Metro Boulevard
Minneapolis, MN 55439
Attn: Myron Kunin

5. Payment of Purchase Price. If Salander exercises its option, all option payments made prior to exercise shall be a credit against the purchase price and Salander shall continue to make monthly payments on or before the 10th day of each month until the entire purchase price has been paid.

6. Failure to Exercise Option. If Salander fails to exercise its option, Curtis shall retain all option payments, and Salander shall immediately return the painting to Curtis, and neither party shall have any further obligation to the other with respect to the transaction that is the subject of this Agreement.

7. Title and Insurance. If Salander exercises its option, Curtis shall retain title to the painting until such time as Salander has paid the entire purchase price, at which time title will pass to Salander. Upon exercise of the option, Salander shall immediately insure the painting in an amount not less than the unpaid balance of the purchase price, with the policy of insurance naming Curtis as an additional insured to the extent of such unpaid balance.

8. Applicable Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Minnesota.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

CURTIS GALLERIES, INC.

By: ______________________
Myron Kunin, President

SALANDER-O'REILLY GALLERIES LLC

By: ______________________
Lawrence Salander, Chief Manager

SALANDER-O'REILLY GALLERIES, LLC

22 East 71 Street New York, NY 10021 Telephone 212-879-6606 FAX 212-400-4490

August 1, 2006

COPY

Mr. Myron Kunin
Curtis Galleries
7201 Metro Boulevard
Minneapolis, MN 55439

VIA FAX: (952) 947-7900
And US mail

Dear Mike,

This is to confirm our choice to exercise our option to purchase the painting by Georgia O'Keeffe, *Shelton Hotel* as of this date, August 1, 2006.

Best,

Larry Salander

Minneapolis, Minnesota 55439
Telephone: (952) 918-4166
Facsimile: (952) 918-4011
bert.gross@regiscorp.com

VIA E-MAIL AND U.S. CERTIFIED MAIL

April 25, 2007

Mr. Larry Salander
Salander-O'Reilly Galleries, LLC
22 East 71st Street
New York, NY 10021

Dear Larry:

After giving the matter long and careful consideration, Myron has regretfully come to the conclusion that you and he should part company with respect to the ownership of the Salander–O'Reilly Galleries. There are several reasons for this decision.

Among other problems, Curtis Galleries has been and will be incurring very significant amounts of taxable income from the SOR Galleries' operations, but receives no distributions to cover the taxes on this income. A further matter is your gallery's failure to make timely payments to Curtis Galleries for its paintings sold by SOR, such as the O'Keefe painting where $3.5 million is owed and where Curtis simply has not been receiving the agreed-upon installments. Myron is also concerned about the $750,000 owed Curtis for the Turner painting recently sold by SOR. We will not terminate the Financing Statement filed against the Turner until Curtis Galleries has received the full amount of the purchase price. Another significant concern is SOR's failure to provide reasonably current financial statements to Myron; the latest financials provided to date go no further than last September.

Your lawyers have recently sent me certain documents requested by your bank to be executed by Curtis Galleries in connection with an additional loan to SOR. Myron will not sign these documents or consent to any future modifications of your banking arrangements without a clear understanding regarding resolution of the problems mentioned above.

Section 4.3 of the SOR Galleries Operating Agreement, which governs the parties' legal relations relating to SOR, provides that any member desiring to withdraw from the company must give at least six months' prior notice of the member's intention to withdraw. You should consider this letter as formal notice of Curtis Galleries' intention to withdraw.

Myron believes that you and he should make every effort to conclude a prompt agreement regarding the buyout of Curtis Galleries' interest in SOR. The parties should also resolve the various ongoing matters involving payments to Curtis Galleries for the sales of the O'Keefe and Turner paintings and the delivery of the Lachaise bronze to the Minneapolis Institute of Arts.

Myron still hopes to remain a customer of SOR after the legal separation of ownership is concluded. He has enjoyed the long-time relationship and believes that you feel the same way. However, he cannot continue as a partner.

In the near future, we will contact you to give you Myron's thoughts on a buyout of Curtis's interest in SOR. In the interim, please feel free to give us your ideas on this subject.

Best regards,

Sincerely,

Bert M. Gross

BG:ar

cc: Myron Kunin
Antonette Favuzza
Lauren Ruff, Esq.

of SOR has not been provided since

**Frank Fuller Classics Company**
**Summary of Balance Owed**
**August 1, 2007**

| Contract Number | Invoice Number | Invoice Date | Invoice Amount | Interest thru 08/01/07 | Ending Balance |
|---|---|---|---|---|---|
| 351883 | 1445936 | 03/01/07 | 31,248.00 | 1,921.75 | 33,169.75 |
| 351883 | 1445937 | 03/01/07 | 31,248.00 | 1,921.75 | 66,339.50 |
| 351883 | 1464020 | 04/01/07 | 31,248.00 | 1,437.41 | 99,024.91 |
| 351883 | 1464021 | 04/01/07 | 10,416.00 | 479.14 | 109,920.05 |
| 351883 | 351M0707 | 05/01/07 | 41,664.00 | 1,291.58 | 152,875.63 |
| 351883 | 351M0707 | 06/01/07 | 25,692.80 | 398.24 | 178,966.67 |
| 351883 | 351M0707 | 07/01/07 | 145,824.00 | 72.91 | 324,863.58 |
| 351883A | 1445938 | 03/01/07 | 20,000.00 | 1,230.00 | 346,093.58 |
| 351883A | 1445939 | 03/01/07 | 20,000.00 | 1,230.00 | 367,323.58 |
| 351883A | 1464022 | 04/01/07 | 20,000.00 | 920.00 | 388,243.58 |
| 351883A | 351M0707 | 05/01/07 | 20,000.00 | 620.00 | 408,863.58 |
| 351883A | 351M0707 | 06/01/07 | 20,000.00 | 310.00 | 429,173.58 |
| 351883A | 351M0707 | 07/01/07 | 20,000.00 | 10.00 | 449,183.58 |
| 367808 | 1449579 | 03/27/07 | 1,625.63 | 78.84 | 450,888.06 |
| 367812 | 1449580 | 03/27/07 | 4,876.88 | 236.53 | 456,001.46 |
| 367816 | 1449581 | 03/27/07 | 4,335.00 | 210.25 | 460,546.71 |
| 358270 | 1451188 | 03/30/07 | 5,230.77 | 245.85 | 466,023.33 |
| 358270 | 1451189 | 03/30/07 | 5,230.77 | 245.85 | 471,499.94 |
| 358270 | 1464023 | 04/01/07 | 5,230.77 | 240.62 | 476,971.33 |
| 358270 | 358M0707 | 05/01/07 | 5,230.77 | 162.15 | 482,364.25 |
| 358270 | 358M0707 | 06/01/07 | 5,230.77 | 81.08 | 487,676.10 |
| 358270 | 358M0707 | 07/01/07 | 41,846.16 | 20.92 | 529,543.18 |
| 361331 | 1450853 | 03/30/07 | 10,988.85 | 516.48 | 541,048.51 |
| 361331 | 1450854 | 03/30/07 | 10,988.85 | 516.48 | 552,553.84 |
| 361331 | 1464024 | 04/01/07 | 10,988.85 | 505.49 | 564,048.17 |
| 361331 | 361M0707 | 05/01/07 | 10,988.85 | 340.65 | 575,377.68 |
| 361331 | 361M0707 | 06/01/07 | 10,988.85 | 170.33 | 586,536.85 |
| 361331 | 361M0707 | 07/01/07 | 87,910.80 | 43.96 | 674,491.61 |
| 361331A | 1450855 | 03/30/07 | 5,494.42 | 258.24 | 680,244.27 |
| 361331A | 1450856 | 03/30/07 | 5,494.42 | 258.24 | 685,996.92 |
| 361331A | 1464025 | 04/01/07 | 5,494.42 | 252.74 | 691,744.09 |
| 361331A | 361M0707 | 05/01/07 | 5,494.42 | 170.33 | 697,408.84 |

Formerly Known as Viacom Outdoor

Salander's misconduct have been hidden from them. Basic financial

of SOR has not been provided since September of 2006. CSI's membership in SOR has cost it

**Frank Fuller Classics Company**
**Summary of Balance Owed**
**August 1, 2007**

| Contract Number | Invoice Number | Invoice Date | Invoice Amount | Interest thru 08/01/07 | Ending Balance |
|---|---|---|---|---|---|
| 361331B | 361M0807 | 07/01/07 | 10,988.84 | 5.49 | 708,403.17 |
| 361331C | 361M0807 | 08/01/07 | 32,966.52 | | 741,369.69 |
| 361331D | 1450857 | 03/30/07 | 10,988.85 | 516.48 | 752,875.02 |
| 361331D | 1464026 | 04/01/07 | 10,988.85 | 505.49 | 764,369.35 |
| 361331D | 1464027 | 04/01/07 | 10,988.85 | 505.49 | 775,863.69 |
| 361331D | 361M0707 | 05/01/07 | 10,988.85 | 340.65 | 787,193.19 |
| 361331D | 361M0707 | 06/01/07 | 10,988.85 | 170.33 | 798,352.37 |
| 361331D | 361M0707 | 07/01/07 | 87,910.80 | 43.96 | 886,307.13 |
| 361331E | 1450858 | 03/30/07 | 10,988.85 | 516.48 | 897,812.45 |
| 361331E | 1464028 | 04/01/07 | 10,998.85 | 505.95 | 909,317.25 |
| 361331E | 361M0707 | 05/01/07 | 10,998.85 | 340.96 | 920,657.06 |
| 361331E | 361M0707 | 06/01/07 | 10,998.85 | 170.48 | 931,826.40 |
| 361331E | 361M0707 | 07/01/07 | 87,990.80 | 44.00 | 1,019,861.19 |
| | | **Totals** | $ 999,797.66 | $ 20,063.53 | |

Formerly Known as Viacom Outdoor

of SOR has not been provided since September of 2006. CSI's membership in SOR has cost it